| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **Michael Jay Berger (SBN 100291)**<br>**Sofya Davtyan (SBN 259544)**<br>**Law Offices of Michael Jay Berger**<br>**9454 Wilshire Boulevard, 6th floor**<br>**Beverly Hills, CA 90212**<br>**(310) 271-6223 Fax:  (310) 271-9805**<br>michael.berger@bankruptcypower.com<br>sofya.davtyan@bankruptcypower.com | |

☐ Respondent appearing without attorney
☒ Attorneys for Respondent: Jamie Mazur

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| In re:<br><br>    **Jamie Mazur**<br><br><br><br><br><br><br><br><br><br><br><br><br>                                        Debtor(s). | CASE NO.: **2:25-bk-10181-NB**<br><br>CHAPTER: **11**<br><br>### RESPONSE TO MOTION REGARDING THE AUTOMATIC STAY AND DECLARATION(S) IN SUPPORT<br><br>DATE:  **July 15, 2025**<br>TIME:  **1:00 p.m.**<br>COURTROOM:  **1545**<br>PLACE:  **255 East Temple Street, Los Angeles, CA 90012** |

**Movant:**    **Finance California, a California Corporation**

**Respondent:**    ☒ Debtor    ☐ trustee    ☐ other:

> NOTE REGARDING FILING AND SERVICE OF RESPONSE, EXHIBITS AND DECLARATIONS:
> A copy of the Response, exhibit(s) and declaration(s) must be served upon:
> (1) Movant's attorney (or Movant, if Movant does not have an attorney);
> (2) the trustee; and
> (3) the judge who presides over this bankruptcy case.
> Then the document must be filed with the court.

1. ☐ **NONOPPOSITION**

---

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2014*                                                    Page 1                                **F 4001-1.RFS.RESPONSE**

The Respondent does not oppose the granting of the Motion.

2. ☐ **LIMITED OPPOSITION**

a. ☐ Respondent opposes the Motion only to the extent that it seeks immediate relief from stay. Respondent requests that no lock out, foreclosure, or repossession take place before (*date*):_____ and the reason for this request is (*specify*):

b. ☐ As set forth in the attached declaration of the Respondent or the Debtor, the motion is opposed only to the extent that it seeks a specific finding that the Debtor was involved in a scheme to hinder, delay or defraud creditors.

The Debtor:
(1) ☐ has no knowledge of the Property.
(2) ☐ has no interest in the Property.
(3) ☐ has no actual possession of the Property.
(4) ☐ was not involved in the transfer of the Property.

c. ☐ Respondent opposes the Motion and will request a continuance of the hearing since there is an application for a loan modification under consideration at this time. Evidence of a pending loan modification is attached as Exhibit _____.

3. ☒ **OPPOSITION** The Respondent opposes granting of the Motion for the reasons set forth below.

a. ☐ The Motion was not properly served (*specify*):

(1) ☐ Not all of the required parties were served.
(2) ☐ There was insufficient notice of the hearing.
(3) ☐ An incorrect address for service of the Motion was used for (*specify*):

b. ☒ Respondent disputes the allegations/evidence contained in the Motion and contends as follows:
(1) ☒ The value of the Property is $ 4,500,000_____ , based upon (*specify*): **Appraisal of Property as of April 15, 2025, reflected in the Residential Appraisal Report attached to the Declaration of Peter B. Burness, that was filed to the Court on May 21, 2025 [docket no. 78], and attached hereto.**
(2) ☒ Total amount of debt (loans) on the Property is $ 3,404,571.55_____.
(3) ☐ More payments have been made to Movant than the Motion accounts for. True and correct copies of canceled checks proving the payments that have been made are attached as Exhibit _____.
(4) ☐ There is a loan modification agreement in effect that lowered the amount of the monthly payments. A true and correct copy of the loan modification agreement is attached as Exhibit _____.
(5) ☒ The Property is necessary for an effective reorganization. Respondent filed or intends to file a plan of reorganization that requires use of the Property. A true and correct copy of the plan is attached as Exhibit _____.
(6) ☐ The Property is fully provided for in the chapter 13 plan and all postpetition plan payments are current. A true and correct copy of the chapter 13 plan is attached as Exhibit _____and proof that the plan payments are current through the chapter 13 trustee is attached as Exhibit _____.
(7) ☐ The Property is insured. Evidence of current insurance is attached as Exhibit _____.
(8) ☐ Movant's description of the status of the unlawful detainer proceeding is not accurate.
(9) ☐ Respondent denies that this bankruptcy case was filed in bad faith.
(10) ☐ The Debtor will be prejudiced if the Nonbankruptcy Action is allowed to continue the nonbankruptcy forum.
(11) ☐ Other (*specify*):

c. ☒ Respondent asserts the following as shown in the declaration(s) filed with this Response:

(1) ☐ The bankruptcy case was converted from chapter _____to chapter _____.
(2) ☐ All postpetition arrearages will be cured by the hearing date on this motion.
(3) ☐ The Property is fully provided for in the chapter 13 plan and all postpetition plan payments ☐ are current, or ☐ will be cured by the hearing date on this motion.
(4) ☒ The Debtor has equity in the Property in the amount of $ 1,095,428.45_____.
(5) ☒ Movant has an equity cushion of $ 1,271,211.75_____ or 28.25_____% which is sufficient to provide adequate protection.
(6) ☒ The Property is necessary for an effective reorganization because (*specify*): The Property has been the Debtor's principal residence since 2019, and Debtor filed bankruptcy in order to protect his equity in the

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2014                                          Page 2                                **F 4001-1.RFS.RESPONSE**

Property. Debtor's intent is to sell the Property and use the proceeds to pay his creditors. To this end, Debtor has filed an Application for Order Authorizing Debtor to Employ Crosby Doe Associates Inc. as Real Estate Broker ("Application to Employ Broker") [docket no. 72], which was granted by Court order on June 13, 2025 [docket no. 86]. The sale of the Property is necessary for the Debtor to pay his creditors and emerge as a Reorganized Debtor. Without the Property, Debtor will not be able to raise the funds to pay his creditors.

(7) ☒ The motion should be denied because (specify):

Debtor has sufficient equity in the Property. The claims secured by the Property total approximately $3,404,571.55, based upon the amount claimed by Movant in the Motion ($679,391.25; see Motion, p.7 section 8), and the amounts claimed by secured creditors in their respective Proofs of Claim (Franchise Tax Board, POC#3, secured $166,857.68; US Bank POC#2, secured $2,469,835.32; California Dept. of Tax and Fee Administration POC#12, $8,925.62). The fair market value of the Property is approximately $4,500,000, meaning Debtor has approximately $1,095,428.45 in equity. (See, Appraisal of Property, attached to the Declaration of Peter B. Burness as **Exhibit 1.**) The Property possesses unique architectural features which support its $4,500,000.00 fair market value.[1]

Debtor has held several showings per week to potential buyers of the Property. Debtor has been in contact with two potential buyers who have expressed interest in purchasing the Property at its listed price. The Property was recently featured in a May 30, 2025 article in luxury lifestyle magazine Robb Report, and has also been featured in several architectural publications. Debtor intends to pay Movant and other creditors in full, using funds raised by selling the Property.

Movant does not properly authenticate its Exhibit No. 3 attached to the Motion, which is titled "SN Servicing Corporation -- Competitive Marketing Analysis" prepared by one "Ashleigh Rader, Compass." Without a declaration from Ashleigh Rader, it is unclear how she is qualified to provide her Competitive Marketing Analysis. Movant's Exhibit 4 is not supported by a declaration of Ashleigh Rader, and cannot be considered as evidence in support of the Motion.

The Motion provides no reason why the mandatory 14-day stay dictated by FRBP 4001(a)(3) should be waived.

(8) ☐ An optional memorandum of points and authorities is attached in support of this Response.

---

## 4. EVIDENCE TO AUTHENTICATE EXHIBITS AND TO SUPPORT FACTS INSERTED IN THE RESPONSE:

Attached are the following documents in support of this Response:

☒ Declaration by the Debtor                    ☐ Declaration by the Debtor's attorney
☐ Declaration by trustee                       ☐ Declaration by trustee's attorney
☒ Declaration by appraiser                     ☐ Other (specify):
///
///
///
///
Date:  **June 30, 2025**

**Law Offices of Michael Jay Berger**
Printed name of law firm for Respondent (if applicable)

**Sofya Davtyan**
Printed name of individual Respondent or attorney for Respondent

Signature of individual Respondent or attorney for Respondent

---

1 Due to the unique nature of the Property, Debtor believes that it can be marketed for an asking price of $5.4 million, above the Property's appraised price of $4.5 million.

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 3                          **F 4001-1.RFS.RESPONSE**

## DECLARATION OF JAMIE MAZUR

I, Jamie Mazur, declare and state as follows:

1.    I am the Debtor and Debtor-in-Possession (the "Debtor"). I am over the age
of 18. I have personal knowledge of the facts I state below, and if I were to be called as a
witness, I could and would competently testify about what I have written in this
declaration.

2.    I have equity in the Property in the amount of $1,095,428.45.

3.    Movant has an equity cushion of 1,271,211.75 or 28.25%, which is
sufficient to provide adequate protection.

4.    The Property has been my principal residence since 2019, and I filed
bankruptcy in order to protect my equity in the Property. My intent is to sell the Property
and use the proceeds to pay my creditors. To this end, I have filed an Application for
Order Authorizing Debtor to Employ Crosby Doe Associates Inc. as Real Estate Broker
("Application to Employ Broker") [docket no. 72], which was which was granted by
Court order on June 13, 2025 [docket no. 86]. The sale of the Property is necessary for
me to pay my creditors and emerge as a Reorganized Debtor. Without the Property, I will
not be able to raise the funds to pay my creditors.

5.    I have sufficient equity in the Property. The claims secured by the Property
total approximately $3,404,571.55, based upon the amount claimed by Movant in the
Motion ($2,549,397.00, see Motion, p.7 section 8), and the amounts claimed by secured
creditors in their respective Proofs of Claim (Franchise Tax Board, POC#3, secured
$166,857.68; US Bank POC#2, secured $2,469,835.32; California Dept. of Tax and Fee
Administration POC#12, $8,925.62). The fair market value of the Property is
approximately $4,500,000, meaning Debtor has approximately $1,095,428.45 in equity.
(See, Appraisal of Property, attached to the Declaration of Peter B. Burness as **Exhibit**

1.) The Property possesses unique architectural features which support its $4,500,000.00 fair market value.[1]

6.      I have held several showings per week to potential buyers of the Property. I have been in contact with two potential buyers who have expressed interest in purchasing the Property at its listed price. The Property was recently featured in a May 30, 2025 article in luxury lifestyle magazine Robb Report, and has also been featured in several architectural publications. I intend to pay Movant and other creditors in full, using funds raised by selling the Property.

7.      Movant does not properly authenticate its Exhibit No. 3 attached to the Motion, which is titled "SN Servicing Corporation – Competitive Marketing Analysis" prepared by one "Ashleigh Rader, Compass." Without a declaration from Ashleigh Rader, it is unclear how she is qualified to provide her Competitive Marketing Analysis. Movant's Exhibit 3 is not supported by a declaration of Ashleigh Rader, and cannot be considered as evidence in support of the Motion.

8.      The Motion provides no reason why the mandatory 14-day stay dictated by FRBP 4001(a)(3) should be waived.


I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed on June 30, 2025 at _____ Los Angeles _, California.


_____
Jamie Mazur

---

1 Due to the unique nature of the Property, Debtor believes that it can be marketed for an asking price of $5.4 million, above the Property's appraised price of $4.5 million.

## DECLARATION OF PETER B. BURNESS

I, Peter B. Burness, declare as follows:

1.      I am a Real Estate Appraiser for the State of California, State License Number AR028342. I have been involved in the appraisal of approximately __5100__ pieces of residential real estate in my career over the last _23.5_ years. I currently work for Burness Property Services., located at 31701 Bainbrook Ct., Westlake, California 91361.

2.      I know the matters stated in this declaration are within my personal knowledge, and if called upon to testify hereto, I can and will do so competently. I understand that if called upon to testify, such testimony will be provided at my usual and customary rate, which, as of the date of this declaration, is $_250_ per hour, with a $_500_ minimum. Compensation for such services is subject to adjustment in accordance with prevailing rates at the time the services are rendered.

3.      I had previously inspected the property located at 1181 Bel Air Road, Los Angeles, California 90077 in Los Angeles County (the "Property") on or about April 14, 2023. I performed the April 14, 2023 appraisal on behalf of the lender for the Property, Marquee Funding Group, not on the Debtor's behalf. Based on the inspection of the interior and exterior areas of the Property, I concluded at that time the Property was valued at $4,500,000.00.

4.      On or about April 15, 2025, I conducted an updated valuation for the Property.

5.      In conducting my valuation, I considered a number of matters ordinarily considered by those in my profession that have a bearing on the fair market value of residential real estate. This includes the condition of the property, the size and location of the property, the interior and exterior of the Property as well as the comparable sales of similar properties in the area for a reasonable period before my appraisal.

6.      In my professional opinion, the fair market value of the Property as of

1

April 15, 2025 is $4,500,000.00.

7.    A true and correct copy of the Appraisal Report dated May 12, 2025, is attached hereto as **Exhibit 1**.


I declare under penalty and perjury that the foregoing is true and correct. Executed this _21st_ day of May 2025 at ___Westlake Village_____, California.

By: _____
Peter B. Burness

2

# EXHIBIT 1

Main File No. PP25-A0403

| Borrower | N/A - Private Party | | File No. | PP25-A0403 |
|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | |
| City | Los Angeles | County  Los Angeles | State  CA | Zip Code  90077 |
| Lender/Client | N/A | | | |

## TABLE OF CONTENTS

| | |
|---|---|
| GP Residential | 1 |
| Additional Comparables 4-6 | 4 |
| Supplemental Addendum 1 | 5 |
| Subject Photos | 29 |
| Photograph Addendum | 30 |
| Photograph Addendum | 31 |
| Photograph Addendum | 32 |
| Photograph Addendum | 33 |
| Building Sketch | 34 |
| Architectural Floor Plan/Site Plan | 35 |
| Plat Map | 36 |
| Aerial Map 1 | 37 |
| Aerial Map 2 | 38 |
| Area Map | 39 |
| Comparable Photos 1-3 | 40 |
| Comparable Photos 4-6 | 41 |
| Photograph Addendum | 42 |
| Photograph Addendum | 43 |
| Location Map | 44 |
| USPAP Addendum | 45 |
| Supplemental Addendum 2 | 46 |
| CoreLogic Public Records - Page 1 | 62 |
| CoreLogic Public Records - Page 2 | 63 |
| CoreLogic Public Records - Page 3 | 64 |
| CoreLogic Public Records - Page 4 | 65 |
| Appraisal License | 66 |
| E&O | 67 |

Burness Property Services    Main File No. PP25 A0403    Page # 1 of 67

# RESIDENTIAL APPRAISAL REPORT

File No.: PP25 A0403

## SUBJECT

| | |
|---|---|
| Property Address: 1811 Bel Air Rd | City: Los Angeles | State: CA | Zip Code: 90077 |
| County: Los Angeles | Legal Description: See Supplemental Addendum; Refer to Title Report |
| | Assessor's Parcel #: 43/0 014 025 |
| Tax Year: 2024 | R.E. Taxes: $ 37,682 | Special Assessments: $ 0 | Borrower (if applicable): N/A - Private Party |
| Current Owner of Record: Mazur Jamie | Occupant: ☐ Owner ☒ Tenant ☐ Vacant ☐ Manufactured Housing |
| Project Type: ☐ PUD ☐ Condominium ☐ Cooperative ☐ Other (describe) | HOA: $ ☐ per year ☐ per month |
| Market Area Name: Bel Air | Map Reference: 31084 | Census Tract: 2621.00 |

## ASSIGNMENT

The purpose of this appraisal is to develop an opinion of: ☒ Market Value (as defined), or ☐ other type of value (describe)

This report reflects the following value (if not Current, see comments): ☒ Current (the Inspection Date is the Effective Date) ☐ Retrospective ☐ Prospective

Approaches developed for this appraisal: ☒ Sales Comparison Approach ☐ Cost Approach ☐ Income Approach (See Reconciliation Comments and Scope of Work)

Property Rights Appraised: ☒ Fee Simple ☐ Leasehold ☐ Leased Fee ☐ Other (describe)

Intended Use: To aid the client in valuation of collateral for planning purposes and chapter 11 bankruptcy. No other use is intended or authorized by the appraiser. The scope of this assignment is specific to the identified intended use.

Intended User(s) (by name or type): Jamie Mazur, Sofya Davtyan. No other intended users.

Client: Jamie Mazur    Address: 1935 E 7th St Los Angeles, CA 90021

Appraiser: Peter B Burness    Address: Westlake Village, CA 91361

## MARKET AREA DESCRIPTION

| Location: ☒ Urban ☐ Suburban ☐ Rural | Predominant Occupancy | One-Unit Housing | Present Land Use | Change in Land Use |
|---|---|---|---|---|
| Built up: ☒ Over 75% ☐ 25-75% ☐ Under 25% | ☒ Owner | PRICE $(000) / AGE (yrs) | One-Unit 80% | ☒ Not Likely |
| Growth rate: ☐ Rapid ☒ Stable ☐ Slow | ☐ Tenant | Low 0 | 2-4 Unit 0% | ☐ Likely * ☐ In Process * |
| Property values: ☐ Increasing ☒ Stable ☐ Declining | ☐ Vacant (0-5%) | 750  Low | Multi Unit 5% | * To: |
| Demand/supply: ☒ Shortage ☐ In Balance ☐ Over Supply | ☐ Vacant (>5%) | 40,000 High 100 | Comm'l 5% | |
| Marketing time: ☒ Under 3 Mos. ☐ 3-6 Mos. ☐ Over 6 Mos. | | 4,300 Pred 55 | Other 10% | |

Market Area Boundaries, Description, and Market Conditions (including support for the above characteristics and trends): Market Area Boundaries are Roughly:

Mulholland Dr (North); Sunset Blvd (South); Beverly Glen Blvd (East).

* "One-Unit Housing" Low and High PRICE figures reflect "prevailing" market area prices.

* AGE Low and High reflect prevailing ages.

* "Other" Land Use refers primarily municipal use, vacant and/or undeveloped parcels

See Supplemental Addendum for detailed Market Area Description.

## SITE DESCRIPTION

| Dimensions: Irregular, refer to plat map | Site Area: 8,202 sf |
|---|---|
| Zoning Classification: RE-40-1-HCR | Description: Residential Estate (40,000 sf min site & 80 ft min frontage |
| Zoning Compliance: ☐ Legal ☒ Legal nonconforming (grandfathered) ☐ Illegal ☐ No zoning |
| Are CC&Rs applicable? ☐ Yes ☒ No ☐ Unknown    Have the documents been reviewed? ☐ Yes ☒ No    Ground Rent (if applicable) $ / |
| Highest & Best Use as improved: ☒ Present use, or ☐ Other use (explain)    See Addendum for additional comments. |

Actual Use as of Effective Date: Single-Family Residence    Use as appraised in this report: Single-Family Residence

Summary of Highest & Best Use: SFR (current use). See Supplemental Addendum.

| Utilities | Public | Other | Provider/Description | Off-site Improvements | Type | Public | Private | Topography | Flat pad with partial slope |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | | Street | Asphalt | ☒ | ☐ | Size | Smaller-than-Average |
| Gas | ☒ | ☐ | | Curb/Gutter | Concrete | ☒ | ☐ | Shape | Irregular |
| Water | ☒ | ☐ | | Sidewalk | None | ☐ | ☐ | Drainage | Appears Adequate |
| Sanitary Sewer | ☒ | ☐ | | Street Lights | None | ☐ | ☐ | View | Gd:Cty,Cyn,Mtn Ocn |
| Storm Sewer | ☐ | ☐ | | Alley | None | ☐ | ☐ | | |

Other site elements: ☒ Inside Lot ☐ Corner Lot ☐ Cul de Sac ☐ Underground Utilities ☐ Other (describe)

FEMA Spec'l Flood Hazard Area ☐ Yes ☒ No    FEMA Flood Zone X    FEMA Map # 06037C1580F    FEMA Map Date 9/26/2008

Site Comments: No apparent adverse easements or other conditions were noted. Geological and Title reports were not provided to the appraiser and are assumed to be favorable. Typical site utility for the area. See Attached Addendum.

## DESCRIPTION OF THE IMPROVEMENTS

| General Description | | Exterior Description | | Foundation | | Basement ☒ None | Heating |
|---|---|---|---|---|---|---|---|
| # of Units 1 | ☐ Acc.Unit | Foundation | Concrete | Slab | Concrete | Area Sq. Ft | Type FWA |
| # of Stories 1 | | Exterior Walls | Wd,Stucco | Crawl Space | None | % Finished | Fuel Gas |
| Type ☒ Det. ☐ Att. | | Roof Surface | Rolled | Basement | None | Ceiling | |
| Design (Style) MdCntMdrnArch | | Gutters & Dwnspts. | Metal | Sump Pump | None | Walls | Cooling |
| ☒ Existing ☐ Proposed ☐ Und.Cons. | | Window Type | Metal | Dampness | None Noted | Floor | Central CAC |
| Actual Age (Yrs.) 72 | | Storm/Screens | Partial | Settlement | None Noted | Outside Entry | Other |
| Effective Age (Yrs.) 40 | | | | Infestation | None Noted | | |

| Interior Description | | Appliances | | Attic ☒ None | | Amenities | | Car Storage | ☐ None |
|---|---|---|---|---|---|---|---|---|---|
| Floors | Tile,Etc. | Refrigerator | ☒ | Stairs | None | Fireplace(s) # 1 | Woodstove(s) # 0 | Garage # of cars ( 2  1ot) |
| Walls | Wd,Etc. | Range/Oven | ☒ | Drop Stair | None | Patio | Concrete | Attach 0 |
| Trim/Finish | Paint,Wd,Etc. | Disposal | ☒ | Scuttle | None | Deck | None | Detach 0 |
| Bath Floor | Tile | Dishwasher | ☒ | Doorway | None | Porch | Covered | Blt-In 0 |
| Bath Wainscot | Tile | Fan/Hood | ☒ | Floor | None | Fence | +Wall | Carport 2 Attached |
| Doors | Standard | Microwave | ☒ | Heated | None | Pool | None | Driveway 0 |
| | | Washer/Dryer | ☐ | Finished | None | | | Surface Concrete |

Finished area above grade contains: 5 Rooms 2 Bedrooms 2 Bath(s) 1,705 Square Feet of Gross Living Area Above Grade

Additional features: Subject appears to have energy efficient items relatively consistent with other "competing" properties (and comparables) in the neighborhood. No adjustments for "special energy efficient items" appear warranted unless otherwise indicated. See Addendum.

Describe the condition of the property (including physical, functional and external obsolescence): See Supplemental Addendum & Refer to attached pages titled asdf "Assumptions, Limiting Conditions & Scope of Work" and "Certifications".

GP RESIDENTIAL

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited

Form GPRES2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE    3/2007

# RESIDENTIAL APPRAISAL REPORT

File No.  PP25-A0403

| | |
|---|---|
| My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal. | |
| Data Source(s)  CoreLogic & theMLS.com | |

| 1st Prior Subject Sale/Transfer | Analysis of sale/transfer history and/or any current agreement of sale/listing: |
|---|---|
| Date:  12/24/2019 | No transfers of the subject property within |
| Price:  2,950,000 | the past five years unless otherwise indicated. No current agreement of sale/listing unless otherwise indicated. |
| Source(s):  MLS/Public Records | |
| 2nd Prior Subject Sale/Transfer | |
| Date: | |
| Price: | |
| Source(s): | |

## SALES COMPARISON APPROACH TO VALUE (if developed)  ☐ The Sales Comparison Approach was not developed for this appraisal.

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1811 Bel Air Rd | 12221 Dorothy St | | 1095 N Kenter Ave | | 2210 Neutra Pl | |
| | Los Angeles, CA 90077 | Los Angeles, CA 90049 | | Los Angeles, CA 90049 | | Los Angeles, CA 90039 | |
| Proximity to Subject | | 4.03 miles SW | | 7.97 miles SW | | 10.84 miles E | |
| Sale Price | $ | | $ 5,120,000 | | $ 3,295,000 | | $ 3,400,000 |
| Sale Price/GLA | $ /sq.ft. | $ 1,811.11 /sq.ft. | | $ 2,125.81 /sq.ft. | | $ 2,173.91 /sq.ft. | |
| Data Source(s) | Inspection | CLAW # 25494595;DOM 1 | | CLAW # 24-457107;DOM 45 | | CLAW # 24-371837; DOM 3 | |
| Verification Source(s) | PR/MLS/Assessor | Doc#128658;02/28/25,02/07/25 | | Doc#733306;10/25/24,09/13/24 | | Doc#290970;05/03/24,04/13/24 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Cash;0 | 0 | Conv;0 | 0 | Cash;0 | 0 |
| Date of Sale/Time | | s02/25;c02/25 | 0 | s10/24;c09/24 | 0 | s05/24;c04/24 | 0 |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Location | Gd:Residential | Gd:Residential | 0 | Gd:Residential | | Gd:Residential | |
| Site | 8,202 sf | 6000 sf | 0 | 9,680 sf | 0 | 10,050 sf | 0 |
| View | Gd:Cty,Cyn,Mtn,Ocn | N:Res;TrTps | +385,000 | Gd:Cty,Cyn,Mtn,Ocn | | N:Res;TrTps | +340,000 |
| Design (Style) | MdCntMdrnArch | ModernArch | 0 | MdCntMdrnArch | | MdCntMdrnArch | |
| Quality of Construction | Avg/Gd | Gd | -255,000 | Gd | | Gd | -85,000 |
| Age | 72 | 99 | 0 | 66 | 0 | 65 | 0 |
| Condition | Avg/Gd | Gd | -255,000 | Gd | | Gd | -85,000 |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 5   2   2 | 8   3   2.1 | -25,000 | 4   2   2 | | 6   3   2 | |
| Gross Living Area | 1,705 sq.ft. | 2,827 sq.ft. | -729,500 | 1,550 sq.ft. | +101,000 | 1,564 sq.ft. | +91,500 |
| Basement & Finished | Osf | Osf | | Osf | | Osf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Typical for Mkt | Typical for Mkt | | InferiorSiteUtil | +165,000 | Typical for Mkt | |
| Heating/Cooling | FWA CAC | FWA CAC | | FWA CAC | | FWA CAC | |
| Energy Efficient Items | Insulation | Insulation | | Insulation | | Insulation | |
| Garage/Carport | 2cp | 2cp | | 2cp | | 2cp | |
| Porch/Patio/Deck | Porch/Patio | Porch/Patio/Pool | -60,000 | Porch/Patio/Deck | 0 | Porch/Patio | |
| Accessory Structures | None | None | | None | | None | |
| Site - (Use/Addtnl) | 7,000/1,202 | 6,000/0 | +110,000 | 3,850/5,830 | +175,000 | 7,775/2,275 | 0 |
| Other 1/Market Area | BelAir | Brentwood | 0 | Brentwood/Crstwd | +247,500 | SilverLake/NeutraClny | +340,000 |
| Other 2: | CaseStudy/Ellwood | PierreKoenigArch | +255,000 | Craig/EllwoodArch | +327,500 | Richard/NeutraArch | +340,000 |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - $ | -574,500 | ☒ + ☐ - $ | 1,016,000 | ☒ + ☐ - $ | 941,500 |
| Adjusted Sale Price | | Net  11.2 % | | Net  30.8 % | | Net  27.7 % | |
| of Comparables | | Gross 40.5 % $ 4,545,500 | | Gross 30.8 % $ 4,311,000 | | Gross 37.7 % $ 4,341,500 | |

Summary of Sales Comparison Approach    Major Physical Characteristic Adjustment Factors Overview

- Bathroom: $40,000 ea.;
- 1/2 Bathroom: $25,000 ea.;
- GLA: $650/SqFt (rounded for differences greater than 100 SqFt);
- Garage Parking Space: $50,000 ea.;
- Carport Parking Space: $25,000 ea.;
- Pool: $30,000 - $200,000, depending on size, quality, design, estimated cost/return- on investment, estimated effective age, etc
- Spa: $15,000 - $50,000, depending on size, quality, design, estimated cost/return- on investment, estimated effective, etc
- "Usable" Site: $85/SqFt (rounded for differences greater than 100 SqFt);
- "Additional" Site: $20/SqFt (rounded for differences greater than 100 SqFt).

Other Adjustment Factors

- Location in increments of 2.5% of the comparable sale price (rounded up, or down if warranted to more accurately reflect estimated market reaction)
- View in increments of 2.5% of the comparable sale price (rounded up, or down if warranted to more accurately reflect estimated market reaction)
- Design (Style) in increments of 2.5% of the comparable sale price (rounded up, or down if warranted to more accurately reflect estimated market reaction)
- Functional Utility in increments of 2.5% of the comparable sale price (rounded up, or down if warranted to more accurately) reflect estimated market reaction

See Attached Addendum.

Indicated Value by Sales Comparison Approach $    4,500,000

**GP** RESIDENTIAL

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

Form GPRES2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

3/2007

# RESIDENTIAL APPRAISAL REPORT

File No.: PP25-A0403

## COST APPROACH

**COST APPROACH TO VALUE (if developed)** ☒ The Cost Approach was not developed for this appraisal.

Provide adequate information for replication of the following cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value): N/A

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | = $ |
|---|---|---|---|
| Source of cost data: | DWELLING | Sq.Ft. @ $ | = $ |
| Quality rating from cost service:    Effective date of cost data: | | Sq.Ft. @ $ | = $ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.): | | Sq.Ft. @ $ | = $ |
| N/A. Not developed due to minimal relevance. Client is advised that the | | Sq.Ft. @ $ | = $ |
| development of the Cost approach for properties like the subject rarely | | Sq.Ft. @ $ | = $ |
| yields results that contribute to the credibility of an opinion of value for the | Garage/Carport | Sq.Ft. @ $ | = $ |
| intended purpose of the valuation as engaged by the client. | Total Estimate of Cost-New | | = $ |
| | Less | Physical | Functional | External | |
| | Depreciation | | = $ |
| | Depreciated Cost of Improvements | | = $ |
| | "As is" Value of Site Improvements | | = $ |
| | | | = $ |
| Estimated Remaining Economic Life (if required):    Years | INDICATED VALUE BY COST APPROACH | | = $ |

## INCOME APPROACH

**INCOME APPROACH TO VALUE (if developed)** ☒ The Income Approach was not developed for this appraisal.

Estimated Monthly Market Rent $ _____ X Gross Rent Multiplier _____ = $ _____   Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM): N/A. Income approach was not developed as it generally is not a methodology that contributes to a credible opinion of value in the subject's market area. Single family properties in the area are rarely purchased as investment properties and the availability of relevant income/rental data is generally limited. The direct sales comparison approach is considered to be the most reliable indicator of value.

## PUD

**PROJECT INFORMATION FOR PUDs (if applicable)** ☐ The Subject is part of a Planned Unit Development.

Legal Name of Project:

Describe common elements and recreational facilities:

## RECONCILIATION

Indicated Value by: Sales Comparison Approach $ 4,500,000   Cost Approach (if developed) $ _____   Income Approach (if developed) $ _____

Final Reconciliation   See Supplemental Addendum.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a Hypothetical Condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a Hypothetical Condition that the repairs or alterations have been completed, ☐ subject to the following required inspection based on the Extraordinary Assumption that the condition or deficiency does not require alteration or repair:

☒ This report is also subject to other Hypothetical Conditions and/or Extraordinary Assumptions as specified in the attached addenda.

Based on the degree of inspection of the subject property, as indicated below, defined Scope of Work, Statement of Assumptions and Limiting Conditions, and Appraiser's Certifications, my (our) Opinion of the Market Value (or other specified value type), as defined herein, of the real property that is the subject of this report is $ 4,500,000 , as of: 04/15/25 , which is the effective date of this appraisal. If indicated above, this Opinion of Value is subject to Hypothetical Conditions and/or Extraordinary Assumptions included in this report. See attached addenda.

## ATTACHMENTS

A true and complete copy of this report contains 67 pages, including exhibits which are considered an integral part of the report. This appraisal report may not be properly understood without reference to the information contained in the complete report.

Attached Exhibits:

| ☒ Additional Comparables | ☒ Plat Map | ☒ Aerial map/s | ☒ Supplemental Addenda | ☒ USPAP Addendum |
| ☐ Comparable Sale Map | ☒ Photograph Addenda | ☒ Sketch Addendum | ☒ Invoice | ☒ Site/Floor Plan rendering |

Client Contact: Jamie Mazur    Client Name: Jamie Mazur
E-Mail: jamiemazur@gmail.com    Address: 1935 E 7th St Los Angeles, CA 90021

## SIGNATURES

**APPRAISER**

Appraiser Name: Peter B Burness
Company: Burness Property Services
Phone: 310-704-7448    Fax:
E-Mail: Burness@Gmail.com
Date of Report (Signature): 05/12/2025
License or Certification #: AR028342    State: CA
Designation:
Expiration Date of License or Certification: 09/25/2025
Inspection of Subject: ☒ Interior & Exterior ☐ Exterior Only ☐ None
Date of Inspection: 04/15/25

**SUPERVISORY APPRAISER (if required)**
**or CO-APPRAISER (if applicable)**

Supervisory or
Co-Appraiser Name:
Company:
Phone:    Fax:
E-Mail:
Date of Report (Signature):
License or Certification #:    State:
Designation:
Expiration Date of License or Certification:
Inspection of Subject: ☐ Interior & Exterior ☐ Exterior Only ☐ None
Date of Inspection:

GP RESIDENTIAL

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPRES2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE    3/2007

## ADDITIONAL COMPARABLE SALES

Main File No. PP25-A0403 | Page # 4 of 97

File No.: PP25-A0403

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 1811 Bel Air Rd<br>Los Angeles, CA 90077 | 4791 Bonvue Ave<br>Los Angeles, CA 90027 | | 2460 Sunset Plaza Dr<br>Los Angeles, CA 90069 | | 9038 Wonderland Park Ave<br>Los Angeles, CA 90046 | |
| Proximity to Subject | | 8.92 miles E | | 3.60 miles E | | 3.47 miles E | |
| Sale Price | $ | | $ 4,800,000 | | $ 8,000,000 | | $ 3,260,000 |
| Sale Price/GLA | $        /sq ft. | $ 2,744.43 /sq ft. | | $ 4,219.41 /sq ft. | | $ 2,540.92 /sq ft. | |
| Data Source(s) | Inspection | CLAW#0;DOM 0 | | CLAW#0;DOM 0 | | CLAW#18-393358;DOM 72 | |
| Verification Source(s) | PR/MLS/Assessor | Doc#200953;03/30/23.02/24/23 | | Doc#345323;02/03/23,01/05/23 | | Doc#119313;s02/08/19,c12/17/18 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust | DESCRIPTION | +(-) $ Adjust | DESCRIPTION | +(-) $ Adjust |
| Sales or Financing | | ArmLth | | NonArm | | ArmLth | |
| Concessions | | Conv:0 | | Cash:0 | 0 | Cash:0 | 0 |
| Date of Sale/Time | | s03/23;c02/23 | 0 | s02/23;c01/23 | -80,000 | s02/19;c12/18 | +120,000 |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Location | Gd;Residential | Gd;Residential | | Gd;Res,Promontory | -400,000 | Gd;Residential | |
| Site | 8,202 sf | 13955 sf | | 1.57 ac | 0 | 12350 sf | 0 |
| View | Gd;Cty,Cyn,Mtn,Ocn | Gd;Cty,CynMtnOcn | +250,000 | B;Cty;CynMtnOcn | -800,000 | N;Hills;LrTps | +325,000 |
| Design (Style) | MdCntMdrnArch | MdCntMdrnArch | | MdCntMdrnArch | | MdCntMdrnArch | |
| Quality of Construction | Avg/Gd | VeryGood | -475,000 | VeryGood | -400,000 | asdf | |
| Age | 72 | 58 | 0 | asdf | | 61 | +163,000 |
| Condition | Avg/Gd | VeryGood | -475,000 | VeryGood | -400,000 | Avg | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 5    2    2 | 6    2    2.0 | 0 | 6    2    1.0 | +40,000 | 4    2    2.0 | 0 |
| Gross Living Area | 1,705 sq. ft. | 1,749 sq. ft. | | 1,896 sq. ft. | -124,000 | 1,283 sq. ft. | +274,500 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Typical for Mkt | Typical for Mkt | | Typical for Mkt | | Typical for Mkt | |
| Heating/Cooling | FWA CAC | FWA CAC | | FWA None | +10,000 | FWA CAC | |
| Energy Efficient Items | Insulation | Insulation | | Insulation | | Insulation | |
| Garage/Carport | 2cp | 2cp | | 1ga | | 2cp | |
| Porch/Patio/Deck | Porch/Patio | Pool/Spa | -250,000 | Prch/Ptio/Rflctv | -25,000 | Prch/Ptio/Rflctv | 0 |
| Accessory Structures | None | None | | None | | None | |
| Site - (Use/Addtnl) | 7,000/1,202 | 6,700/7,255 | -95,000 | 10,500/52,275 | -1,320,000 | 6,775/5,575 | -67,500 |
| Other 1/Market Area | BelAir | LosFeliz | +480,000 | HlywdHills/SnstPlza | 0 | HlywdHills/LrlCyn | +325,000 |
| Other 2: | CaseStudy/Ellwood | CraigEllwoodArch | +250,000 | RichardNeutraArch | 0 | CaseStudy/Koenig | |
| Net Adjustment (Total) | | [ ] + [X] - | $ -315,000 | [ ] + [X] - | $ -3,499,000 | [X] + [ ] - | $ 1,140,000 |
| Adjusted Sale Price | | Net     6.6 % | | Net    43.7 % | | Net    35.0 % | |
| of Comparables | | Gross   47.4 % | $ 4,485,000 | Gross   45.0 % | $ 4,501,000 | Gross   39.1 % | $ 4,400,000 |

Summary of Sales Comparison Approach    See Page 2 and Supplemental Addendum.

*SALES COMPARISON APPROACH*

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc must be acknowledged and credited

GP RESIDENTIAL

Form GPRES2.(AC) — "TOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

3/2007

Supplemental Addendum 1                                                    File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

# RESIDENTIAL APPRAISAL REPORT
## (Form GPRES2 Supplemental Addendum)

## SUBJECT PROPERTY (continued from GPAR form page 1)

**Property Address**
1811 Bel Air Rd, Los Angeles, CA 90077 / APN: 4370-014-025

**Property Type**
Single Family Residential

**Legal Description**
TRACT NO 10798 LOT COM AT MOST W COR OF LOT 6 TH N 89¢55'46" E 1.05 FT TH S 18¢ 21'48" E 263.24 FT TH N
61¢40' E TO E LINE OF SD LOT TH S ON A CURVE CONCAVE TO E RADIUS EQUALS 89 FT 88.82 FT TH S 66¢ 07'18" W
139.21 FT TH N 18¢21'48" W 333.42 FT TO BEG PART OF LOT 6

Source of Legal Description: Los Angeles County Assessor. Refer to Title Report for full Legal Description.

## ASSIGNMENT (continued from GPAR form page 1)

**DEFINITION OF MARKET VALUE**
**Fair Market Value** is the price at which the property would change hands between a willing buyer and a willing
seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant
facts.

Source: US Code § 20.2031–1

**VALUE DATE**
04/15/2025 ("Current") as of the inspection date. Date of valuation is date of property visit per client's specific
request rather than date of filing (01/10/2025).

**PROPERTY RIGHTS APPRAISED** (continued from GPAR form page 1 "ASSIGNMENT")
Fee Simple. Subject to any applicable covenants, conditions, and restrictions of record.

**INTENDED USE** (continued from GPAR form page 1 "ASSIGNMENT")
To aid the client in valuation of collateral for planning purposes and chapter 11 bankruptcy. No other use is
intended or authorized by the appraiser. The scope of this assignment is specific to the identified intended use.

**INTENDED USER/S**
Appraiser has not identified any purchaser, borrower, or seller as an intended user of this appraisal and no such
parties should rely on the appraisal for their own purposes. Neither payment for the appraisal, nor receipt of a
copy of the appraisal, by such a party or any other third party means that the party is an intended user of the
appraisal. Such parties are advised to obtain an appraisal from an appraiser of their own choosing if they require
an appraisal for their own use. This appraisal report should not serve as the basis for any property purchase
decision or any appraisal contingency in a purchase agreement relating to the property. Any use of or reliance on
the appraisal by any party, regardless of whether such use or reliance is authorized or known by Appraiser,
constitutes acceptance of all appraisal statements, limiting conditions, assumptions, and all other terms and
conditions stated in this appraisal report. The appraiser is not responsible for unauthorized use and/or
distribution of the report.

## MARKET AREA DESCRIPTION (continued from GPAR form page 1)
Bel Air is a mostly residential area with a housing stock that is extremely diverse. CoreLogic public records data
indicates that the first home in Bel Air was built in 1900 and development of the "Estate" areas of Bel Air began in
the 1920's. Development of Holmby Hills (included by some market participants in the Bel Air market area) also
began in 1920's. It appears that development of most of Bel Air was completed (at least in part) by individual
owners and/or small-scale (non-tract) developers. CoreLogic public records indicates that homes in the Bel Air
range from under 300 SqFt to over 50,000 SqFt and some that exceed 65,000 of "habitable" SqFt (including guest
houses, etc.). Residential parcels (non-assembled) range in size from just under 1,300 SqFt to over 13 acres.

A significant portion of the single-family homes in Bel Air have been updated/renovated and/or modified thus

Main File No. PP25-A0403    Page # 6 of 67

### Supplemental Addendum 1

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

resulting in a wide variety of home sizes, designs, quality, and condition. While some mostly original homes still exist, a sizable portion of the original homes have been demolished and sites have been redeveloped with larger homes. The property stock in Bel Air also includes several condominium projects and apartment buildings located mostly on Roscomare Rd. Access to schools, services and local supporting centers is good. Significant infrastructure and/or points of interest in (or close to) Bel Air include, but may are not limited to: Roscomare Rd; the Stone Canyon Reservoir; the Bel Air Country Club; Beverly Glen Blvd and Bellagio Rd.

The neighborhood of Bel Air is bordered by the San Fernando Valley to the North, by the neighborhood of Westwood/UCLA to the South, by the neighborhood of Beverly Hills Post Office to the East and by the neighborhood of Brentwood to the West. The Bel Air "marketing area" spans a distance significantly greater than 1-mile both N/S and E/W due, in part, to its largely canyon topography which includes several canyon sub-neighborhoods/communities which extend North/South between Mulholland Dr and Sunset Blvd. The Bel Air neighborhood also includes some properties located on the North Side of Mulholland Drive as well as several additional, small cul-de-sac streets overlooking the San Fernando Valley and the neighborhood of Sherman Oaks.

Peak sale prices in Bel Air are typically in the range of $30,000,000 - $50,000,000 with a historic high sale (assembled compound) of $150,000,000 in 2019. Some market participants believe the actual price "ceiling" in Bel Air may be even higher than the highest, verified, historic sale price.

• NOTE: Some market participants consider Bel Air to be comprised of three distinct submarkets: East Gate Old Bel Air; West Gate Bel Air and Upper Bel Air. Furthermore, a significant portion of the neighborhood of Bel Air is located along Beverly Glen Blvd and adjacent streets where many more modest homes significantly impact Median sales price figures for the neighborhood. There is also a diverse mix of estate-like properties interspersed with more modest homes along portions of Roscomare Rd and adjacent streets. These "modest" sub-neighborhoods of Bel Air contribute to an overall predominant value that is lower than the predominant value within the areas more widely known as Bel Air (Bel Air Estates). Some market participants also recognize "Beverly Glen" as a separate market area with boundaries that are roughly: Mulholland Drive to the North, Sunset Blvd to the South, Benedict Canyon Drive/Beverly Hills city limits to the East and Beverly Glen Blvd to the West. The development of Bel Air Ridge, located at the Northeast corner of Bel Air (mostly West of Beverly Glen Blvd) is also considered by some market participants to be a separate and distinct market area along with the development of Bel Air Glen located East of Beverly Glen Blvd.

• NOTE: Neighborhood figures on page 1 of the URAR do not include the submarket of Holmby Hills which is regarded by many market participants to be its own distinct neighborhood/marketing despite being included with Bel Air in a single MLS area (4/Bel Air - Holmby Hills). High-end properties in the "estate" areas of Bel Air and properties within Holmby Hills are generally considered to be the same market area.

• NOTE: Properties in the "Estate" area of Bel Air are also considered to be located within the unofficial market area commonly referred to as the "Platinum Triangle" which consists of the "Estate" portions of the city of Beverly Hills, Holmby Hills and the Estate portions of Bel Air.

• NOTE In some specific cases, properties located at the Northern edge of Bel Air may warrant comparisons to portions of the adjacent city of Los Angeles neighborhoods of Sherman Oaks and Encino located just North of Mulholland Drive.

• Zoning information is per Zimas.lacity.org/. CoreLogic public records is not a reliable source of zoning information for properties located in the city of Los Angeles.

### Bel Air Sales and Listing data as of 04/21/2025

| | 12-Month History | Listings |
|---|---|---|
| # Of Sales: | 134 | 150 |
| Price (Avg): | $7,720,991 | $15,891,963 |
| Price (Median): | $4,327,650 | $7,722,500 |
| GLA $/SqFt (Avg): | $1,253 | $1,746 |
| GLA $/SqFt (Median): | $1,054 | $1,409 |
| $/Site SqFt (Avg): | $316 | $425 |
| $/Site SqFt (Median): | $239 | $326 |
| GLA (Average): | 4,938 | 6,738 |
| GLA (Median): | 3,641 | 5,267 |
| Site SqFt (Avg): | 34,468 | 54,665 |

Main File No. PP25 A0403 | Page # 7 of 57

### Supplemental Addendum 1

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

| | | |
|---|---|---|
| Site SqFt (Median): | 23,640 | 28,316 |
| | | |
| GLA (Low): | 501 | 1,026 |
| GLA (High): | 26,663 | 35,000 |
| Site Area (Low): | 2,437 | 1,978 |
| Site Area (High): | 305,758 | 569,331 |
| Price (Low): | $840,000 | $1,050,000 |
| Price (High): | $92,800,000 | $177,000,000 |

The significant disparities between several of the Median and Average figures in the above data sets demonstrate the potentially detrimental impact of both limited/diverse data and optimistic list prices on attempts to develop credible analysis for matched pair, prevailing prices, market/price trends, anticipated market negotiations, etc. asdf

• The Median Sale Price is roughly 56% of the Average Sale Price.

• The Average Sale Price is roughly 49% of the Average List Price.

• The Median Sale Price is roughly 56% of the Median List Price.

Additional dynamic factors that can further contribute to potentially dubious data integrity include: fluctuations in redevelopment activity (both pre-development land-value sales and post development new construction sales); and fluctuations in the volume of off-market (no MLS exposure) sales activity.

Thus, unfiltered market data sourced from the MLS and/or public records may not always be reflective of actual, substantive changes in market conditions. Alternatively, data sets that are culled/controlled for conformity often yield results with too few data points to be utilized as the basis for market trend conclusions of any certitude.

## SITE DESCRIPTION (continued from GPAR form page 1)

**Site area**: Significant discrepancies noted.
• Plat Map (dated 2018): 4,400 SqFt.
• Public Records: 8,211 SqFt (listed in public records as 8,202 at time of prior 2019 transfer).
• Los Angeles County Assessor: 4,400 SqFt.
• Los Angeles City/Zimas: 8,408 SqFt.
• MLS (2019): 8,427 SqFt.
• GIS property boundary measurements: ~8,000 SqFt based on appraiser estimates not including a narrow portion of the lot (1.05 feet x ~265 feet) that extends behind the property to the N/NW into the hillside and likely has no measurable contributory value.

In this case, the site area utilized in the report is based on public records data as it appears to be consistent with GIS aerial image measurements. The cause of the significantly smaller figures reported in Assessor data and on the plat map was not readily apparent during the normal course of business. This appraisal is based on the extraordinary assumption that the subject's site area is indeed similar to the 8,202 SqFt reported in public records data. If this assumption is proven to be false, it may have an adverse impact on value and revisions to the appraisal report/valuation may be necessary to adequately reflect information not consistent with the original assumptions.

**Zoning** information is per Zimas.lacity.org/. CoreLogic public records is not a reliable source of zoning information for properties located in the city of Los Angeles.

**Zoning Compliance**: legal non-conforming based on current zoning requirements which specify a minimum site area of 40,000 SqFt per dwelling unit (slightly smaller with city approval).

Per the Official City of Los Angeles Municipal Code - SEC. 16.03. RESTORATION OF DAMAGED OR DESTROYED BUILDINGS. (Amended by Ord. No. 173,268, Eff. 7/1/00, Oper. 7/1/00.)

"A. Nonconforming. Notwithstanding any other provisions of this article to the contrary, a building nonconforming as to use, yards, height, number of stories, lot area, floor area, residential density, loading space, parking, off-site signs or other nonconforming provisions of the Los Angeles Municipal Code, which is damaged or destroyed as a

**Supplemental Addendum 1**    File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

result of the declared emergency may be repaired or reconstructed with the same nonconforming use, yards, height, number of stories, lot area, floor area, residential density, loading space, parking or off-site signs as the original building. Provided, however, that repair or reconstruction shall be commenced within two years of the date of damage or destruction and completed within two years of obtaining a permit for reconstruction. Provided, further, that neither the footing nor any portion of the replacement building may encroach into any area planned for widening or extension of existing or future streets as determined by the Planning Department upon the recommendation of the City Engineer.

The provisions of this section shall supersede any Interim Control Ordinances, Interim Plan Revision Ordinances, Specific Plans (except for the South Central Alcohol Beverage Specific Plan, Ord. No. 171,681), Section 16.05 and the City's hillside regulations under Section 12.21A17 (except for Paragraphs (d) and (e)). Notwithstanding any provision in this section to the contrary, any existing provision of law regulating the issuance of building or demolition permits for buildings or structures currently with historical or cultural designations on the federal, state and City lists shall remain in full force and effect. All Historic Preservation Overlay Zone regulations shall continue in full force and effect with respect to the demolition, repair and reconstruction of damaged or destroyed buildings or structures.

For purposes of this subsection, a building or structure may only be demolished and rebuilt to its non-conforming status, relative to the provisions of this Code, any Interim Control Ordinances, Interim Plan Revision Ordinances, Specific Plans (except for the South Central Alcohol Beverage Specific Plan, Ord. No. 171,681) and the City's hillside regulations under Section 12.21A17 (except for Paragraphs (d) and (e)), if the building or structure either is destroyed or is "damaged" in the following manner:

1. Any portion of the building or structure is damaged by earthquake, wind, flood, fire, or other disaster, in such a manner that the structural strength or stability of the building or structure is appreciably less than it was before the catastrophe and is less than the minimum requirements of this Code for a new building or structure of similar structure, purpose or location, as determined by the Department of Building and Safety; and 2. The cost of repair would exceed 50 percent of the replacement cost of the building or structure, not including the value of the foundation system, as determined by the Department of Building and Safety.

Nothing here shall be interpreted as authorizing the continuation of a nonconforming use beyond the time limits set forth in Section 12.23 of this Code that were applicable to the site prior to the events which necessitated the declaration of the emergency.

If issues of interpretation relating to the above provisions arise, the Zoning Administrator is hereby authorized to resolve those issues in light of the scope and purposes of this subsection."

Based primarily on the existence of many other parcels in the neighborhood that also do not meet current minimum site area requirements the extraordinary assumption was made that the Zoning Compliance of the subject's site area was legal at the time of the original subdivision.

Subject's nonconforming Zoning Compliance is unlikely to have an adverse impact on marketability and/or market value as legal nonconforming lots are common throughout many areas of Los Angeles (and in the subject's neighborhood specifically) and existing, undeveloped residential lots can often still be developed, despite newer site area requirements, if the original subdivision of the parcel was legal at the time. Furthermore, multiple comparables utilized in the report have similar nonconforming Zoning Compliance.

The client is advised that it is beyond the scope of the appraisal, as engaged by the client, for the Appraiser to obtain a "rebuild letter" from the city. However, if the client requires a rebuild letter, a request can be submitted to the city of Los Angeles at https://www.ladbsservices2.lacity.org/OnlineServices/?service=rbl for a fee payable to the city.

**Highest & Best Use** (continued from GPAR form page 1 "SITE DESCRIPTION")

Based upon the "intended use" of this Appraisal and the scope of work required for 'credible results' [USPAP], the valuation and analysis of the subject property is for its "highest value" in terms of "Market Value", "As Is" and "As Improved" as of the 'Effective Date' of this Appraisal (within parameters of allowable uses under its current zoning). It is beyond the scope of this "As Is" appraisal, as engaged by the client, to conduct a feasibility study for the possibilities (which may or may not exist) for different types of residential uses, subdivision and/or redevelopment. To produce a credible analysis of highest and best use, would require full appraisals which would need to be completed on all alternate, permissible uses while invoking hypothetical conditions based on fully permitted and entitled plans and specifications. As the subject's current use does not appear to represent a significant under-improvement or an antiquated use, it was deemed appropriate to indicate that the highest and

Supplemental Addendum 1

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State CA | Zip Code 90077 |
| Lender/Client | N/A | | | | |

best use of the subject is "As Improved", because it meets the HBU criteria (test) cited above within the limiting conditions of this engagement as explained.

The Dictionary of Real Estate Appraisal: Fifth Edition; Appraisal Institute; 2010 [Page 250] – highest and Best Use definition states, "The most probable use of a property which is physically possible; appropriately justified; legally permissible; financially feasible which results in the highest value of the property being valued".

**Other site elements:** No apparent, atypical, adverse site influences of any likely consequence noted unless otherwise indicated.

## Property Summary

The subject property is an architecturally significant property that was originally designed by architect Craig Ellwood as part of the Case Study Program.

The book Case Study Houses, The Complete CSH Program 1945 - 1966 published by Taschen includes the following description of the subject property,

"Elwood's pavilion-like design for Case Study House #16 was the first of three houses he contributed to the program. Trained as an engineer, Elwood had a keen interest in the application of industrial materials and techniques to architecture. The primary materials of the house were steel, glass, and concrete, yet they were used with an extreme elegance and sensitivity. Walls in this house approximate freestanding units in both the interior and parts of the exterior, where translucent glass panels screen the house from the street. Inside, Elwood departed from the use of conventional floor-to-ceiling walls, instead configuring walls as floating panels inset into the exposed steel frame. The design manifests a high degree of rationality throughout, yet also a sensuality in terms of its finishes, textures, and details. The exterior patio, too, was well defined for relaxed, outdoor living and entertaining, including among its features a large stone chimney complete with fireplace and electric barbecue spit.

The original announcement of the project in Arts and Architecture Magazine, April 1952 stated, "The house is to be located in the Bel Air section of Los Angeles on a property that will permit the development of a dwelling that, while economical in general concept, will offer (and generously we hope) amenities of living with practical considerations given to the too often ignored necessities in the modern house.

It will be approximately 1600 square feet in area and will be built within a reasonable economy governed, however, by quality in material and craftsmanship. The site itself is on a leveled hillside with a southerly view of city and sea and a westerly view of mountains and valleys. Irregular in shape, the property is approximately 70' × 100'. The limited lot size, with certain restricting code requirements, and the selection of view exposures have more or less governed the plan layout and site orientation. To achieve ease of construction, economy, and harmony in design of the juxtaposed elements, the basic plan is a four-foot modular rectangle, 28' x 56'. The interior walls, however, extend through the perimeter wall of steel-framed sliding glass units to give the illusion of unrestricted space and to accent the house and garden interpenetration. (...)

While this is to be essentially a two-bedroom house, the den will serve as either a third bedroom or as a television room. An accordion wall opens this room to the living area thereby increasing the dimensions from 28' to 40'. Both bedrooms open to private courtyards. A bed "island" in the master bedroom provides a dressing area within the room and alleviates the need for additional bath facilities; the mirrored wall behind the bed holds a dressing table cabinet with a concealed minimum-sized stainless steel lavatory.

Construction is to be of concrete floor slab with vertical framing of steel 2 1/2" square pipe columns or 4" H columns at eight-foot on centers. Horizontal roof spans are minimized to allow the economical use of wood beams in the framing of the plastered ceiling roof slab.

To assure proper correlation of house and garden and proper specification of landscape elements, the designer and landscape architect have worked together since the beginning of the project. The important provisions for yard and pool lighting, terrace areas, retaining walls, and finish grading were thus provided for during construction.

It was the desire to keep the landscape as simple, as useful, and as easily maintained as possible, and yet have the luxury of rich forms and textures- all within a nominal budget. To complement the architecture, interesting forms of plant material, rapid in growth, and unique to Southern California, have been specified.

Main File No. PP25-A0403 | Page # 19 of 67

**Supplemental Addendum 1**

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | | |
| City | Los Angeles | County | Los Angeles | | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | | |

The perimeter clay block curb and wall define the physical limits of the site and control water runoff, Play and garden storage are provided, and a clay block wall separates the service and child play areas from the living garden. A "jungle gym" makes further use of this wall, and becomes a sculptural element in the landscape changing its shadow pattern throughout the day. Nearby is an open space of lawn for more active play. A low bench for sunning and for the display of tubbed plant material leads into the "view" part of the garden, with its garden furniture, pools, and plant material. The mound here weds the site to the surrounding landscape and offers a feeling of protection from the wide canyon below. Liquidambar trees give filtered shade and wind protection without restricting the view. Three steel bowls, painted colors sed in the house (black, eggshell, and terra cotta) are lit from beneath, at night becoming huge reflectors of soft light. The jets in the pool are at varying heights, and again repeat the structure's interior colors.

Each bedroom has its own private garden court; a battle of obscure glass, integrated with the architecture, protects these courts and assures privacy from the street. A large mound between the screen and the street helps set the house into the landscape and makes an advantage of an otherwise awkward pitching-away of the ground at that point."

The Los Angeles Conservancy website description of the subject property states, in part, "Case Study House #16 was the first of three houses in Arts & Architecture magazine's Case Study House program designed by Craig Ellwood, a contractor with no formal architectural training. It remains highly intact today, and is the only surviving, intact example of Ellwood's designs for the program; his built designs for #17 and #18 have both been altered through subsequent remodeling.

Ellwood was trained as an engineer and had a passion for using industrial materials and construction techniques in residential architecture. As a result, Case Study House #16 exhibits a highly rational design and is constructed of steel, glass and concrete.

Completed in 1952, the house was innovative in its use of exposed steel structural framing, and floor-to-ceiling glass walls took advantage of spectacular views.

The one-story, flat-roofed residence was built on a flat pad in the hills of Bel-Air with magnificent views to the south and west. The layout and setting take into account the views and sun orientation, taking full advantage of both.

From the street the house presents itself as a glowing, floating glass pavilion. Translucent glass panels screen the house from the street, while frameless floor-to-ceiling glass walls in the living room merge with floors, ceilings, and a massive natural rock fireplace that extends through the glass to the covered patio."

A 2019 article posted to the Mansion Global website states, in part, "Of the 23 homes that remain, three were demolished over the years, and another four were renovated past the point of recognition. The 16 Case Study Houses that remain in close-to or in their original forms, designed by architecture greats including Craig Ellwood and Richard Neutra, are owned and lived in by private individuals, and traded at a premium every time they change hands."

The Wikipedia entry for the Case Study Program states, "The Case Study Houses were experiments in American residential architecture sponsored by Arts & Architecture magazine, which commissioned major architects of the day, including Richard Neutra, Raphael Soriano, Craig Ellwood, Charles and Ray Eames, Pierre Koenig, Eero Saarinen, A. Quincy Jones, Edward Killingsworth, and Ralph Rapson to design and build inexpensive and efficient model homes for the United States residential housing boom caused by the end of World War II and the return of millions of soldiers.

The program ran intermittently from 1945 until 1966. The first six houses were built by 1948 and attracted more than 350,000 visitors. While not all 36 designs were built, most of those that were constructed were built in Los Angeles, and one was built in San Rafael, Northern California and one in Phoenix, Arizona. Of the unbuilt houses, #19 was to have been built in Atherton, in the San Francisco Bay Area, while #27 was to have been built on the east coast, in Smoke Rise, New Jersey.

A number of the houses appeared in the magazine in iconic black-and-white photographs by architectural photographer Julius Shulman."

8 of the remaining Case Study Houses are located in Western Los Angeles County

#1, J.R. Davidson, Toluca Lake.

#8, Charles Eames, Pacific Palisades.

Supplemental Addendum 1                                                    File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | | |
| City | Los Angeles | | County | Los Angeles | | State CA | Zip Code 90077 |
| Lender/Client | N/A | | | | | | |

#16 (aka 1953), Craig Ellwood, Bel Air (Subject).

#17, Rodney Walker, Hollywood Hills.

#18, Rodney Walker, Pacific Palisades.

#20, Richard Neutra, Pacific Palisades.

#21, Pierre Koenig, Hollywood Hills.

#22, Pierre Koenig, Hollywood Hills.

## Additional Subject Information

MLS Listing #19-531106 Remarks: "Presenting The Salzman House: Craig Ellwood's iconic Case Study House #16. Built between 1951-1953, this one-story, flat-roofed residence was constructed on a flat pad in the hills of Bel-Air with magnificent views to the south and west. The floor plan takes into account the views and sun orientation, with the main living areas taking full advantage of both. From the street the house presents itself as a glowing, floating glass pavilion, surrounded by mature trees and landscaping. Translucent glass panels screen the house from the street, while floor-to-ceiling glass walls in the living room blend seamlessly with floors, ceilings and a large natural rock fireplace that extends through the glass to the covered patio. A rare opportunity to own a significant piece of architecture, in one of the most coveted neighborhoods in the world."

# SALES COMPARISON APPROACH

Any discrepancies between data sources related to the characteristics of the comparables and deemed to be of possible consequence are noted accordingly in the addendum. Data discrepancies are not uncommon in the area and not all discrepancies are expressly articulated in the report. No warranties, implied or explicit, are made regarding the accuracy of any comparable information utilized in the report.

## Comparable search & selection

The search for relevant sales comparables proved to be extremely difficult due largely to the architectural significance of the subject property along with the smaller than typical GLA and site for the Bel Air neighborhood.

Buyers of architecturally significant properties like the subject often will cast a significantly wider "net" than buyers of more conventional homes. It is not unusual for buyers seeking architecturally significant properties to consider multiple neighborhoods that span many miles in search of properties.

The salient characteristics which have the greatest impact on market value/marketability of specific properties can differ from neighborhood to neighborhood and, in some cases, can differ within specific neighborhoods, depending on property price range and/or category. The preeminent consideration for buyers in some areas/price ranges may be GLA while it may be Site Size in other areas/price ranges. Furthermore, in some specific areas, combinations of multiple/myriad factors can have similar or equal impact on marketability/market value.

## SALE COMPARABLES in the Sales Comparison Approach "grid"

Sales comparables are provided in reverse chronological order (by contract date) largely to facilitate analysis of market changes for older transactions.

NOTE: Data discrepancies/inconsistencies are not atypical in the subject's market area (e.g., GLA, Room Counts, etc.). Some figures reported in the Sales Comparison Approach "grid" may reflect information gathered from peers, clients, agents, or prior appraisals, and may not be consistent with figures/descriptions available in the MLS and/or public records/assessor data.

## Comparable #1 | 12221 Dorothy St

- Pierre Koenig Architect, Koenig House #2, 1985 renovation and expansion by Koenig (originally built 1926)
- https://www.laconservancy.org/learn/historic-places/koenig-house-2/
- https://debbieweiss.com/properties/12221-dorothy-st-los-angeles-ca-us-90049-25494595
- Date of Sale/Time: Most recent of the relevant sales comparables.
- View: Inferior based on MLS/marketing photos, drive-by inspection, and aerial images.
- Design (Style): 1985 renovation and expansion by noted architect Pierre Koenig completed for himself and family. Original home on the site was built 1926. Not "Mid-Century" Modern architecture but similar market appeal overall.
- Quality & Condition: Superior based on MLS/marketing photos and description (indicates partial restoration

| Borrower | N/A - Private Party | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | | |
| City | Los Angeles | | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | | |

2024), drive-by inspection, and aerial images.

• Room Count: Per floor plan from the MLS.

• GLA: Acknowledged to have a significantly larger GLA than the subject; however, was deemed a relevant comparable due primarily to the limited availability of recent, relevant comparables with more similar GLA's.

• Market Area: Brentwood. Generally slightly inferior compared to Bel Air; however, the subject's specific parcel location in Upper Bel Air vs. the specific parcel location of 12221 Dorothy St does not appear to have precipitated any substantive, measurable market reaction.

• Architect/Significance: Line-item adjustment was deemed warranted, and was applied to reflect the marketing advantage of the subject being a Case Study house vs. non Case Study house.

• Last known/most recent List Price: $5,790,000.

• No price changes for most recent listing.

• Other Relevant Listing History: None in the preceding 3-months.

• NOTE: 2025 sale price is noted to be just slightly higher than prior sale price of $4,931,500 on 02/13/2024 despite significant expenditure by the 2025 seller. It appears to demonstrate that architecturally significant homes that remain closer to the architects original design can have similar market appeal as updated architectural properties that stray from the original design.

### Comparable #2 | 1095 N Kenter Ave

• Craig Ellwood Architect, The Smith House, 1958.

• https://www.dwell.com/article/craig-ellwood-smith-house-los-angeles-real-estate-59bfcc7a

• https://beyondshelter.com/craig-ellwood-brentwood-home/

• Date of Sale/Time: Second most recent of the relevant sales comparables. Slightly older transaction that was provided largely due to the lack of more recent/relevant sales of architecturally significant properties. The Zillow Home Value Index indicates a change of roughly -0.8% (from the contract date to the most recent Index value) which is well within a reasonable variance of stable market conditions. Thus, no line-item adjustment was warranted or applied.

• Design (Style): Same architect as the subject/Craig Ellwood.

• Functional Utility: A separate line-item adjustment was deemed warranted as the line-item adjustment for site does not adequately reflect the lack of site utility of 1095 N Kenter Ave which has very little outdoor space apart from decking built over steep hillside topography.

• Site ("Usable"/"Additional"): Limited "usable" site with no substantive outdoor areas with utility beyond the driveway, front porch and front walkway.

• Market Area: Brentwood/Crestwood Hills. Slightly inferior compared to Bel Air. Inferior location is partially offset by location within a well-known enclave of architecturally significant (and largely protected) properties.

• Architect/Significance: Same architect as the subject. Line-item adjustment was deemed warranted, and was applied to reflect the marketing advantage of the subject being a Case Study house vs. non Case Study house.

• Last known/most recent List Price: $3,295,000.

• No price changes for most recent listing.

• Other Relevant Listing History: #24-377921, 39 DOM (Withdrawn 06/18/24), LP: $3,495,000.

• CDOM (approximate): 84.

### Comparable #3 | 2210 Neutra Pl

• Richard Neutra Architect, The Ohara House, 1959.

• https://crosbydoe.com/address/2210-neutra-pl-los-angeles-ca-90039/

• Date of Sale/Time: Slightly older transaction that was provided largely due to the lack of more recent/relevant sales of architecturally significant properties. The Zillow Home Value Index indicates a change of roughly -0.8% (from the contract date to the most recent Index value) which is well within a reasonable variance of stable market conditions. Thus, no line-item adjustment was warranted or applied.

• View: Inferior based on prior walk-through inspection, MLS/marketing photos, 2025 drive-by inspection, and aerial images.

• Quality & Condition: Slightly superior based on MLS/marketing photos, drive-by inspection, and aerial images.

• GLA: Noted to be reported in some sources as a 1,300 SqFt residence; however, reported in CoreLogic Public Records and the most recent MLS as 1,564 SqFt.

Main File No. PP25-A0403 | Page # 13 of 67

### Supplemental Addendum 1

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | | |

- Site ("Usable"/"Additional"): No site adjustment warranted as it appears that most of the "usable" site area still has at least some slope; whereas, the subject's "usable" site is mostly flat.

- Market Area: Silver Lake. Generally slightly inferior compared to Bel Air; however, the subject's specific parcel location within the enclave known as "Neutra Colony" partially offsets the otherwise significant price difference between Silver Lake and Bel Air.

- Architect/Significance: Line-item adjustment was deemed warranted, and was applied to reflect the marketing advantage of the subject being a Case Study house vs. non Case Study house. Architect/Significance:

- Last known/most recent List Price: $3,100,000.

- No price changes for most recent listing.

- Other Relevant Listing History: None in the preceding 3-months.

### Comparable #4 | 4791 Bonvue Ave

- Craig Ellwood Architect, The Moore House, 1965.

- http://www.woodsdangaran.com/project/moore-house

- Information based largely on prior appraisal of the property.

- Off-market ("pocket") transfer that took place after receiving unsolicited offer brought by agent Daria Greenbaum per seller.

Date of Sale/Time: Older transaction that was provided largely due to the lack of more recent/relevant sales of architecturally significant properties. The Zillow Home Value Index indicates a change of roughly +0.4% (from the contract date to the most recent Index value) which is well within a reasonable variance of stable market conditions. Thus, no line-item adjustment was warranted or applied.

- Location: Similarly marketable parcel location.

- Site & "Usable" Site/Site Utility: No discrepancies of likely consequence noted.

- View: Inferior based on observations during property visit.

- Design (Style): Same architect as the subject. Very similar design as the subject.• Quality & Condition: Superior based on observations during property visit. Substantial restoration/renovation completed by architecture firm Woods Dangaran.

- Market Area: Distant comparable located in Los Feliz where property prices are typically lower than in the subject's immediate neighborhood.

- Architect/Significance: Craig Ellwood design like the subject. Slightly inferior market appeal due largely to the subject's significance as a Case Study House.

- Other Relevant Listing History: None in the preceding 3-months.

### Comparable #5 | 2460 Sunset Plaza Dr

- Richard Neutra Architect, The Chuey House, 1956.

- https://www.architecturaldigest.com/story/richard-neutra-chuey-house

- Off-market ("pocket") transfer between tenant and prior owner. Market-value transfer per Philippe Naouri who completed a full restoration of the property with seller Eric Choi.

- Date of Sale/Time: Older transaction that was provided largely due to the lack of more recent/relevant sales of architecturally significant properties. The Zillow Home Value Index data indicates a change of roughly -2% between the contract date of the comparable and the most recent Index. Due largely to the capricious nature of the market in recent months, as well as recent and ongoing changes in market momentum and sales volume, "Date of Sale/Time" line-item adjustments were applied equal to roughly 1/2 the indicated change in the Zillow Home Value Index (date of the valuation and the contract date of the comparable) and which appear to work well to reconcile differences in market conditions.

- Location: Superior parcel location on what may be the highest residential, promontory parcel in the Hollywood Hills and which more-than offsets the otherwise somewhat inferior neighborhood location at the top of the Sunset Plaza neighborhood.

- Site & "Usable" Site/Site Utility: No discrepancies of likely consequence noted. However, street easements noted in GIS aerial images do not appear to be reflected on the plat map and/or in other publicly recorded data sources. The effective, "total" site area after deduction of estimated easements is estimated at roughly 62,775 SqFt which was utilized as the basis for the site adjustments.

- View: Superior based on MLS listing photos, drive-by inspection, and aerial images.

- Other/Submarket: Competing neighborhood of Sunset Plaza, above the Sunset Strip in the Hollywood Hills. No

**Supplemental Addendum 1**                                         File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

line-item adjustment for superior/inferior neighborhood is warranted or was applied after consideration of superior promontory parcel location.

**Comparable #6 | 9038 Wonderland Park Ave**

• Pierre Koenig, **Case Study House #21**/The Bailey House, 1958

• https://www.laconservancy.org/learn/historic-places/bailey-house-case-study-house-21/

• Information based largely on prior appraisal of the property.

• Date of Sale/Time: Significantly older transaction that was provided largely due to the lack of more recent/relevant sales of architecturally significant properties as it is among the most similar of the remaining Case Study homes to have sold in the past decade. The Zillow Home Value Index data indicates a change of roughly +7.4% between the contract date of the comparable and the most recent Index. Due largely to the capricious nature of the market in recent months, as well as recent and ongoing changes in market momentum and sales volume, "Date of Sale/Time" line-item adjustments were applied equal to roughly 1/2 the indicated change in the Zillow Home Value Index (date of the valuation and the contract date of the comparable) and which appear to work well to reconcile differences in market conditions.

• Site ("Usable"/"Additional"): Site utility noted to be somewhat subjective due to a significant portion of the lot having slope of various degrees. Estimated "usable" site was based on 2023 Los Angeles County GIS aerial images which were not previously available.

• Market Area: Inferior market area of Laurel Canyon in the Hollywood Hills where prices are typically lower than in Bel Air.

• Architect/Significance: Most similar overall as it is Case Study House #21 and has a very similar overall design and scale as the subject.

• Last known/most recent List Price: $3,600,000.

• No price changes for most recent listing.

• Other Relevant Listing History: None in the preceding 3-months.

**Listing "Comparables"**

No Listing/Pending/Under-Contract comparables were identified that were considered to add any substantive additional credibility to the valuation of the subject property. Thus, no Listing "comparables" were provided in the Sales comparison approach "grid".

**Additional Sale/s considered as potential "comparables"**

219 Chautauqua Blvd, Pacific Palisades.
Richard Neutra Architect, **Case Study House #20**/The Bailey House, 1948.
Sold: 02/03/2021.
$11,250,000.
GLA: 1,849 SqFt.
Site Area: 33,501 SqFt.
Not utilized primarily due to its unique location on a shared, private drive along with 3 other Case Study homes. It is also a property with a significantly larger Gross site area, a significantly larger "usable" site area, proximate to the beach/Ocean, and with Ocean Views. More similar/relevant and/or recent comparables were available/utilized. NOTE: As of the signature date of the appraisal, the property is also noted to be marketed for sale in the MLS with a list price of $10,500,000. The marketability of the property may be adversely impacted by the 2025 Pacific Palisades fires.

82 Rivo Alto Canal, Long Beach/Naples
Killingsworth, Brady, Smith & Associates, **Case Study House #25**/The Frank House, 1961.
Sold: 11/18/2022.
$3,250,000.
GLA: 2,307 SqFt.
Site Area: 3,312 SqFt.
Not utilized primarily as it is in a significantly different location in the city of Long Beach, on a significantly smaller lot, located along a canal in the Naples market area.

2256 El Content Dr
Richard Neutra Architect, The Bonnet House, 1941
Sold: 02/25/2025.

**Supplemental Addendum 1**                                          File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State CA | Zip Code 90077 |
| Lender/Client | N/A | | | | |

$2,635,000.
GLA: 1,551 SqFt per MLS vs. 1,154 SqFt per CoreLogic Public Records. MLS figure appears to include a "separate studio with kitchenette".
Site Area: 7,520 SqFt.
Not utilized primarily as it is a property located in a significantly inferior portion of the Hollywood Hills, with a higher degree of adverse, external influence and the property has a significantly smaller lot and "usable" lot.

7850 Torreyson Dr, Hollywood Hills.
Richard Neutra Architect, The Shaarman House, 1951.
Sold: 12/10/2024.
$12,300,000.
GLA: 3,410 SqFt plus ~540 SqFt guest house based on reliable peer information.
Site Area: 41,380 SqFt.
Not utilized primarily as it is significantly larger home on a significantly larger lot with a guest house, at the end of a private, cul-de-sac Street. It appears to have commanded a significant premium.

1438 N Kenter Ave
Richard Neutra Architect, The Adler House, 1956.
Sold: 10/02/2024.
$2,775,000.
GLA: 2,299 SqFt per MLS vs. 1,925 SqFt per public records data.
Site Area: 8,010 SqFt.
Not utilized primarily as it appears to have been altered somewhat and does not appear to have commanded any discernible premium over otherwise similar properties in the area.

1845 Niodrara Dr, Glendale
Rudolph Schindler Architect, The Rodriguez House, 1941.
Sold: 09/10/2024.
$3,000,000.
GLA: 2,356 SqFt.
Site Area: 13,800 SqFt
Not utilized as it is located in an area of the city of Glendale where property prices are substantially lower than those in Bel Air. It is also a larger home with no apparent "marketable" view.

1880 Blue Heights Dr, Sunset Plaza/Hollywood Hills.
Richard Neutra and Gregory Ain Architects, The Galka Scheyer House, 1934.
Sold: 07/18/2024.
$3,000,000.
GLA: 1,472 SqFt.
Site Area: 9,860 SqFt.
Not utilized as it is located on a street that may be regarded by some as somewhat treacherous, adjacent to high-tension electrical wires/towers, within a "pocket" of the Sunset Plaza neighborhood where the marketability of properties is typically inferior to the marketability of properties closer to Sunset Blvd and on more conforming streets. It is also a property with less architectural significance and the property has ingress/egress via a shared driveway easement over portions of two adjacent properties (/APN 5558-015-017 & 1870 Blue Heights Dr/APN 5558-015-004). Based on Los Angeles County GIS aerial images with parcel boundaries, portions of the improvements appear to extend onto portions of other properties to the East and SE, and North. It is unknown if these areas represent encroachments or easements, and GIS aerial boundaries can lack precision; thus, the level of accuracy remains unknown.

126 Mabery Rd, Santa Monica Canyon.
Richard Neutra Architect, The Sten Frenke House, 1933.
Sold: 06/04/2024.
$10,725,000.
GLA: 2,929 SqFt.
Site Area: 16,560 SqFt.
Not utilized as it is a significantly larger residence, with a substantial, habitable auxiliary structure, on a larger lot, with ocean views, in a superior market area proximate to the Pacific Ocean.

2456 Astral Dr, Hollywood Hills/Nichols Canyon.
The Loring House, Richard Neutra Architect, 1958.
Sold: 05/31/2024.
$8,800,000.

Supplemental Addendum 1

| | | File No. PP25-A0403 | | | |
|---|---|---|---|---|---|
| Borrower | N/A - Private Party | | | | |
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

GLA: 1,968 SqFt + 1,150 SqFt, detached guest house (per prior appraisal).

Site Area: 28,250 SqFt.

Not utilized primarily as it is a property with a significantly larger lot, significantly larger "usable" site area, a large guest house designed by a different high-profile architect, and a pool. Worthy of note is the succession of three sales in roughly six years which appears to indicate increasing demand as it sold for $5,625,000 on 03/06/2018, for $7,500,000 on 04/19/2022, and most recently for $8,800,000 on 05/31/2024.

7301 Mulholland Dr, Hollywood Hills.
The Eisele House, John Lautner Architect, 1948.
Sold 04/05/2024 (off-market/no apparent MLS listing at the time of sale).
$6,995,000.
GLA: 1,029 SqFt
Site Area: 109,351 SqFt (6 total parcels)
Not utilized primarily as it was marketed as a development opportunity along with its architectural significance. It is a ridge-top property with a larger "usable" site area and superior views.

2621 La Cuesta Dr, Hollywood Hills/Nichols Canyon
Buff & Hensman Architects, 1957.
Sold: 04/01/2024.
$4,190,000.
GLA: 1,750 SqFt per MLS vs. 1,540 SqFt per CoreLogic Public Records.
Site Area: 19,010 SqFt.
Not utilized primarily as it sold as a completely renovated property which did not remain completely consistent with the original design and has a pool and spa with limited views.

8010 Fareholm Dr, Hollywood Hills
Rudolph Schindler Architect, The Tucker House, 1951
Sold: 02/01/2024.
$2,775,000.
GLA: 2,285 SqFt per MLS vs. 1,832 SqFt per CoreLogic Public Records.
Site Area: 4,460 SqFt
Not utilized primarily as it is a "cliffhanger" property with no site substantive utility apart from the structure's footprint. Furthermore, it does not appear to have commanded discernible premium over otherwise similar properties in the area.

2300 N Edgemont St, Los Feliz.
Neil A Johnson Architect, The Steel House, 1960.
Sold: 03/28/2023.
$5,500,000.
GLA: 2,092 SqFt.
Site Area: 13,070 SqFt.
Not utilized primarily as it was reportedly part of a larger property "swap" which included the seller of 2300 N Edgemont St buying the home (compound) of the 2023 buyer of The Steel House. It is unknown if the recorded price of $5,500,000 reflects the amount that would be agreed upon outside of the property swap.

7436 Mulholland Dr, Hollywood Hills.
John Lautner Architect, The Garcia House (aka The Rainbow House), 1961.
Sold: 03/21/2023.
$12,500,000.
GLA: 2,596 SqFt.
Site Area: 9,730 SqFt.
Not utilized primarily as it is a highly unconventional and widely recognized design that appears to have commanded a premium that is significantly higher than achieved by most other architecturally significant properties in the region. It is also a property with a significantly larger GLA, a new pool (based on original plans), and is of overall superior Quality and Condition. *NOTE: Appraiser completed prior inspection of property.

7541 Woodrow Wilson Dr, Hollywood Hills/Woodrow Wilson.
Architect Ed Fickett, 1957.
Sold: 11/22/2022.
$3,300,000.
GLA: 2,062 SqFt (includes converted garage).
Site Area: 7,380 SqFt.
Not utilized primarily as the property has less architectural significance, has an apparent converted garage, has an

**Supplemental Addendum 1**    File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

inferior view, and has is located in an inferior neighborhood. More similar/relevant and/or recent comparables were available/utilized.

10801 Chalon Rd, Bel Air/Estate Area.
Richard Neutra Architect, The Brown House, 1955.
Sold: 11/01/2022 (off-market/No MLS).
$29,000,000.
GLA: 5,295 SqFt (per prior appraisal).
Site Area: 35,280 SqFt.
Not utilized primarily as it is a significantly larger home in a significantly superior "Estate" area of Bel Air, in overall superior condition, of overall superior quality, with a pool, spa, pool house and significantly larger lot. The seller was a high-profile celebrity and the property commanded a significant premium, even for architecturally significant properties. NOTE: As of the signature date of the appraisal, the property is also noted to be marketed for sale in the MLS with a list price of $29,995,000.

810 Bramble Way, Brentwood/Crestwood Hills.
A. Quincy Jones and Whitney R. Smith Architects, The Goldenfeld House, 1950.
Sold: 09/29/2022.
$3,485,000.
GLA: 2,054 SqFt.
Site Area: 10,020 SqFt.
Not utilized primarily as it is an out-of-area sale of a property with less architectural significance than the subject, and with a significantly inferior view.

17446 Revello Dr, Pacific Palisades/Castellammare
Pierre Koenig Architect, Beagles House, 1963.
Sold: 09/14/2023.
$3,740,000.
GLA: 2,467 SqFt.
Site Area: 4,320 SqFt.
Not utilized primarily as it is a "cliffhanger" property with no site substantive utility apart from the structure's footprint. It also has a superior view (ocean), backs a large condominium project and has direct exposure to the Pacific Coast Highway and Sunset Blvd.

215 La Vereda Rd, Pasadena/Linda Vista
Craig Ellwood Architect, Kubly House, 1965
Sold: 05/09/2022.
$3,600,000.
GLA: 2,156 SqFt.
Site Area: 26,300 SqFt
Not utilized primarily as it is located in a significantly distant market area in the city of Pasadena. It is also an older transaction than all but one of the comparables (Case Study House #21) utilized in the report.

11492 Thurston Cir, Bel Air SW.
Nordlinger House #1, Architect A. Quincy Jones, 1948.
Sold: 04/20/2022.
$4,350,000.
GLA: 2,950 SqFt.
Site Area: 12,800 SqFt.
Not utilized primarily as it is a property with a larger GLA, inferior view and a design of less architectural significance than the subject and it does not appear to have commanded a significant premium. It is also an older transaction than all but one of the comparables (Case Study House #21) utilized in the report.

2567 Glendower Ave, Los Angeles/Los Feliz
Rudolph Schindler Architect, The Skolnik Residence, 1951.
Sold: 01/31/2022.
$3,966,500.
GLA: 2,357 SqFt per MLS vs. 1,822 SqFt per CoreLogic Public Records.
Site Area: 10,940 SqFt
Not utilized primarily as it is was described by Schindler Biographer Esther McCoy as ""The house is essentially a carousel, an open space with a merry-go-round in the middle.". It is also an older transaction than all but one of the comparables (Case Study House #21) utilized in the report.

Supplemental Addendum 1

Main File No. PP25-A0403 | Page # 18 of 67

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code 90077 |
| Lender/Client | N/A | | | | | |

858 N Doheny Dr, West Hollywood.
Lloyd Wright Architect, The Lloyd Wright Studio and Residence, 1927.
Sold: 12/30/2021.
$4,350,000.
GLA: 2,413 SqFt.
Site Area: 3,570 SqFt.
Not utilized primarily as it is a Duplex with partial commercial use. It is also an older transaction than all but one of the comparables (Case Study House #21) utilized in the report.

2262 Stradella Rd, Bel Air/Roscomare.
Architect J.R. Davidson, 1958.
Sold: 10/27/2021.
$3,358,000.
GLA: 2,269 SqFt.
Site Area: 20,470 SqFt.
Not utilized primarily as it is a property of significantly less architectural significance than the subject. I It is also an older transaction than all but one of the comparables (Case Study House #21) utilized in the report.

1515 N Tigertail Rd, Brentwood/Crestwood Hills.
Craig Ellwood Architect, The Johnson Residence, 1953.
Sold: 12/31/2020.
$3,495,000.
GLA: 1,676 SqFt.
Site Area: 12,170 SqFt.
Not utilized primarily as it is an older transaction than all of the comparables utilized apart from the sale of Case Study House #21. It is also an out-of-area sale of a property with less architectural significance than the subject and is an older transaction than all but one of the comparables (Case Study House #21) utilized in the report.

## ADJUSTMENTS

### Adjustment Increments

Line-item adjustments were applied in increments of 2.5%, (most rounded to the nearest $500) for Location, View, Design (Style), Quality, Condition, and Submarket. Some specific line-item adjustments were rounded in increments of $1,000 to $15,000 (up or down depending on multiple factors) if deemed to more closely reflect the variable impact of some of the more static factors on value within the context of GLA differences, etc. (e.g., line-item adjustment for Condition of a comparable with a smaller GLA may be rounded down whereas a line-item adjustment for Condition of a comparable with a larger GLA may be rounded up).

### Additional Commentary on MAJOR ADJUSTMENT FACTORS

#### Date of Sale/Time

Adjustments (if applicable) in the Sales Comparison Approach "grid" may not always be linear/uniform based on the chronological order of the comparables due largely to fluctuations in the market and/or market data. Analysis for potential Date of Sale/Time is completed with information from multiple data sources which include, but may not be limited to: The Zillow Home Value Index (typically contract date of comparable to effective date of the appraisal); limited matched pair analysis within the Sales comparison approach "grid" itself; appraiser experience/findings from prior assignments in the area; interviews of/interaction with market participants. Well-reasoned market analysis in diverse market areas is conducted with adequate recognition of myriad additional potential factors that can impact the overall integrity/reliability of the unfiltered data such as: the fluid/non-linear nature of property value/property pricing; seasonal market changes; the often-disproportionate impact of specifically motivated buyers and/or buyers with extraordinary purchasing power; sudden and/or acute changes in supply and; the variability of property characteristics/attributes within samples; the somewhat arbitrary nature of pre-defined time-periods typically utilized in analysis (e.g., last three months, last six months, etc.).

Any applicable Market Condition adjustments were based largely on analysis of the Zillow Home Value Index along with limited matched-pair analysis within the "Sales Comparison Approach "grid". NOTE: While individual home value estimates from companies such as Zillow, Redfin, Trulia, etc. may not always be reliable/accurate, the market trend data for entire market areas (zip codes, cities, etc.) appears to be significantly more reliable. Client is advised that aggregated market data in most Southern California market areas is notoriously delusive and should not be relied upon as a sole basis for market analysis. Unless otherwise stated, noted changes in the Zillow Home

### Supplemental Addendum 1

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

Value Index data between the contract date of the comparable and the most recent Index are applied at roughly 1/2 the indicated change in Index due largely to the capricious nature of the market in recent months, as well as recent and ongoing changes in market momentum and sales volume.

Client is advised that the price appreciation of properties with specific market appeal, like the subject, do not always track in a manner commensurate with the overall market. The marketability of unique properties can be significantly impacted by acute fluctuations in supply/demand and the specific motivations of buyers with extraordinary purchasing power.

### Bel Air 12-month Sales history

| | Prior 10-12 Months | Prior 7-9 Months | Prior 4-6 Months | Current-3 Months |
|---|---|---|---|---|
| # Of Sales: | 37 | 26 | 27 | 35 |
| Average Sale Price: | $5,839,551 | $6,656,015 | $9,122,804 | $7,526,442 |
| Median Sale Price: | $3,735,000 | $4,327,650 | $4,110,600 | $4,979,000 |
| Average GLA (SqFt): | 4,083 | 4,972 | 5,062 | 5,143 |
| Median GLA (SqFt): | 2,917 | 3,951 | 3,247 | 4,225 |
| Avg Site (SqFt): | 25,817 | 32,613 | 24,617 | 27,926 |
| Median Site (SqFt): | 23,306 | 20,999 | 18,267 | 29,063 |

The results of the expanded market data search demonstrate the significant fluctuations that can occur in Bel Air depending on multiple property-specific factors rather than overall market trends. The data set above (which was culled for potential outlier sales, etc.) reflects fluctuating prices with an overall increasing trend over the 12-month time-frame. However, it is prudent to examine sales data within the context of the diversity of the housing stock, and the impact of a diverse housing stock on the Average and Median figures for GLA, Site, etc., the trends are less discernible, and conclusions regarding market conditions become more fallible. Even data sets that include Average and Median GLA and Site figures (such as those above), can sometimes be skewed by a higher, or lower, number of tear-down sales vs. new construction sales, or a higher number of sales in submarkets driven primarily by location (e.g., smaller homes on smaller lots closer to the beach often command significantly higher prices than larger homes on larger lots in adjacent canyons). In these cases, larger GLA or site figures may not necessarily reflect "superior" properties. While efforts are made to control for outliers, etc., the overall quantity of available data is often insufficient to do so without further debasing the integrity of the data.

In this case, it was deemed prudent to examine the data sets in conjunction with other data sources and the aforementioned potential juxtaposition of myriad ancillary variables.

Zillow Home Value Index data, as of the end of March 2025 (most recent available) indicates a year-over-year change of roughly -1.9% for "Bel Air". Index data also reflects peak 24-month Index pricing in December 2023, 24-month Index lows in August 2024 and historic Index highs in July-August 2022.

NOTE: While individual home value estimates from companies such as Zillow, Redfin, Trulia, etc. may not always be reliable/accurate, the market trend data for entire market areas (zip codes, cities, etc.) appears to be significantly more reliable. Client is advised that aggregated market data in most Southern California market areas is notoriously delusive and should not be relied upon as a sole basis for market analysis.

Predominant financing appears to be of the conventional type and interest only financing also appears to be available to many borrowers. Financing appears to be available for well qualified buyers, and there appears to be relatively strong demand for properties in the subject's market. The marketability of the subject appears to be good, and at a reasonable price it appears that the subject would sell within the time frame indicated on GPAR form page 1.

### Location
The location adjustments appear to work well to reconcile the sale prices. Thus, the Sales Comparison Approach "grid" itself is considered to serve as a limited form of paired sales analysis and no significant adverse impact on the overall credibility of the valuation is noted.

### Site
Price-per-site-SqFt adjustment factors utilized in the Sales comparison approach "grid" do not necessarily correlate directly with overall price-per-site-SqFt of parcels as market reaction to site area differences can be impacted by myriad factors such as diminishing returns for larger sites and "price of entry" for smaller sites.

### View
The View adjustments utilized in the Sales Comparison Approach "grid" appear to work well to reconcile the sale

Supplemental Addendum 1

Main File No. PP25-A0403    Page # 28 of 67

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

prices, thus the grid itself can be reasonably regarded as a form of paired sales that warrants the adjustment factor utilized in the Appraisal. View ratings for both the subject and comparables are generally based on the appraiser's exterior inspections, in conjunction with MLS listing remarks, MLS photos (if available), as well as Listing Agent comments and/or opinions of credible and knowledgeable local real estate agents who may be familiar with the properties (when/if necessary, available and if deemed relevant/credible).

**Design (Style)**
Line-item adjustments for Design (Style) utilized in the Sales Comparison Approach "grid" appear to work well to reconcile the sale prices, thus the grid itself is regarded as a form of paired sales that warrants the adjustment factor utilized in the Appraisal. NOTE: There are some instances when potentially detrimental design elements may not warrant line-item adjustments if it appears that said deficiencies can be remedied with renovations, and thus adequately reflected in Quality and Condition adjustments.

**Quality of Construction & Condition**
Refer to individual comparable descriptions.

**Age**
No separate line-item adjustments appear warranted for age differences as both actual age and "effective" age are considered in the overall Condition & Quality ratings and/or adjustments. In some specific sub-markets and/or categories, 100% new construction properties can command a premium over otherwise similar "like-new" homes that have been previously occupied. In the subject's market area and price range it is not unusual for the correlation between actual age and condition to be limited.

**Above-Grade Room Count**
Bedroom counts for the subject and comparables were deemed to be functionally adequate relative to their respective GLA's and intended use/utility unless otherwise noted. Any room count differences considered to impact marketability and/or market value of a property to an extent not adequately accounted for with GLA adjustments alone are adjusted for accordingly with separate adjustments.

**Gross Living Area**
Client is cautioned that the veracity of "Gross Living Area" data, utilized in the appraisal report is for reference only. Publicly recorded property data has, in recent years, become less-and-less reliable as many municipalities (Los Angeles County Assessor in particular) have shifted away from previous methods of property SqFt calculation to more complex SqFt calculation methods which may include SqFt credits, SqFt allowances, non-habitable areas, variable definitions of SqFt, etc. The resulting figures made available to the public may, or may not, reflect figures commensurate with what would be measured on-site by an appraiser following industry standards of measurement.

**Basement & Finished Rooms Below Grade**
N/A

**Energy Efficient Items**
N/A

**Garage/Carport**
Additional information regarding Garage/Carport adjustments is available in Supplemental Addendum Pt. 2.

**Porch/Patio/Deck**
The line-item for "Porch/Patio/Deck" in the Sales Comparison Approach "grid" is utilized primarily to report and/or adjust for differences in Pool and/or Spa as there is not dedicated, pre-printed line-item for Pool and/or Spa in appraisal forms. In areas where pools and/or spas are prevalent, porches, patios, decks, and/or balconies may not be specifically reported in the Sales Comparison Approach "grid" and are considered to be relatively conforming with other properties in the area unless otherwise indicated.

**NON PRE-PRINTED FIELDS**

**Accessory Structure/s**
N/A

**Site - (Usable/Additional)**
The definition of "usable" site is acknowledged to be somewhat subjective/open to interpretation as there is no industry-wide and/or market-wide consensus regarding what constitutes "usable" site. However, no adverse impact on the overall credibility of the valuation is noted as the same standards are utilized to determine

| | Main File No. PP25-A0403 | Page # 71 of 67 |

**Supplemental Addendum 1**    File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|----------|---------------------|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State CA | Zip Code 90077 |
| Lender/Client | N/A | | | | |

estimates of "usable" site for the subject are also utilized to determine estimates of "usable" site for all comparables utilized in the report.

**Other/Submarket**
Refer to individual comparable descriptions/analysis.

*NOTE: Additional information/commentary regarding the process of gathering and reporting comparable data, analysis of the data, and development of adjustment factors is available in Supplemental Addendum Pt. 2.*

## RECONCILIATION

The Sales Comparison Approach is the most reliable and relevant indicator of value for the subject and given most consideration in reconciliation.

The indicated opinion of value is "bracketed" by both the sale prices and the adjusted values of the comparables, and the opinion of value is well within the indicated, adjusted range.

• Most weight: Comparable #1 as it is the most recent sale of an architecturally significant property relevant to the valuation of the subject.  has the lowest Gross adjustments of the relevant sales comparables.

• Secondary Consideration: Comparables #2 and #4 as they were designed by the same architect, and comparable #6 as it is the most similar sale of a Case Study house in the past decade.

The opinion of market value for the subject is slightly higher than the predominant value for properties in the market area. Some contributing factors specific to the subject property include (but may not be limited to): architectural significance; view; site location; site utility. Also impacting the predominant value in the Bel Air neighborhood are several sizable "pockets" of Bel Air which include more modest homes. The subject is not considered to be an over-improved or over-valued home (at the indicated opinion of value) for the area and there is no apparent adverse impact on marketability noted.

**Additional Comments on the Final Opinion of Value**
The indicated range of adjusted values in the Sales Comparison Approach "grid", whether explicitly stated, or by inference/implication, reflects a reasonable range of value. In accordance with conditions of the appraisal engagement, the final opinion of value herein is expressed as a single dollar amount. However, the subject's market area is highly nuanced with perpetually changing market conditions and the most probable price of the subject could reasonably fall anywhere within the adjusted range of values, depending on myriad additional circumstances, influences, and/or specific motivations of buyer and/or seller that can impact sale prices. The singular figure is not intended to imply any certitude of precision as the typically high-degree of buyer subjectivity in residential real estate purchases, acute changes in supply-and-demand, and the often-capricious nature of both market trends and buyer/seller sentiment can all impact perception of market value to varying degrees.

Appraiser acknowledges that, while the final opinion of value, contained herein, is deemed credible based on the data that was available as of the effective date of the valuation, it may not always be predictive of an actual, future sale price of a property if it were to be marketed for sale. Appraisal methodology relies on mostly historic data which is often incomplete, unreliable, and/or absent of relevant context. The myriad variables that can impact the marketability of a property (and any potential, future, final sale price) is extensive, and many variables in high-end markets (and areas with buyers that have extraordinary purchasing power) are subjective in nature (sometimes involving powerful, emotional, and/or specific motivations). Furthermore, in many market areas there is insufficient commonality of interest among market participants to reasonably assert market preferences for (and/or contributory value of) many specific property attributes/characteristics.

## ASSUMPTIONS & LIMITING CONDITIONS

**General**
1. Title to the subject property is assumed to be free and clear of any existing liens. The subject property is assumed to be under responsible ownership/management. Title is assumed to be held in fee simple interest as of the date/s of value, and is assumed to be in readily marketable condition. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it and will not render any opinions about the title. The payment of all applicable taxes is/are assumed to be current, unless otherwise stated.
2. The appraiser obtained information, estimates, and opinions that were expressed in the appraisal report from

### Supplemental Addendum 1

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

sources that were assumed to be reliable, and appraiser believes information provided by sources to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

3. The appraiser has noted in the appraisal report any adverse conditions that may have a measurable impact on value (including, but not limited to, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property, or that the appraiser became aware of, during the normal course of business/research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property, or adverse environmental conditions (including, but not limited to, the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing  that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

4. It is assumed that the utilization of the land and improvements is within the boundaries or property lines of the property described, and that there is/are no encroachment/s or trespass unless otherwise stated in this report.

5. While environmentally sensitive habitats may or may not exist on the subject property, I am not an environmental or biological expert. This report assumes that there are no sensitive habitats or vegetation that would significantly affect the development of the subject property to its highest and best use.

6. No opinion is expressed as to the value of subsurface oil, gas, or mineral rights and it is assumed that the property is not subject to surface entry for the exploration or removal of such materials except as is expressly stated.

7. An appraisal of real property is not a 'home inspection' and should not be construed as such. As part of the valuation process, the appraiser performs a non-invasive visual inventory that is not intended to reveal defects or detrimental conditions that are not readily apparent. The presence of such conditions or defects could adversely affect the appraiser's opinion of value. Clients with concerns about such potential negative factors are encouraged to engage the appropriate type of expert to investigate. The appraiser specializes in property valuation however is not a home inspector, building contractor, structural engineer, land use consultant, architect or other property related expert. The client is invited and encouraged to employ qualified experts to inspect/address any areas of specific concern regarding the property. If any negative conditions are discovered they may have an adverse effect on value and/or marketability and revisions to the appraisal report/valuation may be necessary to adequately reflect information not consistent with the original assumptions.

8. All matters related to utilities (waste disposal, water supply, water delivery, electrical service, etc.) are assumed to be favorable and all utilities are assumed to be in working order, sufficient to serve the current (or proposed) use, and safe for use. Geological, Engineering, Title, Environmental and Surveyor reports were not provided to the appraiser, unless otherwise stated in the report, and are assumed to be favorable. Analysis of any possible Geological, Engineering, Surveyor and/or Title issues which were not made known to the appraiser (or were not readily apparent to the appraiser during the normal course of business), are beyond the scope of the appraisal and are beyond the scope of the appraiser's expertise. The client is advised that all properties in California are subject to some degree of seismic risk.

9. Unless otherwise indicated in the appraisal report, the appraiser assumes that all components of the property are fundamentally sound and in working order and the property to be of free of any latent defects which may adversely impact marketability and/or market value. Any viewing of the property by the appraiser was limited to readily observable areas. Unless otherwise noted, attics and crawl spaces were not accessed. The appraiser did not move furniture, floor coverings or other items that may restrict the viewing of the property.

10. Any photographs, plat maps, and/or aerial images maps furnished in this report are to assist the reader in visualizing the property only.

11. The appraiser will not give testimony, or appear in court, because he or she developed an opinion of value of the property in question, unless specific arrangements to do so have been made beforehand. The submission of this report constitutes completion of the services authorized. It is submitted with the condition that if additional appraisal services are required, the client will provide customary compensation, relative to updated valuation preparation, appraiser-client conferences, deposition, or expert witness testimony.

12. Any projections included in this report are utilized to assist in the valuation process and are based on market conditions as of the effective date of the valuation, anticipated short-term supply, and demand factors. Therefore, the projections are subject to changes in future conditions that cannot be accurately predicted and could affect the future value projections.

13. No attempt has been made to evaluate any fractional interests, should they exist.

14. An appraiser's client is the party (or parties) who engage an appraiser in a specific assignment. Any other party

### Supplemental Addendum 1

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

acquiring this report from the client does not become a party to the appraiser-client relationship. Any persons receiving this appraisal report because of disclosure requirements applicable to the appraiser's client do not become intended users of this report unless specifically identified by the client at the time of the assignment. This report was prepared for the sole and exclusive use of the client and other identified intended users for the identified intended use and its use by any other parties is prohibited. The appraiser is not responsible for unauthorized use and/or distribution of the report.

15. The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public, through advertising, public relations, news, sales, or by means of any other media, or by its inclusion in a private or public database.

16. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice, and any applicable federal, state or local laws.

17. The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public, through advertising, public relations, news, sales, or by means of any other media, or by its inclusion in a private or public database.

18. The Americans with Disabilities Act ("ADA") became effective January 26, 1992. I have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformance with the various detailed requirements of the ADA. It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one or more requirements of the ADA. If so, this fact could have a negative impact on the value of the property. Since I have no direct evidence relating to this issue, I did not consider.

19. Limitations of Liability: To the fullest extent permitted by applicable law, the maximum monetary liability of Appraiser, Firm or Client to one another or to any third party (regardless of whether such party's claimed use or reliance on the appraisal was authorized by Appraiser) for any and all claims or causes of action relating to the appraisal or agreement shall be limited to the total compensation actually received by Appraiser for the appraisal or other services that are the subject of the claim(s) or cause(s) of action. Appraiser will have no legal liability to any third party who claims to have relied upon the report, in whole or in part, for any purpose, whatsoever, unless such reliance was agreed to, in advance, by the appraiser, in writing.

20. If this appraisal is indicated as subject to satisfactory completion, repairs, or alterations, the appraiser has based his or her appraisal report and valuation conclusion on the assumption that completion of the improvements will be performed in a manner commensurate with local market expectations.

21. The appraiser *may* have provided a sketch in the appraisal report to show approximate dimensions of the improvements, and any such sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size. Unless otherwise indicated, a Land Survey was not performed.

22. *If* so indicated, the appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

23. *If* the cost approach is included in this appraisal, the appraiser has estimated the value of the land in the cost approach at its highest and best use, and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used. Unless otherwise specifically indicated, the cost approach value is not an insurance value, and should not be used as such.

24. Deed was not provided to the appraiser unless otherwise stated. No adverse impact on the overall credibility is noted.

## EXTRAORDINARY ASSUMPTION/S

1. The appraisal is based on the extraordinary assumption that all information provided to the appraiser, by the client or representatives of the client, is true and correct. If this assumption is proven to be false, it may have an adverse impact on value and revisions to the appraisal report/valuation may be necessary to adequately reflect information not consistent with the original assumptions.

## SPECIFIC/ASSIGNMENT CONDITIONS

1.This is a Restricted Appraisal Report that was prepared to comply with the reporting requirements set forth under Standard Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice. As such, it presents limited discussions of the data, reasoning, and analyses that were used in the appraisal process to develop opinions and conclusions. Therefore, use of this report is limited to the client. There are no other intended users.

2. NOTE: The GP Residential form is not intended for use in transactions that require a Fannie Mae 1004/Freddie

Supplemental Addendum 1

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

Mac 70 form (a.k.a. Uniform Residential Appraisal Report or "URAR").

3. The Cost Approach was not developed as it was not requested by the client. Development of the Cost Approach for properties like the subject rarely yields results that contribute to the credibility of an opinion of value for the intended purpose of the valuation as engaged by the client.

4. The Income Approach was not developed as it was not requested by the client. Development of the Income Approach for properties like the subject rarely yields results that contribute to the credibility of an opinion of value for the intended purpose of the valuation as engaged by the client.

5. This report was completed in compliance with all local, state and federal laws and regulations related to the appraisal of real estate and "appraiser independence", including but not limited to California Senate bill 223/California Civil Code section 1090.5 as well as all relevant / applicable sections of the Fannie Mae and Freddie Mac appraisal guidelines (when/if deemed appropriate to the intended use).

## SCOPE OF WORK/SCOPE OF THE APPRAISAL

Scope of work is defined in the Uniform Standards of Professional Appraisal Practice (USPAP) as "the type and extent of research and analyses in an assignment". In short, scope of work is simply what the appraiser did and did not do during the course of the assignment. It includes (but may not be limited to): the extent to which the property is identified and inspected, the type and extent of the data researched, the type and extent of analyses applied to arrive at opinions or conclusions.

The Scope of Work is the type and extent of research and analyses performed in an appraisal assignment that is required to produce credible assignment results, given the nature of the appraisal problem, the specific requirements of the intended user(s) and the intended use of the appraisal report. Reliance upon this report, regardless of how acquired, by any party or for any use, other than those specified in this report by the Appraiser, is prohibited. The Opinion of Value that is the conclusion of this report is credible only within the context of the Scope of Work, Effective Date, the Date of Report, the Intended User(s), the Intended Use, the stated Assumptions and Limiting Conditions, any Hypothetical Conditions and/or Extraordinary Assumptions, and the Type of Value, as defined herein. The appraiser, appraisal firm, and related parties assume no obligation, liability, or accountability, and will not be responsible for any unauthorized use of this report or its conclusions.

The appraiser's certification appearing in this appraisal report is subject to the above conditions and to such other specific conditions as are set forth by the appraiser in the report. All extraordinary assumptions and/or hypothetical conditions are stated in the report. Extraordinary assumptions and/or hypothetical conditions may impact the assignment results.

This analysis is intended to be an "appraisal" as defined in the Uniform Standards of Professional Appraisal Practice ("USPAP"). It is my intent that the appraisal service be performed in such a manner that the results of the analysis, opinion, or conclusion be that of a disinterested third party. All appropriate data deemed pertinent to the solution of the appraisal problem was collected, confirmed, and reported in conformity with USPAP and the supplemental requirements of the Appraisal Institute. This appraisal report includes a description of the subject property as well as a limited discussion of the reasoning that has resulted in the conclusions. The scope was appropriate in relation to the appraisal problem and the assignment parameters set forth by the client.

Elements of the valuation of the subject property included (but may not be limited to):

- Inspection of the subject property: An interior and exterior viewing of the subject property on 04/15/2025. As part of the property viewing, significant physical characteristics were cataloged and analyzed, and the improvements were photographed. Measurement of the subject property was completed at the time of a prior appraisal assignment on 04/14/2023. The appraiser used data from a variety of sources, including (but not necessarily limited to): local MLS; public records data; County Assessor data; County GIS data; Los Angeles Department of Building and Safety; Los Angeles County Department of Regional Planning.

- Investigation of the physical, legal, and economic characteristics of the subject property.

- Analysis of the highest and best use of the subject property.

- Research and verification of relevant market data including recent, area sales.

- Research and analysis of the subject's immediate market area and any relevant competing market areas if deemed necessary.

- Research and analysis of market conditions, including supply/demand.

- Development of a limited sales comparison approach analysis.

- The appraiser has summarized relevant analysis and conclusions in this report, but additional pertinent information may also be found in the appraiser's files.

Supplemental Addendum 1

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

## CERTIFICATIONS

1. The statements of fact contained in this report are true and correct.

2. The credibility of this report, for the stated use by the stated user(s), of the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are the appraiser's personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. Unless otherwise indicated, the appraiser has no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. Unless otherwise indicated, the appraiser has performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. The appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. The appraiser's engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. The appraiser's compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. The appraiser's analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.

9. Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.

10. The appraiser did not base, either partially or completely, my analysis and/or the opinion of value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property, or of the present owners or occupants of the properties in the vicinity of the subject property.

11. Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification.

## Appraisal Practice additional comments

USPAP Advisory Opinion 13 states, in part, "An appraiser must not allow assignment conditions to limit the scope of work to such a degree that the assignment results are not credible in the context of the intended use."

Appraisers are given the task of deriving adjustments that are intended to reflect the contributory value of various property characteristics based on the actions/reactions of buyers in the marketplace. The most common (and theoretically ideal) method for accomplishing this task is known as a paired sales analysis. This method can work quite well in areas of mostly conforming homes properties with minor differences. However, many market areas in the greater Los Angeles area are very diverse in property characteristics and amenities. In its purest form, paired sales analysis works by comparing two (or more) properties and attributing the difference in sale prices to specific, easily identifiable characteristics or amenities. Take, for example, two sold properties that are almost identical in every way, apart from one having a pool. If the contract and transfer dates are proximate (with same or similar market conditions), both represented "typical" arms-length, and both represented fair market value transfers, it can generally be safely concluded that the difference between the sale prices is most likely attributed primarily to the pool. The difference between sale prices could then be utilized as a reliable adjustment factor. In areas like the subject's neighborhood however, it becomes less practical to apply this method (sometimes, nearly impossible). In market areas where no two homes are alike, the task of determining which specific differences or attributes contribute to value (and to what extent they contribute to value) can become hazy. In fact, in many cases, the emotions and/or specific motivation of the individual buyer/s can play a greater role than more tangible, salient characteristics. This makes the challenge of adjusting for the contributory value of any singular attribute very complicated, unscientific, and nuanced.

Appraisers must rely on a combination of several approaches and/or perspectives, including (but not limited to): a form of modified matched paired sales analysis (with controls); the attributable market difference ascertained by depreciated replacement cost/contributory value; discussions with local realtors who specialize in the area; and the appraiser's experience in (and knowledge of) the subject's specific market area. In some cases, is may be prudent to speak directly to market participants (buyers, sellers, agents, brokers, etc. involved in recent transactions), to gain a better understanding of the motivations of the market participants and how much the

### Supplemental Addendum 1

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

"typical" buyers are willing to pay for various property characteristics or amenities. We, as appraisers, also analyze what the current cost would be to build a similar house or to add a certain/specific amenity. Unfortunately, the exact contributory value of any one feature/item is often unclear and there is generally a range of prices/costs that could be considered "reasonable" projections.

While most market participants would acknowledge that actual market reaction to differences between properties exists on a fluid continuum, generally accepted appraisal methodology and industry standards dictate that adjustments in the sale comparison approach "grid" of standardized appraisal forms are applied with broad/rounded, incremental figures (e.g., $50,000, $100,000, $150,000, etc.) and/or percentages (e.g., 2.5%, 5%, 7.5%, 10%, etc.). Additionally, significant consideration may be given to the reaction of market participants to "Static" factors (e.g., Location, View) vs. "Dynamic" factors (e.g., Quality, Condition). Location, View, Design (Style), Quality, Condition and Submarket are generally applied in increments of 2.5% of the Sales prices of the comparables (when applicable and unless otherwise indicated). Adjustments in the Sales Comparison "grid" (for most factors) are rounded to the nearest $500 unless otherwise indicated in the addendum. Adjustments for all individual amenities / characteristics are intended to reflect the estimated market reaction to differences and they may not always represent figures that are commensurate with actual construction costs/contractor bids. While some amenities historically a have a higher "return on investment" than others, the items that recapture their cost in the market often differ from area to area and/or between different price ranges and categories. This is especially true when analyzing the contributory value of additional structures and/or secondary "living" areas such as guest units, bonus rooms, or finished basements for which the contributory value of (and corresponding adjustments in the sales comparison Sales Comparison Approach "grid") may, in some cases, be greater than actual construction or replacement costs due to myriad factors that may include (but may not be limited to): set-back regulations; lot coverage limitations; location and/or configuration of existing improvements; and other factors described above.

The diversity of opinions among market participants extends well beyond the variables widely acknowledged to be subjective (Style, etc.). Multiple variables such as Room Counts and SqFt are widely assumed to be clearly, and objectively quantifiable and unambiguous. However, in Real Estate, many of these variables are paradoxically open to interpretation. For instance, rooms indicated as "Bedrooms" in Real Estate marketing may-or-may-not have closets, reasonable access to bathrooms, sufficient ingress/egress, sufficient ceiling height, etc. and both buyers and sellers may have different criteria for what they consider to be a "Bedroom". Industry standards for measuring/calculation SqFt/GLA have also changed somewhat in recent years and some approaches to property measurement remain somewhat ambiguous and/or incompatible with widely held understanding/assumptions (e.g., credit given to thicker-than-typical foundation walls, or walls with additional ornamentation). Adding to potential uncertainty related to seemingly objective variables are inconsistencies that have been noted on a relatively regular basis not just between but also within data sources (e.g., MLS listings with differing room counts in the property overview, the listing remarks, online marketing, and/or shown on floor plans). The client is advised that due to the aforementioned irregularities in reporting, the representations of salient characteristics of properties (GLA, room count, site area, etc.) utilized in the appraisal report may differ somewhat from figures reported in other data sources and discrepancies are sometimes irreconcilable. In some cases, the source deemed most reliable/credible may ultimately reflect a "judgment call" based on the appraiser's prior experience, knowledge of market areas, knowledge of the fallibility/reliability of the data sources, etc. and data utilized in the report is by no means intended to imply absolute certainty.

Some market participants may mistakenly equate "Value" with "Cost" or "Price". Cost refers to actual expenditures (materials, labor, etc.). Price, however, refers to the amount that someone pays for something. While cost and price can each affect value, they do not determine value. This dynamic can also impact the return-on-investment for the market value of a property as some expenditures may generate significant profits while others may have an adverse impact on the market value of a property. Admittedly, some line-item adjustments within an appraisal report are as much "qualitative" (reflecting generally positive or negative market influences) as they are "quantitative" (verifiably derived from hard data/information). Even in a high-quality and well supported appraisal report, it remains possible that every single line-item adjustment could be questioned if scrutiny is focused on a singular variable, outside the larger context of the entire report and myriad other factors which can also impact marketability/value, and which do not have the same impact for every buyer. Further impeding an appraiser's ability to develop irrefutable adjustments is the fundamental foundation of appraisal practice which involves the appraiser's "opinion" of value which itself is based largely on the "opinions" and/or specific motivations of market participants (buyers, sellers, etc.) due to the largely subjective nature of real estate in general.

In some cases, verbiage from MLS listings may be included in the appraisal report as part of a property description for a comparable utilized in the Sales Comparison Approach "grid". Any MLS listing verbiage included in an appraisal report should not be construed as the opinion of the appraiser unless otherwise stated. California licensed Real Estate brokers and salespeople, though subject to Federal Fair Housing laws, are not subject to the

Supplemental Addendum 1                                    File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State CA | Zip Code 90077 |
| Lender/Client | N/A | | | | |

same GSE criteria as Appraisers regarding subjective descriptions. California Real Estate Law permits realtors to describe properties with subjective language that is legally allowed and referred to as "puffing" ["superlative statements about a property that shouldn't be considered assertions of fact": California Real Estate Law; 6th Edition - 2007; Page 558 {cf. pages. 214-215}]. Thus, while personally refraining from similar subjective terminology within the appraisal report, it is still Appraisers' USPAP responsibility to attempt to distinguish between comments that may reflect "puffing" and those that represent actual assertions of fact. Appraisers are obligated to analyze all relevant marketing factors that may have an impact on "market reaction" and to 'objectively' adjust for differences. In some cases, understanding the way a property was marketed may be integral to adequately understanding market reaction and direct quotes from marketing materials may be the most concise and direct manner to encapsulate any potentially relevant marketing strategies to an end user. The appraiser acknowledges that Federal Fair Housing regulations and Government Sponsored Enterprises (GSE's) have guidelines regarding unacceptable, 'subjective' terminology and has endeavored to remain in compliance with industry standards for Appraiser verbiage.

NOTE: The prevalence of investment buyers (syndicates, etc.) indicates that the Principle of Anticipation is now a significant market factor in some high-end markets of Southern California. While this may have a tangible impact on the outcome of "bidding wars" it is not entirely consistent with the definition of "Market Value".

## ADDITIONAL COMMENTARY ON MARKET DYNAMICS AND APPRAISAL PRACTICE

The high-end real estate market in the greater Los Angeles/Beverly Hills/Malibu area can, during certain economic climates, function in a manner that appears to be independent from much of the remainder of the real estate market. It is not unusual for a portion of the buyers participating in real estate transactions in these high-end market areas to be somewhat "insulated" from economic conditions that might otherwise impact most participants in more "typical" or conforming market areas.

It is not unusual in some high-end market areas and/or categories for the market participants (both buyers and sellers) to have motivations that may appear to have minimal correlation with prevalent economic indicators, economic influences and/or market conditions. In some cases, the specific motivations of these market participants may even appear to be somewhat incongruent, contrary to, or disconnected from, these indicators, influences and/or conditions.

In some cases, the buyer/seller dynamic may also involve sellers who recognize their potential advantage over a significantly motivated buyer and who may compel buyers to pay significant premiums that may not necessarily reflect any substantive consideration of prior sales in the area and/or the market value of the property as it relates to so-called "comparable" sales. This dynamic between buyer and seller in the high-end market is not always consistent with the buyer/seller dynamic as it relates to the widely accepted definition/understanding of "Market Value" in the real estate industry (defined by the Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. as "The most probable price that the specified property interest should sell for in a competitive market after a reasonable exposure time, as of a specified date, in cash, or in terms equivalent to cash, under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, for self-interest, and assuming that neither is under duress").

Transactions in some high-end markets may also involve buyer-agent relationships that are somewhat inconsistent with typically understood boundaries of fiduciary duty. In some cases, the market value of a property targeted for purchase may be less germane than getting the property they want, regardless of the market value that could be reasonably supported by market data and a "winning" bid may be the sole metric by which a buyer's agent is judged. It is not unusual for some buyers to be completely unaware of prior sales in the area and evaluate the value of a property exclusively by how it compares to other listings available/on the market at that time.

In some high-end market areas that include participants with extraordinary purchasing power, participants with specific motivation, and/or a substantial number of transactions that take place with no widespread market exposure in Multiple Listing Services, it could reasonably be argued that the market dynamics are sufficiently atypical to reasonably conclude that few (if any) of the transactions should be considered "market value" when examined within the context of the widely accepted definitions of "market value" (the foundation of most residential appraisals).

From an appraisal standpoint, the task of reconciling the sale prices of these transactions can be quite daunting. It is not unusual for typical "industry standards" and/or lender guidelines to offer insufficient latitude within the context of typical appraisal practice to adequately reflect market reaction to differences between properties.

In some cases, a property may be initially exposed to the market via an MLS listing only to be later Withdrawn, Canceled, or allowed to Expire by the listing agent once a buyer has been secured. This tactic is not uncommon in

| Main File No. PP25 A0403 | Page # 28 of 67 |

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

the market area and is often implemented by agents to shelter buyer and/or seller from widespread, public awareness of the transaction. The status of Canceled or Withdrawn listings will sometimes be changed in the MLS to "Expired" after a specific amount of time which can further obscure details of the transaction. The noted lack of transparency associated with some transactions in the market can have a detrimental impact any efforts to credibly analyze market data/trends.

Due to the significant number of transactions in high-end markets in which confidentiality is a priority, it may be necessary, in some cases, to rely heavily on confidential information provided by local real estate agents/brokers, colleagues, real estate professionals and/or other market participants. Further exacerbating difficulties in accurately evaluating market conditions/trends in some high-end submarkets are the significant number of listings with extraordinarily optimistic list prices, some of which can remain on the market for extended periods of time with unmotivated sellers and/or with few (or no) price adjustments. While these listings may have a significant impact on the superficial/raw months of supply statistics, they may have minimal appreciable impact on perception of supply-and-demand among informed market participants (effective supply and demand).

Analysis of potential listing comparables, estimated months-of-supply, and estimates of projected market negotiations must all be navigated with cognizance of the preponderance of listings with optimistic list prices. These list prices may not reflect actual market value and thus these listings may contort DOM data (both macro and micro) as well as Average/Median List Price figures. It is not unprecedented (or even atypical) for a portion of the optimistically priced listings in certain submarkets to ultimately sell for prices that are more "in-line" with actual market conditions despite the lack of any substantive price adjustments.

Client is cautioned that in some high-end markets in which relevant market data is limited, conclusions drawn from a limited matched pair analysis (with only 2 sales) involving market participants who may have specific motivations and extraordinary purchasing power, and for whom risk mitigation may not be among the primary objectives, may not be the most definitive indicator of market reaction to differences.

In cases when multiple potential buyers with "deep pockets" are in competition with each other to submit the "winning" bid for a property, it is not unusual for at least a portion of the potential buyers to develop specific motivations, not unlike what some behavioral economists may refer to as "auction fever". This can be especially true if one (or multiple) potential buyers have recently "lost out" during previous attempted property purchases and can sometimes result in contract prices that are well above prices that could otherwise be supported by market data. In some cases, these premiums may also exceed what can be reasonably explained and/or reconciled within the Sales Comparison Approach "grid".

**REFER TO: SUPPLEMENTAL ADDENDUM PT 2 for additional commentary**

## Subject Photo Page

| Borrower | N/A - Private Party | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | | |
| City | Los Angeles | | County | Los Angeles | | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | | |



**Subject Front**

1811 Bel Air Rd
Sales Price
G.L.A.            1,705
Tot. Rooms       5
Tot. Bedrms.     2
Tot. Bathms.     2
Location         Gd:Residential
View             Gd:Cty,Cyn,Mtn,Ocn
Site             8,702 sf
Quality          Avg/Gd
Age              72

**Subject Rear**



**Subject Street**



Main File No. PP25-A0403 | Page # 30 of 67

## Photograph Addendum

| | |
|---|---|
| Borrower | N/A - Private Party |
| Property Address | 1811 Bel Air Rd |
| City | Los Angeles |
| County | Los Angeles |
| State | CA |
| Zip Code | 90077 |
| Lender/Client | N/A |



Subject Street opposite



Front View alternate



Front View alternate



Foyer



Hallway/Living Room



Living Room/View

## Photograph Addendum

| | |
|---|---|
| Borrower | N/A - Private Party |
| Property Address | 1811 Bel Air Rd |
| City | Los Angeles |
| Lender/Client | N/A |

County: Los Angeles  State: CA  Zip Code: 90077



Den



View



View



Living Room and View



Dining Room/Yard



Kitchen

Main File No. PP25-A0403 | Page # 32 of 67

## Photograph Addendum

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |



Dining Room and Yard alternate



Primary Bedroom



View



Bathroom of Primary Bedroom



Bedroom



Bathroom

## Photograph Addendum

| | |
|---|---|
| Borrower | N/A - Private Party |
| Property Address | 1811 Bel Air Rd |
| City | Los Angeles |
| Lender/Client | N/A |

County  Los Angeles    State  CA    Zip Code  90077



Side View/Patio/Yard



Side View/Patio/Yard alternate



Yard



Yard alternate



Yard alternate

Main File No. 1975 A0403    Page # 34 of 67

## Building Sketch

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |



| | AREA CALCULATIONS SUMMARY | | | | |
|---|---|---|---|---|---|
| Code | Description | Factor | Net Size | Perimeter | Net Totals |
| GLA1 | First Floor | 1.00 | 1705.31 | 186.25 | 1705.31 |
| GAR | Carport | 1.00 | 615.04 | 99.20 | 615.04 |
| | | | | | |
| | Net LIVABLE | cnt | 1 | (rounded) | 1,705 |

| | AREA CALCULATIONS BREAKDOWN | | | |
|---|---|---|---|---|
| Name | Base x | Height x | Width = | Area |
| First Floor | | 7.50 x | 5.65 = | 42.38 |
| | | 55.85 x | 29.75 = | 1661.54 |
| | 0.5 x | 55.85 x | 0.05 = | 1.40 |
| | | | | |
| 3 total items | | | (rounded) | 1,705 |

© iLOOKABOUT (US) Inc. dba Apex Software

Main File No. PP25-A0403 | Page # 35 of 67

### Architectural Floor Plan/Site Plan

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |



Main File No. PP25-A0403 | Page # 36 of 67

## Plat Map

| Borrower | N/A - Private Party | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | | |



Aerial Map 1

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |



Main File No. PP25-A0403 | Page # 38 of 67

## Aerial Map 2

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |



### Area Map

| Borrower | N/A - Private Party | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | | |



**Comparable Photo Page**

| | |
|---|---|
| Borrower | N/A - Private Party |
| Property Address | 1811 Bel Air Rd |
| City | Los Angeles |
| County | Los Angeles |
| State | CA |
| Zip Code | 90077 |
| Lender/Client | N/A |



### Comparable 1

12221 Dorothy St

| | |
|---|---|
| Prox. to Subject | 4.03 miles SW |
| Sale Price | 5,120,000 |
| Gross Living Area | 2,827 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Gd;Residential |
| View | N;Res;TrTps |
| Site | 6000 sf |
| Quality | Gd |
| Age | 99 |



### Comparable 2

1095 N Kenter Ave

| | |
|---|---|
| Prox. to Subject | 2.97 miles SW |
| Sale Price | 3,295,000 |
| Gross Living Area | 1,550 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2 |
| Location | Gd;Residential |
| View | Gd;Cty,Cyn,Mtn,Ocn |
| Site | 9,680 sf |
| Quality | Gd |
| Age | 66 |



### Comparable 3

2210 Neutra Pl

| | |
|---|---|
| Prox. to Subject | 10.84 miles E |
| Sale Price | 3,400,000 |
| Gross Living Area | 1,564 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | Gd;Residential |
| View | N;Res;TrTps |
| Site | 10,050 sf |
| Quality | Gd |
| Age | 65 |

Main File No. PP25-A0403 | Page # 41 of 67

## Comparable Photo Page

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code 90077 |
| Lender/Client | N/A | | | | | |



### Comparable 4

4791 Bonvue Ave

| | |
|---|---|
| Prox. to Subject | 8.92 miles E |
| Sale Price | 4,800,000 |
| Gross Living Area | 1,749 |
| Total Rooms | 6 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.0 |
| Location | Gd:Residential |
| View | B;Cty;CynMtnOcn |
| Site | 13955 sf |
| Quality | VeryGood |
| Age | 58 |



### Comparable 5

2460 Sunset Plaza Dr

| | |
|---|---|
| Prox. to Subject | 3.60 miles E |
| Sale Price | 8,000,000 |
| Gross Living Area | 1,896 |
| Total Rooms | 6 |
| Total Bedrooms | 2 |
| Total Bathrooms | 1.0 |
| Location | Gd;Res;Promontory |
| View | B;Cty;CynMtnOcn |
| Site | 1.52 ac |
| Quality | VeryGood |
| Age | asdf |



### Comparable 6

9038 Wonderland Park Ave

| | |
|---|---|
| Prox. to Subject | 3.47 miles E |
| Sale Price | 3,260,000 |
| Gross Living Area | 1,783 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.0 |
| Location | Gd:Residential |
| View | N;Hills;TrTps |
| Site | 12350 sf |
| Quality | Avg |
| Age | 61 |

Main File No. PP25-A0403 | Page # 42 of 67

## Photograph Addendum

| | |
|---|---|
| Borrower | N/A - Private Party |
| Property Address | 1811 Bel Air Rd |
| City | Los Angeles |
| County | Los Angeles |
| State | CA |
| Zip Code | 90077 |
| Lender/Client | N/A |



12221 Dorothy St MLS Photo



12221 Dorothy St MLS Photo



1095 N Kenter Ave MLS Photo



1095 N Kenter Ave MLS Photo



2210 Neutra Pl MLS Photo



2210 Neutra Pl MLS Photo

Form PIC6_LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Photograph Addendum

| Borrower | N/A - Private Party | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | | |
| City | Los Angeles | County | Los Angeles | | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | | |



4791 Bonvue Ave Architect website photo



4791 Bonvue Ave Architect website photo



2460 Sunset Plaza Dr MLS Photo



2460 Sunset Plaza Dr marketing photo



9038 Wonderland Park Ave MLS photo



9038 Wonderland Park Ave MLS photo

Main File No. PP2S-A0403 | Page # 44 of 67

**Location Map**

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |



## USPAP ADDENDUM

File No. PP25-A0403

| | |
|---|---|
| Borrower | N/A - Private Party |
| Property Address | 1811 Bel Air Rd |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender | N/A |

This report was prepared under the following USPAP reporting option:

☐ Appraisal Report    This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☒ Restricted Appraisal Report    This report was prepared in accordance with USPAP Standards Rule 2-2(b).

This is a Restricted Appraisal Report that was prepared to comply with the reporting requirements set forth under Standard Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice. As such, it presents limited discussions of the data, reasoning, and analyses that were used in the appraisal process to develop opinions and conclusions. Therefore, use of this report is limited to the client. There are no other intended users.

### Reasonable Exposure Time

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is:    Under 3 months.

The indicated estimate of Exposure Time is directly associated with the indicated opinion of value, and is typical for the subject's neighborhood and competing marketing areas. The estimated Exposure Time is based on the presumption of a list price consistent with the market. The subject's estimated exposure time (as well as the estimated marketing time indicated on page 1 of the appraisal) are based on current market trends, analysis of the Average & Median "days on market" of the comparables utilized in the appraisal report. The estimated marketing and exposure times are based on the subject property at the final opinion of value which is supported by actual closed sale comparables rather than optimistically priced listings. See attached addenda.

### Additional Certifications

I certify that, to the best of my knowledge and belief:

☐ I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☒ I HAVE performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

A prior 1004 assignment was completed in 2023 with an effective date of 04/14/2023 and a signature date of 04/24/2023.

· The statements of fact contained in this report are true and correct.

· The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

· Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

· I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

· My engagement in this assignment was not contingent upon developing or reporting predetermined results.

· My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

· My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.

· Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report. · Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

### Additional Comments

APPRAISER COMPETENCY

· Appraiser's office/home are within a 25-mile radius of the subject property.

· Appraiser has access to appropriate local MLS, public records, Assessor, and Title data sources.

· This report was completed in compliance with all applicable local, state and federal laws and regulations related to the appraisal of real estate and "appraiser independence", including but not limited to California Senate bill 223/California Civil Code section 1090.5.

· Licensed appraiser since 2001. Certified Residential Appraiser since 2005.

· Significant and recent experience appraising "high-end" properties including an average single-family residential valuation of over $8,000,000 since 2019.

· Significant and recent experience appraising in the subject's market area.

· This report was completed in compliance of IRS standards of a Qualified Appraisal and by a Qualified Appraiser.

| APPRAISER: | SUPERVISORY APPRAISER: (only if required) |
|---|---|
| Signature: | Signature: |
| Name:   Peter B Burness | Name: |
| Date Signed:   05/12/2025 | Date Signed: |
| State Certification #:   AR028342 | State Certification #: |
| or State License #: | or State License #: |
| State:   CA | State: |
| Expiration Date of Certification or License:   09/25/2025 | Expiration Date of Certification or License: |
| Effective Date of Appraisal:   04/15/25 | Supervisory Appraiser Inspection of Subject Property: |
| | ☐ Did Not  ☐ Exterior-only from Street  ☐ Interior and Exterior |

| Borrower | N/A - Private Party | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | | |
| City | Los Angeles | County | Los Angeles | | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | | |

## SUPPLEMENTAL ADDENDUM PT 2

Disclaimers & Additional/General commentary on the Appraisal process (*NOTE: Some commentary herein may not apply to all appraisals; however, some commentary may have relevance to widely held appraiser/appraisal standards and the appraisal process)

---

## SUBJECT

### MEASUREMENTS & REPORTING OF GLA/SQFT

As of April 1, 2022, Fannie Mae has mandated that all appraisals for Fannie Mae must utilize ANSI measurement standards and reporting of Gross Living Area (GLA) Although not all appraisal assignments require strict adherence to Fannie Mae guidelines, many lenders have adopted Fannie Mae requirements as the basis for their own requirements. It should be noted that several portions of the ANSI measurement and reporting standards may not be "in-line" with market perception of "GLA", or "SqFt".

Excerpts from The Fannie Mae Selling Guide (Published: March 02, 2022) section titled, "How is the gross living area measured and calculated?" include:

• "Appraisers must follow the - Square Footage-Method for Calculating ANSI® Z765-2021 when measuring, calculating, and reporting the gross living area and non-gross living areas (basement, additional structures, etc.) of the subject property. Appraisals requiring interior and exterior inspections must follow this standard; appraisals of this type performed without using this standard will not be acceptable.

• The most common comparison for one-unit properties, including units in PUD, condo, or co-op projects, is above-grade gross living area and below-grade square footage. The appraiser must be consistent when reporting the finished above grade gross living area, below-grade square footage, and room count. The need for consistency also applies from report to report. For example, when using the same transaction as a comparable sale in multiple reports, the room count, and gross living area must not change.

• When using sketching or 3D scanning software, the resulting output must also conform to the Square Footage-Method for Calculating: ANSI®Z765-2021 standards. See Exhibits for Appraisals in B4-1.2-01, Appraisal Report Forms and Exhibits for information on sketches and floor plans.

• Only finished above-grade areas can be used in calculating and reporting of above-grade room count and square footage for the gross living area. Fannie Mae considers a level to be below-grade if any portion of it is below-grade, regardless of the quality of its finish or the window area of any room. Therefore, a walk-out basement with finished rooms would not be included in the above-grade room count. Rooms that are not included in the above-grade room count may add substantially to the value of a property, particularly when the quality of the finish is high. For that reason, the appraiser should report the basement or other partially below-grade areas separately and make appropriate adjustments for them on the Basement & Finished Rooms Below-Grade line in the Sales Comparison Approach adjustment grid. *NOTE: The same reporting standards are also applied to comparables in the Sales comparison approach "grid".

• Detached structures with finished square footage must be reported on a different line in the adjustment grid and not included as part of the subject's reported gross living area.

• When the subject property has an area that does not meet the ANSI minimum ceiling height requirements, the additional square footage must be reported on an additional line in the adjustment grid and an appropriate market adjustment applied, if warranted. Additionally, the appraiser must provide and explanation in the report for how this area was handled in order to comply with the ANSI standard and also acknowledge any contribution of the additional square footage.

• If the appraiser is unable to adhere to the Square Footage-Method for Calculating: ANSI® Z765-2021 standard, they must enter "GXX001-" at the beginning of the Additional Features field of the appraisal and provide an explanation of why they were not able to comply. For example, if the appraiser is performing an appraisal in a state that requires adherence to a different measuring standard, then the loan may still be eligible for purchase by Fannie Mae."

*NOTE: Appraisers are typically not privy to details about measurement standards and/or reporting standards utilized for comparable properties. Measurement and reporting methodology utilized for publicly recorded sources may differ significantly from what would be reported in an appraisal if the property were to be measured by an appraiser.

Excerpts of potential relevance from the ANSI Z765-2021 guide "SQUARE FOOTAGE--METHOD FOR CALCULATING: ANSI" include,

• "For attached single-family houses, the finished square footage of each level is the sum of the finished areas on that level measured at floor level to the exterior finished surface of the outside wall or from the centerlines between houses, where appropriate."

• "Openings to the floor below cannot be included in the square footage calculation. However, the area of both stair treads and landings proceeding to the floor below is included in the finished area of the floor from which the stairs descend, not to exceed the area of the opening in the floor."

• "The above grade finished square footage of a house is the sum of finished areas on levels that are entirely above grade. The below-grade finished square footage of a house is the sum of finished areas on levels that are wholly or partly below grade."

• "To be included in finished square footage calculations, finished areas must have a ceiling height of at least 7 ft. (2.13 m) except under beams, ducts, and other obstructions where the height may be 6 ft. 4 in. (1.93 m); under stairs where there is no specified height requirement; or where the ceiling is sloped. If a room's ceiling is sloped, at least one-half of the finished square footage in that room must have a vertical ceiling height of at least 7 ft. (2.13 m); no portion of the finished area that has a height of less than 5 ft. (1.52 m) may be included in finished square footage."

• "No statement of a house's finished square footage can be made without the clear and separate distinction of above-grade areas and below-grade areas."

• "Finished areas that do not meet the criteria of calculated square footage such as those areas not connected to the house, unfinished areas, and other areas that do not fulfill the requirements of finished square footage prescribed above cannot be included in the Statement of Finished Square Footage but may be listed separately. Any calculation and statement of unfinished square footage must distinguish between above-grade areas and below-grade areas."

• "Porches, balconies, decks, and similar areas that are not enclosed or not suitable for year-round occupancy cannot be included in the statement of Finished Square Footage but may be listed separately, measured from the exterior finished surface of the house to the outer edge of the floor surface area or exterior surface, and calculated by using the method referenced in the standard."

• "Finished areas above garages are included in the finished square footage that is at the same level in the main body of the house, but only if they are connected to the house by continuous finished areas such as hallways or staircases."

*NOTE: FNMA Standardized Property Measuring Guidelines (Published July 2022) are available at: https://singlefamily.fanniemae.com/media/30266/display

Main File No. PP25-A0403 | Page # of 67

## Supplemental Addendum 2

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

### Floor Plan Sketch

Measurements are approximate and sketch is not intended to represent an exact replication of the footprint, floor plan, or original blueprints. Exact measurements are rarely possible during an appraisal inspection however the appraiser measured the property in a manner intended to exceed industry standards of precision. Each accessible exterior wall is measured by the appraiser unless otherwise indicated. When measuring a residential structure, it is not unusual to encounter portions of the exterior to be partially, or completely inaccessible. Myriad factors can impede attempts to measure a property accurately including exterior obstacles, ornamentation, shrubbery, hardscaping, exterior construction variations/ inconsistencies (stucco thickness, wood trim, stone/brick facades, "dead" space, etc.). In some cases, interior measurements may serve as an adequate alternative for some portions of the measurement however thickness of exterior (or interior) walls may be estimated in some cases and interior access may be somewhat limited by interior floor plans, irregular angles or curves, variations/inconsistencies in interior floor plans and inconsistencies of finishes. While an effort is made to measure each wall to a precision of less than an inch when feasible, it may be necessary, in some cases, to round some measurements/dimensions and/or to utilize some estimated dimensions when physical access to portions of the exterior of the subject is limited. Refer to "STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS" on page 4 of the URAR.

*NOTE: Structure locations shown on the floor plan sketch do not necessarily reflect actual structure locations in relation to each other.

*NOTE: All appraiser measurements, reporting of square footage, and/or sketches/floor plans included in the report, are solely for the purpose of the appraiser's analysis and should not be used, or relied on, by any party in connection with a different purpose, such as (but not limited to) a property purchase decision, price negotiations, or list price decisions. Any measurements, sketches, or floor plans included in this report may not be republished or distributed outside of the report. Any parties requiring property measurements, sketches, or floor plans for any use is advised to engage a professional of their own choosing, such as an architect or contractor.

### GARAGE/CARPORT ("Car Storage")

• Garage and/or Carport "Car Storage" figures reported on URAR page 1 include tandem parking spaces per guidelines.
• Driveway "Car Storage" reported on URAR page 1 reflects the estimated number of cars that could be parked in the driveway without impeding access to other spaces, garages, or carports. Driveway "Car Storage" is noted to be open-to-interpretation as there is no official FNMA guidance regarding the definition of driveway car "storage." However, early URAR form guidance from the Department of Housing and Urban Development (HUD) is noted to have stated, "If there is no garage or carport, but there is a driveway, state 'yes' and enter the number of cars that can be reasonably parked in the driveway."

### Fannie Mae Selling Guide (Subject Improvements)

Fannie Mae Selling Guide (Published October 05 2022), Section B4-1.3-05, Improvements Section of the Appraisal Report (04/06/2022).
• Overview: https://singlefamily.fanniemae.com/media/31146/display#page=602
• Gross Living Area: https://singlefamily.fanniemae.com/media/31146/display#page=605
• Accessory Dwelling Units: https://singlefamily.fanniemae.com/media/31146/display#page=606

Fannie Mae Selling Guide (Published October 05 2022), Section B4-1.3-06, Property Condition and Quality of Construction of the Improvements
• Introduction: https://singlefamily.fanniemae.com/media/31146/display#page=609
• Property Condition: https://singlefamily.fanniemae.com/media/31146/display#page=610
• Property Condition Ratings: https://singlefamily.fanniemae.com/media/31146/display#page=611
• Identifying Property Condition: https://singlefamily.fanniemae.com/media/31146/display#page=612
• Definitions of Updated, Not Updated, and Remodeled https://singlefamily.fanniemae.com/media/31146/display#page=613
• Quality of Construction Rating: https://singlefamily.fanniemae.com/media/31146/display#page=614
• Identifying Quality of Construction: https://singlefamily.fanniemae.com/media/31146/display#page=615

### SUBJECT SITE

#### Zoning/Zoning Compliance

• Zoning information based on City (or County) websites, Zoning Maps, and/or General Plans unless otherwise stated in the report.
• Client is advised that CoreLogic public records and most other public records aggregators are NOT reliable sources for accurate zoning information and the availability of current/reliable zoning information can vary greatly depending on the specific market area.
• The appraiser has researched zoning information and zoning compliance for the subject in a manner intended to exceed typical industry standards/expectations.
• Client is cautioned that in-depth knowledge of the complexities of local building codes and zoning requirements are beyond the scope of the appraisal as engaged by the client. The city of Los Angeles Building Code, in particular, is extremely complex and detailed (The 2014 City of Los Angeles Zoning Code Manual and Commentary is 348 pages). There are 36 different "Zones" and within each zone there can be several different specific area plans, temporary ordinances, overlay zones, historic designations, etc. In some areas, myriad additional / supplemental / conditional requirements may impact zoning compliance which may include (but are not limited to): Floor to area ratios (FAR), maximum lot coverage, minimum setbacks, prevailing setbacks, maximum height, minimum frontage, minimum side yards, minimum rear yards, parking requirements, bicycle parking requirements, exceptions, exemptions, bonuses, allowances, multi-zone lots, multi-height district lots, etc.

#### Flood Hazards/Flood Zones

Client is advised that it is prudent to verify the current flood hazard status of the subject property, by their own underwriting standards as discrepant information is not atypical and flood hazard determinations/maps are subject to change/updates based on the somewhat mercurial nature of standards used by FEMA and other related government agencies.

#### Special Assessments

Multiple line-item special assessments are common/typical in Los Angeles County and are included in the total tax liability figures reported in public records sources. It is not atypical for properties in some specific market areas to have 5 to 10 special assessments. Special assessments are not generally indicated on page 1 of the URAR unless atypical and/or likely to impact marketability as the data field appears to be intended for assessments that are above and beyond those of the potential comparables. In specific cases when special assessments for a subject property are higher than typical for the market area, efforts are made to utilize comparables with similar special assessments.

#### Highest and Best Use

The Dictionary of Real Estate Appraisal: Fifth Edition; Appraisal Institute; 2010 [Page 250] – highest and Best Use definition states, "The most probable use of a property which is physically possible; appropriately justified; legally permissible; financially feasible which results in the highest value of the property being valued". Based upon the "intended use" of this Appraisal and the scope of work required for 'credible results' [USPAP], the valuation and analysis of the subject property is for its "highest value" in terms of "Market Value", "As Is" and "As Improved" as of the 'Effective Date' of this Appraisal (within parameters of allowable uses under its current zoning). It is beyond the scope of this "As Is" appraisal, as engaged by the client, to conduct a feasibility study for the possibilities (which may or may not exist) for different types of residential uses, subdivision and/or redevelopment. To produce a credible analysis of highest and best use, would require full appraisals which would need to be completed on all alternate, permissible uses while invoking hypothetical conditions based on fully permitted and entitled plans and specifications. As the subject's current use does not appear to represent a significant under-improvement or an antiquated use, it was deemed appropriate to indicate on page 1 of the appraisal that the highest and best use of the subject is "As Improved", because it meets the HBU criteria (test) cited above within the limiting conditions of this engagement as explained.

Main File No. PP25-A0403 | Page # 48 of 67

**Supplemental Addendum 2**

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

## Geological, Engineering, Title, Environmental and/or Surveyor reports

Geological, Engineering, Title, Environmental and Surveyor reports were not provided to the appraiser unless otherwise stated in the report and are assumed to be favorable. Analysis of any possible Geological, Engineering, Surveyor and/or Title issues which were not made known to the appraiser (or were not readily apparent to the appraiser during the normal course of business), are beyond the scope of the appraisal and are beyond the scope of the appraiser's expertise. The client is advised that all properties in California are subject to some degree of seismic risk.

## Easements/Encroachments

Since this Appraiser is not a surveyor nor provided with a title report, it is left to the Lender/client's discretion to verify that there is no cloud on title related to encroachments, but this Appraiser reserves the right to re-analyze all findings, consider alternative approaches, and to change the opinion of value, if a title and/or surveyor's report is provided by the Lender/client that would demonstrate that there is an encroachment that would have an impact (positive or negative), on the subject's marketability, market value and/or the overall credibility of the valuation.

# NEIGHBORHOOD

## Neighborhood Characteristics

• The pre-printed checkboxes for "Location", "Built-Up", and "Growth" on URAR page 1 are overly-simplistic descriptors for many of the diverse and nuanced market areas in the greater Los Angeles region. The checkbox options for Location (Urban, Suburban, Rural) are inadequate for semi-rural areas in suburban locations or for areas originally built, and zoned, as "Suburban" but have developed into more "Urban" areas due to the growth and sprawl of the city of Los Angeles. The checkbox options for "Built-Up" areas also inadequate in areas with significant open-space designated areas.

## One-Unit Housing Trends

• The diversity of housing stock in many Southern California market areas can be an impediment to attempts at credibly analyzing market data and market trends. Form 1004 MC market data (if applicable) is not always consistent with actual, overall neighborhood trends and inconsistent (sometimes even contradictory) data is not uncommon.

• DOM (days on market) of listings/sales are often impacted more by the relationship between list price and actual market value than by overall market trends. This also holds true when projecting estimated Exposure Time and estimated Marketing time. Thus, a property with a longer than typical DOM or CDOM (cumulative days on market) may not always be indicative of a marketing impairment as it may simply be not be priced competitively. Estimated Marketing time and/or estimated Exposure times are highly dependent on the presumption of a list price consistent with the market. In most Southern California markets, appropriately priced properties can still consistently sell in fewer than 90 days regardless of statistical estimates of "months of supply". Listings that are not priced competitively often have little-to-no impact on the marketability of listings that are priced commensurate with the market. It is not unusual for "Months of Supply" figures in some market areas to offer an incomplete or inaccurate depiction of actual market conditions as myriad factors can impact the DOM of a property. Analysis of DOM, Marketing Time and/or Exposure time for an individual listing/sale without adequate consideration of the congruity of the list price with actual market conditions, potentially relevant comparables, and the property's own listing history would not be prudent. In some cases, estimates of reasonable marketing time may be significantly shorter than might otherwise be deduced from analysis of the Days on Market of other properties which may, or may not, be priced competitively. It could be reasonably argued that credible estimates of exposure time should be more directly associated with DOM at the most recent list price rather than total DOM.

## One-Unit housing Price, Low, High and Pred

• Figures are rounded to the nearest $5,000.

• *Fannie Mae guidelines for the NEIGHBORHOOD portion of page 1 of the URAR state, in part, "The appraiser must indicate the price range and predominant price of properties in the subject neighborhood. The price range must reflect high and low prevailing prices for one-unit properties, two- to four-unit properties, condo units, or co-op units depending on the property type being appraised and the appraisal form being used. Isolated high and low extremes should be excluded from the range".*

Thus, the One-Unit Housing statistics on page one of the main appraisal form do not necessarily reflect the entire range of prices for the neighborhood and the indicated neighborhood "High" may not always represent the actual price ceiling or the historic high price in a given area. Furthermore, in a market with diverse housing stock, it is not atypical for there to be an extremely wide range of what would be considered "typical" prices. In some specific market areas and/or property categories/segments, the significant diversity of housing stock combined with the limited supply of some specific property types can lead to pent up buyer demand that can result in certain sale prices that are seemingly only tangentially related to prior sales in the area. New high sales in some neighborhoods have been noted, in some cases, to eclipse prior high prices by 25 - 50% and in some rare/extreme instances, new historic high sales can double prior historic high sales. Thus, the price "ceiling" in some high-end market areas is largely speculative. While strict adherence to Fannie Mae guidelines may not be required for the appraisal assignment, these requirements are typically followed by most lenders.

## One-Unit housing Pred Age

• Figures for Predominant One-Unit Housing AGE on Page 1 of the URAR report are generally rounded in 5-year increments and reflect the oldest and newest ages in the neighborhood with isolated high and low extremes excluded (per FNMA guidelines).

## Present Land Use %

• Figures on Page 1 of the URAR report are generally rounded to the nearest 5% and are estimated due to the lack of reliable data (unless otherwise indicated in "SUPPLEMENTAL ADDENDUM PT 1").

## Neighborhood Boundaries and Description

• The terms "neighborhood" and "market area" are frequently utilized interchangeably and the two are in fact, sometimes the same. However, in some larger neighborhoods there may be several distinct submarkets considered by residents to be their "neighborhood" (e.g., the Palisades Riviera submarket within the neighborhood of the Pacific Palisades in the city of Los Angeles). The Los Angeles Times identifies 272 Los Angeles "neighborhoods" https://maps.latimes.com/neighborhoods/neighborhood/list/ however, many are not universally recognized as such by residents and some of the neighborhood boundaries reported by the LA Times have been the source of debate among residents. Depending largely on property characteristics, the specific "market area" of a given property may be reasonably confined to a single, well-defined submarket, or it may be prudent to include the entire larger neighborhood, or to include one (or more) of the similar, adjacent and/or competing submarkets. In still other cases a market area may include portions of multiple Neighborhoods and may even include portions of multiple cities (most notably the Platinum Triangle which includes estate portions of the city of Beverly Hills, estate portions of the Los Angeles neighborhood of Bel Air, and the entire city of Los Angeles estate neighborhood of J Holmby Hills). In portions of Malibu the "market area" for a specific property may include beachfront portions of multiple similar and competing neighborhoods but may not include "land-side" portions of those same neighborhoods. Surfrider Beach, for instance, includes only 6 residential properties. Thus, the "market area" by necessity, typically would include several other similar and competing beachfront areas. Furthermore, the very definition of "market area" may have different meanings to different buyers. For instance, some buyers may define a "market area" as much by price range as by physical location (e.g., properties priced between $10,000,000 and $20,000,000 in the "West Side" of the LA area). In such cases, it may be prudent to focus on the most similar properties across several neighborhoods, regardless of the "neighborhood".

## Supplemental Addendum 2

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State CA | Zip Code 90077 |
| Lender/Client | N/A | | | | |

• In some cases, it may be deemed appropriate to identify and utilize both the larger Neighborhood boundaries on page 1 of the URAR, as well as the boundaries of a more specific submarket or sub-neighborhood in the addendum. It may also be appropriate to utilize the submarket for the comparable search and the "comparable" properties ranges (Sold and Listings) at the top of page 2 of the URAR and for the 1004MC (market conditions) addendum.

Market Conditions (continued from form 1004mc and addendum)

Information in the 1004MC form is property specific and may not correlate directly with the neighborhood section on page 1. The form specifically states that "comparable" sales and listings are to be utilized/analyzed. In this context, the term "comparable" presupposes substantial or substantive similarities between properties. As a result, the data developed in this form may not be indicative of the entire market and/or neighborhood for the subject property. Markets and neighborhoods generally consist of a variety of compatible residential uses and often are not related to a specific property type and/or price range. Overall market trends may not be entirely consistent with trends that affect more specific categories and/or price ranges.

Instructions for the 1004MC/market conditions addendum (required by some lenders) include instructions that specifically state that "comparables" must be used to complete the form. In areas with diverse property stock and multiple submarkets (e.g., most areas of the greater Los Angeles region) it is not uncommon for the availability of true "comparables" to be extremely limited.

1004MC instructions further state that the information reported in form 1004MC is to be used as the basis for the conclusion reported in the neighborhood section of the URAR form. However, the 1004MC form instructions also specify that the analysis should be based on properties that compete with the subject. Historically, the trends reported in the neighborhood section of the appraisal are based on the entirety of the neighborhood, which typically includes more than just directly competing properties. Limiting the analysis of an entire neighborhood with such a narrow focus would typically not produce enough data to develop an accurate analysis of a trend. For example, the property may be in an area where there has been only 5 viable sales "comparables" within the past year. In these cases, it may be prudent to expand the search parameters to beyond properties that would otherwise be considered by prospective (or hypothetical) buyers of the subject property, to achieve a sample size large enough to identify trends. Thus, the expanded data set may, or may not, represent truly competing and/or substitute properties.

Using the above approach, however, poses an added challenge. In market with diverse housing stock, there may be such a broad range of prices that the data may not reveal a credible price trend (based on Average or Median prices). In any singular/specific sample there may be more sales at the low end of the "range" or there may be more sales at the high end of the range. These price groupings often are unrelated to any specific market trends and are often due to random chance. These scenarios are why it is not unusual for market trend declarations from various sources to differ from one-another, and in some cases, contradict each other.

The overall diversity of the housing stock within the market area as well as the multivariate nature of both market influences and motivations of market participants are evident in the wide range of prevailing prices in the neighborhood as well as the extraordinary spread between the high and low sales in the neighborhood. It is not unusual for price fluctuations to reflect seasonal changes, differences in the composition of the housing stock and/or variations in the quality, quantity, and consistency of the data rather than actual, substantive changes in the market. Efforts to credibly establish opinions of market trends can be particularly compromised when analysis is required to be completed within the context of lender/client mandated parameters such as those required in the 1004MC which segregates 12-month "comparable" sales data into 3 time periods (Prior 7-12 months; Prior 4-6 months; and Current-3 months). Analysis of limited data sets completed within the context of these pre-defined, and arguably arbitrary time periods can yield results that are of questionable relevance as market changes take place on a perpetual continuum rather than in intervals of 1-month, 3-months, or 6-months. For instance, if market data is collected on two separate days, during the same week, but with the same exact search parameters, the results may differ somewhat due solely to timing. If a particularly high sale took place 89 days ago it would fall within the "Current – 3 months" time-period. However, that same transaction would fall within the "Prior 4-6 months" time-period just several days later. The two samples could thus lead to disparate conclusions about market conditions despite the unfiltered/unsegregated data being the same. In areas with diverse property stock and/or limited sales volume, this scenario is not uncommon/atypical and must be considered when completing the market analysis. Moreover, in most market areas, the most recent sales are not necessarily the most similar, relevant, or applicable "comparables". In some cases, it may be prudent to use sales with older transfer dates, that are more similar to the subject, than to use more recent sales that may be less similar. 1004MC data can also serve to demonstrate typical price disparities between sales and listings that often are indicative more of seller optimism (often unfounded) than actual market trends and offer minimal insight into actual market trends.

In areas with diverse housing stock, it is not unusual for unfiltered sales data to be delusive in nature. It is not uncommon for at least a portion of apparent price trend fluctuations between 1004MC data samples to be related more directly to changes in the quantity and/or quality of specific types of housing stock (e.g., an increase or decrease in the number of new construction sales, increase or decrease in the number of "tear-down" sales, increase or decrease in the number of off-market transactions, etc.) than to any substantive changes in market conditions. The diverse nature of the housing stock can lead to inconsistent, inadequate, unreliable, and potentially conflicting market data, some of which may spuriously signify that Average prices and Median prices are trending in opposite directions.

Optimistically priced listings, which also typically have longer exposure times, can also have an adverse impact on the credible analysis of form 1004 mc "Months of Housing Supply" figures and contribute to the appearance of an over-supply of "comparable" listings. Non-competitively price listings can linger on the market and may eventually be essentially ignored by a significant portion of the market participants.

The prevalence of optimistically priced listings in many Southern California market areas necessitates evaluating each listing individually to estimate the probable final sale price rather than relying on "Median Sale Price as % of List Price" figures indicated on page 1 of the 1004 mc for projections.

Furthermore, the DOM (days on market) of an individual property is often affected more by the relationship between list price and actual market value than it is by historic list price-to-sale price ratios in the neighborhood/market area. This also holds true for estimated Exposure Time as well as estimated Marketing time. Thus, a property with a longer than typical DOM or CDOM may not always be indicative of a property with a marketing impairment as it may simply be priced optimistically.

Analysis of DOM for properties considered to be "directly" competing with the subject, in conjunction with the analysis of the DOM of the comparables utilized in the appraisal report, may result in discrepancies between 1004MC data for "Months of Housing Supply" and estimated marketing time on page one of URAR page 1. as well as discrepancies between "Demand/Supply" and "Marketing Time" on URAR page 1.

Subject pricing (actual sale price or final opinion of value in appraisal report), DOM of the comparables, and the entire market, should all be given consideration when drawing conclusions about estimated Marketing Time, Exposure Time, and market trends. Estimates of marketing time and/or exposure time may differ if based on an optimistic list price vs. actual market value of a property.

Conversely, a listing with a short DOM may not necessarily reflect strong market demand for a particular listing or property type as a property may have a much longer listing history in which listings are "churned." NOTE: Rule 7.23 from TheMLS Rules and Regulations was revised (effective as of Oct 1, 2021) to state, "...if a listing is expired or canceled, then put back on the market by the same listing agent within thirty (30) days, then the Change Type must be Back on Market (BOM) as Active, and not NEW".

NOTE: Due to the limited availability and/or inconsistency of Median Comparable Sales Price data, any reported changes (% increase or decrease) in the Market Research & Analysis should be regarded as a reference point for possible Date of Sale/Time adjustments rather than as irrefutable data to be applied directly to properties in the Sales Comparison Approach "grid".

Main File No. PP25-A0403 | Page # 50 of 6?

**Supplemental Addendum 2**

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

NOTE: Properties listed as "Pending" and/or "Looking for Backup" in the MLS were included in the Active Listings in the 1004MC and neighborhood analysis as they are considered relevant to the overall market analysis.

NOTE: Data for "Median Sale Price as % of List Price" reflects averages due to the limited availability and/or inconsistency of Median Sale Price vs. List Price data.

NOTE: Areas in the 1004MC "grid" for which MLS data is unavailable are noted with "N/A". When analyzing and reporting the statistics on listing activity, it should be noted that a listing, by its very nature, is current (active). The MLS utilized to produce the data for analysis in the form does not maintain records on past active listings. Instead, the status in the MLS changes and the "listings" become canceled, withdrawn, and sold etc. Therefore, the fields related to historical listings are deemed to be not applicable. Additionally, the correlating boxes for Overall Trend analysis are not applicable as trends cannot be determined with only 1 variable.

## SALES COMPARISON APPROACH

• Lack of sufficiently similar comparables in a specific market area may precipitate the use of some line-item adjustments that may not conform with some lender guidelines/expectations (typically 10%) and that may ultimately lead to Net and/or Gross adjustments that also exceed typical lender tolerance thresholds (often 15% Net and 25% Gross), beyond which adjustments may be subject to additional scrutiny and potentially regarded as untenable. However, in market areas with diverse housing stock, the use of comparables with significantly larger or smaller GLA's, Site Areas, etc. may be inevitable. All adjustments applied in the Sales Comparison Approach "grid" were deemed necessary to adequately reflect estimated market reaction to differences and neither the size of the adjustments, nor the quantity of adjustments, are atypical/unusual for the market and the adjustments are unlikely to be regarded as excessive by those familiar with the nuances of the market area. Despite the typically limited "appetite" of many lenders for sizable adjustments, it would be misleading to minimize the impact of noted differences between properties and would thus have a detrimental effect on the overall credibility of the report.

In some specific market areas and/or categories off-market transactions may represent a significant portion of the overall market activity/sales volume. The potential relevance of off-market/"pocket" transactions are largely dependent on how typical they are for the specific market area and how much credible/verifiable information is available.

### DATE OF SALE/TIME

• In some specific market areas and/or in certain property categories, it is not unusual for the balance between supply and demand to change on a month-by-month, week-by-week or even a day-by-day basis. These changes in supply and demand can, in turn, result in some transactions reflecting significant premiums (or significant discounts in some cases), especially in market areas where buyers have extraordinary purchasing power. This scenario can also skew Median/Average price data typically utilized in market trend analysis.

• Full Recording Dates and Contract Dates of the comparables are reported in the "Verification Source(s)" line-item of the SALES COMPARISON APPROACH "grid".

• If Pending/Contract Date discrepancies are noted between data sources (generally MLS/public records) the earlier of the two dates is utilized unless otherwise stated as the earlier date is more often likely to be accurate.

• The Zillow Home Value Index (ZHVI) is often a reliable/credible data source for tracking market trends in specific market areas, neighborhoods, cities, or zip codes. Explanation of the Zillow Home Value Index methodology is available at https://www.zillow.com/research/zhvi-methodology/ - *NOTE: Appraiser acknowledges that Zillow's "Zestimate" is not generally a reliable source for credible value estimates of individual properties.

### LOCATION

*Fannie Mae Uniform Appraisal Dataset (UAD) Frequently Asked Questions (Updated January 2019) includes an answer related to Location ratings and adjustments which states, "The Location field in a UAD appraisal report is for rating and describing the location of the subject and comparable properties within the neighborhood or market area. In those instances where it is necessary to use one or more comparable properties that are located in a different neighborhood or market area than the subject property, the appraiser can report this information by using one of the three "blank" fields located at the bottom of the form and, if necessary, make appropriate adjustments." It is not intended to be utilized to account for superior or inferior market areas. Separate line-item adjustments for superior/inferior neighborhoods/submarkets/pockets/etc. are applied, if warranted, in the custom field titled "Submarket/Other" due to the lack of dedicated line-items for neighborhood in pre-printed appraisal forms.*

Isolating a quantifiable figure that adequately reflects market reaction to a specific external influence in a diverse market area is often extremely difficult. This is due, in large part to myriad other factors which can impact property value along with the general lack of consensus among market participants regarding which specific factors represent substantive marketing advantages or disadvantages and to what extent each specific factor impacts marketability/market value.

Factors that can impede efforts to isolate the impact of individual variables on prices/value include (but are not limited to): the sheer number of non-property-specific factors that impact marketability/value; the variety of site-specific external influences (both positive and negative); combinations of site-specific external influences (positive, negative and/or offsetting); the overall heterogeneity of properties and data; lack of inventory of similar properties that exist in the subject's market area/category; scarcity of recent and/or similar sale "comparables"; short term changes in supply and/or demand; normal variations in the salient characteristics of properties within specific data samples/time-periods; the diversity of properties in similar, adjacent and competing areas; the lack of well-defined/distinct submarket boundaries; and the previously noted premiums that can be commanded by specific properties and paid by specifically motivated buyers.

The diversity of specific demands and/or myriad potential negative external influences (as well as different degrees of those influences) within a particular neighborhood may require the use of some comparables that may not be equally "superior" or "inferior" to the subject, or to each other and may warrant different adjustments despite having similar UAD ratings/descriptions. In some cases, field character limits in appraisal forms may not allow to distinguish between different levels of B/Beneficial factors or A/Adverse factors. Furthermore, a property with both positive factors and negative factors may warrant a N/Neutral description.

• When market data is limited, the estimated impact of an external influence on value must be based, in part, on the appraiser's experience in the specific market area and/or matched pair analysis within the sale comparison "grid" itself along with broker/agent input (if applicable, available, and deemed credible).

• The client is advised that the degree of market impact resulting from adverse site conditions can vary significantly depending on prevailing market conditions at any given time and the impact of site conditions may change in the future.

• In market areas with diverse housing stocks, it is not atypical for the availability of credible and/or relevant market data to be limited. Furthermore, the impact of property location on value can be highly nuanced with multiple locational factors. Client is further cautioned that the degree of market impact resulting from adverse site conditions can fluctuate significantly depending on prevailing market conditions (including supply & demand) at any given time and the impact of site conditions may change in the future.

### SITE AREA

Minor discrepancies between data sources for site area are commonplace in many Southern California market areas and significant discrepancies are not atypical in some portions of Los Angeles County. Noted discrepancies are frequently within an acceptable variance, unlikely to have any material/measurable impact on

## Supplemental Addendum 2

File No. PP25-A0403

| | |
|---|---|
| Borrower | N/A - Private Party |
| Property Address | 1811 Bel Air Rd |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A |

the integrity of analysis. However, there are some instances in which discrepancies are substantial enough to warrant further research that typically includes cross-referencing of multiple, additional data sources. Primary data sources include: Parcel/Plat Maps, County Assessor data portals, City data portals, other City Records, and Public Records data aggregators such as CoreLogic, ParcelQuest, and RealQuest, none of which are "official" record (despite common misconceptions to the contrary), none of which have proven to be unassailable, and several of which are subject to change without notice or explanation. In some cases, it is simply not feasible to reconcile data discrepancies with any certitude during the "normal course of business" and it is not uncommon for appraisers to be left with no other choice but to make a "judgment call" about which data source is most likely to be accurate.

While plat maps are the default/primary data source for many real estate and appraisal professionals they are not guaranteed to be accurate. Los Angeles County plat maps, in fact, include verbiage that states, "Assessor Maps are produced for property assessment purposes, and are NOT surveys. No warranties, expressed or implied, are provided for the data therein, its use, or its interpretation."

### Net, Gross, Effective, and "Usable" Site Areas

Parcel maps with both Gross and Net site area figures, typically warrant not just cross-references with other published data sources, but also analysis of likely market perception of site size.

In some cases, it may be appropriate to give significant consideration to estimated, effective site areas which are typically based on GIS aerial image measurements if they appear to more closely reflect market perception of site size than either the Gross or Net site areas displayed on the plat maps. Thus, the sum of the "usable" and "additional" site areas utilized for line-item adjustments may not always equal the figure reported in the pre-printed line-item for "Site" in the grid.

Some easements may have a significant impact on effective site size (e.g., Shared, private Street easements) while others may have little-to-no apparent impact on market perception (e.g., many slope easements, some restricted use easements, some drainage easements, some flood hazard areas, etc.). A corner lot with shared, private street easements on two sides, for instance, may have a Net site area that is half the reported Gross site area, whereas a property in an area with variable topography may have slope easement or restricted use easement that, despite substantial size, may have minimal impact on site utility/enjoyment and may-or-may-not even be something that property owners or other area residents are aware of.

Furthermore, some easements that are indicated on plat maps can differ significantly from what was actually built and/or what is observed onsite (e.g., a shared private street easement built at a width of 20' despite being indicated as 40' wide on the plat map). Conversely, some easements may have been built larger than indicated on plat maps but have been in place for many decades.

• The definitions of "usable" site and site "utility" are admittedly somewhat subjective/open to interpretation due to the lack of industry-wide and/or market-wide consensus. While it may seem counter-intuitive, the practical application of the term "usable" site can, in some cases, be somewhat fluid and can be highly dependent on the assortment/diversity of properties being compared to each other within the context of a given, specific assignment with limited potential "comparables" and how it relates to what might be commonly considered "typical". For instance, if a lack of relevant comparables necessitates using one property with partial slope in the same Sales Comparison Approach "grid" with five other more conforming flat parcels, the definition of "usable" may be slightly different than it would be if comparing that same, partial slope property to five other properties with similar topography and one with mostly steep hillside topography.

• Estimates of "usable" site utilized in the appraisal report reflect the appraiser's best efforts to represent likely market perception and figures are typically rounded in increments of 5 - 250 SqFt, depending on the overall size of the site, other available credible data sources, and the overall integrity/precision of the primary data source. GIS aerial measurements are acknowledged to have precision that may be less-than-ideal in some cases, but may still be the best of the available sources.

• In areas with partial hillside/sloping topography, some smaller parcels may have more value (on a per SqFt basis) than larger parcels, depending on the utility and what is "typical" for the neighborhood/area.

• The task of establishing both an opinion of site value, and corresponding adjustment factors for site differences, must be approached with awareness of multiple potential other attributes between the Subject and the properties to which it is being compared. Some of the numerous factors that can impact marketability/market value include (but are not be limited to): Neighborhood, "pocket" and/or other locations; external influences; views; changes in market conditions; site utility; potential diminishing returns for larger parcels; potential per-square-foot premiums for smaller parcels (the "cost of entry"); the contributory value (or lack thereof) of "additional" site area (when/if applicable); the generally higher price per SqFt for "as improved" parcels vs. "raw" land; the contributory value of entitlements, plans, specifications, reports and/or reports; etc.

In many cases, the indicated adjustment for differences in site area (land beyond what is legally required for development) may seem low, when compared to typical market reaction. However, the lower adjustment may be deemed reasonable considering what is commonly understood by the intended user, what is typically recognized as "industry standards", and when the law of diminishing returns is taken into consideration.

• "Additional" Site Area adjustments reflect consideration given to both positive factors (privacy, potential partial utility, noise, etc.) as well as potentially negative (and perhaps less obvious) factors such as increased costs for brush clearing, maintenance, etc. In some cases, "additional" site area may have both positive and negative effects on value/marketability and the positive and negative effects may even offset each other (either partially or completely). Furthermore, in areas where surplus land, excess land and/or undeveloped land is common, "additional" site area may have significantly less contributory value than it does in areas where "additional" site area is less common. Conversely, in some cases, "additional" site area may have little-to-no practical/physical utility but may still have significant value as it relates to entitlements and redevelopment potential. "Additional" site area may be either "Excess" Land or "Surplus" Land and is addressed accordingly when/if considered to be relevant and/or applicable to site analysis and/or valuation.

• "Excess Land" is defined in The Dictionary of Real Estate Appraisal (Fifth Edition - Appraisal Institute - 2010) as "Land that is not needed to serve or support the existing improvement. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land may have the potential to be sold separately and is valued separately".

• "Surplus Land" is defined in The Dictionary of Real Estate Appraisal (Fifth Edition - Appraisal Institute - 2010) as "Land that is not currently needed to support the existing improvement but cannot be separated from the property and sold off. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel."

• Due to limitations of the Uniform Appraisal Dataset (UAD) line-item adjustments for "Site - (Usable/Additional)" typically reflect the Net total of both "usable" and "additional" site.

• Despite the availability of satellite images (with contour lines/topographic overlays in some areas), estimates of "usable" site can still be somewhat subjective. Realistically, very few sites with any substantive variance in topography can be adequately valued with only a single adjustment factor (e.g., adjustment "total" site only or "usable" site only) which is common in appraisal practice. Potential site value analysis that includes more than two metrics/adjustment factors (e.g., a site with a completely flat site pad, a landscaped hillside portion, and a steep hillside portion with no utility) could conceivably render more credible results however the plausibility of completing such an analysis while also staying within typically accepted industry standards would be unlikely and would most likely be regarded as an approach that is beyond the scope of a typical appraisal assignment guidelines outlined in the USPAP SCOPE OF WORK RULE which state, in part, "Appraisers have broad flexibility and significant responsibility in determining the appropriate scope of work for an appraisal or appraisal review assignment". The guidelines

## Supplemental Addendum 2

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

also state that an appraisal should also reflect "the expectations of parties who are regularly intended users for similar assignments; and what an appraiser's peers' actions would be in performing the same or a similar assignment".

• Due to the imprecise nature of digitally generated parcel boundaries and plat maps, all site data utilized in the appraisal report are based on the extraordinary assumption that the comparable properties utilized in the Sales Comparison Approach "grid" are free and clear of any encroachments by, from, or with any adjacent parcels unless otherwise indicated. Furthermore, since this Appraiser is not a surveyor, nor was the appraiser provided with a title report for any of the comparables. All comparables utilized in the Sales Comparison Approach "grid" are assumed to have no clouds on title related to encroachments, etc., but this Appraiser reserves the right to re-analyze all findings, consider alternative approaches, and to change the opinion of value, if information becomes available that would demonstrate that there is an encroachment that could impact (positive or negative), the marketability/market value of one of the comparables utilized and/or the overall credibility of the valuation.

• In some greater Los Angeles market areas driveway, shared driveway, shared private street, and various other access easements are not atypical/unusual. Easements are, in some cases, recorded and reflected on plat maps however, in other cases they may be recorded but not reflected on plat maps, or they may be completely informal (verbal / "handshake") between current owners or negotiated by prior owners no longer involved with either property.

• No warranties, expressed or implied, are provided for the data utilized within the appraisal, its use, or its interpretation.

• Unless otherwise stated, no survey or title policies were reviewed by this Appraiser for any of the comparables utilized in the report.

### "Lot" vs. "Site" vs. "Parcel"

The terms "Lot", "Site", and "Parcel" are commonly utilized interchangeably by a large portion of market participants and real estate professionals. Pre-printed data fields in the most commonly utilized appraisal forms, for instance, are labeled "Site Area" however CoreLogic public records data is labeled "Lot Area" and www.TheMLS.com data is labeled "Lot Size". In most cases, the discrepant terminology is largely inconsequential as it relates to appraisal analysis. No impact on the credibility of the valuation is noted unless otherwise stated in the report.

"Lot" is defined in The Dictionary of Real Estate Appraisal (Fifth Edition - Appraisal Institute - 2010) as "1. A distinct piece of land; a piece of land that forms a part of a district, community, city block, etc. 2. A smaller portion into which a city block or subdivision is divided; described by reference to a recorded plat or by definite boundaries; a piece of land in one ownership, whether platted or unplatted".

"Site" is defined in The Dictionary of Real Estate Appraisal (Fifth Edition - Appraisal Institute - 2010) as "Land that is improved so that it is ready to be used for a specific purpose".

"Parcel" is defined in The Dictionary of Real Estate Appraisal (Fifth Edition - Appraisal Institute - 2010) as "A piece of land of any size in one ownership." In some portions of the appraisal report "site" may be utilized as a term to describe all land that is included in an analysis however some portions of the land area indicated as "site" may not be "improved" and/or "ready to be used for a specific purpose".

### VIEW

*Fannie Mae "Uniform Appraisal Dataset (UAD) Frequently Asked Questions", Q16, updated May 15, 2017, states, in part, "If the subject property and a comparable property have features represented on the sales comparison approach grid identically, but which merit an adjustment, is an adjustment permitted? For example, both the subject property and a comparable property feature a view that is rated as Beneficial; Water View (B;Wtr), yet the water view from the comparable property is recognized in the market as being superior (or inferior) to the water view from the comparable property. A. Both properties can be rated as having beneficial water views, but the market can recognize a difference in the quality of the views. These differences must be adjusted for in the sales comparison approach grid and an explanation must be provided in the sales comparison approach comment field or in an addendum"*

Ratings and adjustments for view/s are, in many cases, difficult to determine. Different properties within the same neighborhood may have very different views due to myriad factors which may include (but are not limited to): elevation; position of parcel on the street; position on the site; number of stories; proximity to other homes on the street, etc. Additionally, properties in the same neighborhood may have canyon views, mountain views, city views, ocean views or they may have various combinations and/or degrees of multiple views. Thus, two properties may both have "Beneficial Mountain" views ("B;Mtn") per UAD description guidelines, however one property may have a more expansive view than another which can sometimes result in different view adjustments for homes that may have the same view description in the sale comparison "grid".

### DESIGN (STYLE)

• In some cases, (and/or in specific neighborhoods) one style may be more popular than others, one specific house may have more architectural detail, or a specific house may have been designed by a noted architect whose designs historically attract certain buyers willing to pay a premium. Absent of irrefutable data, ratings and adjustments for Design/Style are, in most cases, based primarily on the appraiser's experience in the area, knowledge of prior market trends, conversations with knowledgeable and credible local agents/brokers and on limited matched pair analysis (when information/data is available). Design (Style) adjustments may not be warranted, despite presumptive marketing disadvantage, in cases when the noted Design deficiencies can be "cured" via renovations. Thus, most Design deficiencies are generally adequately addressed with Quality and Condition adjustments. Design (Style) adjustments may be warranted, in some cases, if Quality and Condition adjustments do not adequately account for estimated market reactions to differences.

• In some tract developments home styles are not always easily identified with singular descriptors as they may not embody a singular design/style. Many tract homes are an amalgam of disparate architectural styles (e.g., 1970's Traditional with some Modern design elements, and Spanish-style roof tiles). Thus, Design (Style) descriptions of comparables in the Sales comparison approach "grid" may, in some cases, may be minimally informative.

• Line-item adjustments for Design (Style) utilized in the Sales Comparison Approach "grid" may, in some cases, reflect home configuration (e.g., # of levels, uphill or downhill floor plans limited by slope/terrain, etc.) The adjustments appear to work well to reconcile the sale prices, thus the grid itself is regarded as a form of paired sales that warrants the adjustment factor utilized in the Appraisal. NOTE: There are some instances when perceived deficiencies of Design may not warrant line-item adjustments if it appears that Design (Style) deficiencies can be remedied with renovations, and thus adequately reflected in Quality and Condition adjustments.

### QUALITY OF CONSTRUCTION & CONDITION

*Fannie Mae Selling Guide Published February 02, 2021, section B4-1.3-06 states, in part, "Properties can have the same rating or description and still require an adjustment. It should be noted that this does not only apply to Condition and Quality ratings and can apply to other ratings or descriptions as well. For example, all water views may not be equal. In this instance, an adjustment should be made and explained in the Additional Comments section of the form or in an addendum."*

• Due to strict UAD definitions and guidelines which limit reporting of Quality and Condition ratings to Q1, Q2, Q3, Q4, Q5, and Q6 / C1, C2, C3, C4, and C6, it is not uncommon for a wide variety of properties to fall within the same UAD ratings despite obvious or apparent differences in overall Condition and/or Quality. In many cases, properties with the same UAD ratings may still warrant adjustments based on apparent/identified differences. The UAD definitions for Q3 and C3 specifically, are worded in a manner that encompasses a very wide range of properties, many of which may not have readily observable differences. The UAD C1

Main File No. PP25-A0403 | Page # 53 : l6/

### Supplemental Addendum 2

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

condition rating is rarely utilized as, per UAD definitions, it is reserved exclusively for new construction. UAD condition rating C2 is reserved for like-new construction, thus very few homes (even those in very good condition) meet the definition of C2 even if 90% renovated.

Adjustment ratings and adjustments for both Quality and Condition and are often very difficult to quantify as there may be multiple levels and/or degrees of ratings and/or adjustments and differences may be noted between properties with the same UAD ratings and/or descriptions. Additionally, in a market as diverse as the subject's different market participants may invest capital in a myriad of ways, some of which may result in significantly higher ROI's (Return on Investment) than others. Furthermore, in some markets it is typical for the market reaction/return on investment to renovations to significantly exceed actual renovation costs (and/or projected renovation costs). "Condition" generally relates to how much a property has been maintained, how recently it was updated, and/or the extent of renovations. "Quality" typically relates to the actual materials that were used, the craftsmanship and/or the extent of custom details in a property. In Southern California, a property owner can spend under $150 per SqFt to update a home while others can spend more than $2,000 per SqFt to renovate a home. The amount that is recaptured in the marketplace generally depends on which items the money was invested in, how tastefully it was done (based on "typical" buyer expectations and/or current market trends), material costs, labor costs, original construction estimates vs. subsequent contractor changes/charges. Costs can vary significantly from one contractor to the next (as well as from one submarket to the next), yet despite potential variations in cost, different projects with significantly different scopes and different budgets may, in some instances, yield similar overall end-results. Conversely, some property owners may spend a significant amount on renovations without increasing the market value while others may spend very little money in a manner that results in a significant potential for profit. Market data indicates that buyers in the area will still pay considerably more for a tastefully remodeled house, done with good quality, than they will for a house in need of updating. With current construction costs, it is not uncommon for buyers to pay significant premiums for high quality/high design remodeled properties. Premiums that, in some cases, may far exceed the actual cost to build, renovate or replace. Hence, the presence and market participation of investors/"flippers" who purchase properties in need of updating, spend money remodeling and/or expanding them and then selling them at a profit. This is especially evident in areas where the permit process is lengthy and cumbersome. Consequently, entrepreneurial profit opportunities remain relatively significant in many "high-end" areas of Southern California. This can result in estimated building costs (price per SqFt) that may differ somewhat from market reactions to GLA differences and that may also differ somewhat from line-item adjustments applied in the sales comparison "grid" that are, in part, dictated by "industry standards". Ratings and adjustments for Condition and Quality were determined primarily on the appraiser's exterior inspections of each sale/comparable as well as realtor comments in the MLS listings, MLS listing photos and comments/input from local, knowledgeable, and credible agents/brokers (when/if available and unless otherwise indicated).

Furthermore, in many high-end market areas Quality and Condition are highly subjective variables that may be evaluated by market participants on a scale that is largely incongruent to opinions of Quality and Condition in more conforming or "typical" market areas. In some high-end market areas, it is not unusual for the lifespan of a renovation to be less than 15-years while in some market areas a property renovated 15-years prior might still be described as "completely remodeled".

• Quality and Condition ratings are often, but not always, congruent and complementary. In some cases, a property may have recently been renovated with "off-the-shelf", "big-box-store" materials which might warrant a Q4/C2 rating. Conversely, some older homes may have been built decades prior, with high quality materials that show signs of wear, which might warrant a Q2/C3 rating.

## AGE

Ages of comparables utilized in the Sales Comparison Approach "grid" is based on transfer date of the comparables. The is no steadfast rule regarding how age is calculated in an appraisal report however, the potential for discrepant age data does exist for properties with transfers that took place in prior calendar years if age were to be based on effective date of the valuation rather than transfer date of the comparable. is not considered to have any consequential impact on the overall credibility of the valuation.

## ABOVE-GRADE ROOM COUNT

Bedroom and Bathroom counts for the comparables are typically based on MLS listings unless otherwise indicated in the report. Room count discrepancies are not uncommon between public records data sources and MLS listings. Any identified room count discrepancies of potential consequence are cross-reference for accuracy accordingly. In most cases, minor room count discrepancies are largely inconsequential and may not be specifically addressed in the report unless deemed relevant.

No significant room count discrepancies of likely consequence and/or considered to have an adverse impact on the overall credibility of the valuation were noted unless otherwise indicated. Minor Bedroom and/or Bathroom count discrepancies between MLS listing data and public records data are not atypical in the market area. Furthermore, Total Room Count data is often not provided (or is incomplete/inaccurate or estimated) both the MLS and in most of the widely available public records data sources. Some publicly recorded data sources will, on occasion, include an incorrect "total" room count (e.g., 4/5/4) that may-or-may-not be intended to reflect non-Bedroom Rooms/Bedrooms/Bathrooms. MLS listing remarks do sometimes include lists of rooms however it may not be a complete list and it may include descriptions of "Bedrooms" that may not actually be official Bedrooms (e.g., guest house "Bedrooms", finished basement "Bedrooms", converted garage "Bedrooms" and/or other "convertible" rooms such as offices, dens, family rooms, etc.). If room count discrepancies are identified that have the potential relevance/consequence, the appraiser has made efforts to verify actual Bedroom and Bathroom counts by cross-referencing various alternate sources (additional MLS remarks, prior MLS listings, conversations with agents/brokers, colleagues, floor plans, etc.). Room counts of comparables reported/utilized in the Sales Comparison Approach "grid" reflect the appraiser's best efforts to accurately reflect actual room counts however may reflect estimates due to the lack of reliable data.

In some cases, verified Bedroom and/or Bathroom count differences may, in fact, impact value to an extent that exceeds that which can be adequately addressed with GLA adjustments. This scenario may be particularly relevant when there are significant restrictions or impediments to additions to, or significant renovations of, existing homes. Limiting factors may include (but are not limited to): set back regulations; location and/or configuration of existing improvements which may not always allow for the construction of new/additional bathrooms; Floor Area Ratios (FAR); other building department limitations; Septic capacity limitations, etc. In these cases, the contributory value of Bathrooms may sometimes significantly exceed actual or projected construction costs. Conversely, some homes with more Bedrooms and/or Bathrooms than are typical for the area may not always have any substantive marketing advantage over homes with more typical/conforming room counts.

Furthermore, some homes may actually have more Bedrooms and/or Bathrooms than considered typical for the home size/anticipated number of occupants which can sometimes have an adverse impact on the floor plan and functional utility of the home.

In some specific property categories and/or in some specific submarkets, market reaction may be noted for a 3-Bedroom vs. a 4-Bedroom home but not for a 5-Bedroom vs. a 6-Bedroom home.

Thus, analysis of potential Bedroom and/or Bathroom count adjustments is completed on a case-by-case basis, based on area norms. Bedroom and Bathroom count adjustments (when applied) in the Sales Comparison Approach "grid" may be reflected in a single "Net" line-item adjustment or Bedroom and Bathroom count differences may offset each other. NOTE: Net adjustments are the system default for A La Mode/Total software.

• Client is advised that some ANSI reporting standards (mandatory for some assignments and/or lenders) are noted to be seemingly incompatible/incongruous reporting requirements with UAD reporting standards (e.g., low-height bedrooms may be included in the room count but may not be counted as GLA).

## GROSS LIVING AREA (GLA)

## Supplemental Addendum 2

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

Terminology utilized among the widely available data sources to describe the square footage of a residence also lacks industry-wide uniformity. The lack of a universally accepted definition for home square footage perpetuates the nebulous and discrepant nature of market participants' understanding / interpretation of SqFt. The URAR appraisal form terminology is "Square Feet of Gross Living Area Above Grade" on page 1 of the URAR and "Gross Living Area" on page 2 of the URAR, however in MLS listings (www.theMLS.com) is "Sqft", whereas in CoreLogic public records it is "Building Sq Ft", and the Los Angeles County Assessor utilizes "Building Improvement Square Footage".

Further impeding a potential industry-wide consensus and/or shared understanding of Square Footage is the widespread practice of some Real Estate Agents and/or Brokers marketing properties with GLA/Square Footage figures based on their own definitions. For these agents/brokers and some other market participants, the definition of "square footage" can be somewhat fluid, depending on the purpose of the calculations/estimates. The Square footage of a home may be represented as one figure for permitting purposes, another figure for tax appeals, another figure when working with an architect or builder, and another figure when being marketed for sale. For example, a 2018 MLS listing stated, in part, "Owner is Listing Agent, Seller ... Now construction, so different measurements of size and SF exist per city building plans". This lack of industry consensus can create difficulty for the appraiser to identify the actual GLA of a comparable based on what we understand the definition of GLA to represent. Agent supplied SqFt figures that cite "appraiser" as source still may not always be reliable as agents will sometimes include appraiser measurements of non-GLA areas (e.g., garage, etc.) when reporting "Living Area (sq ft)" in listings and/or other marketing materials.

• The process of determining the estimated contributory value of GLA (and corresponding line-item adjustments) can become a complicated issue which is often clouded by a lack of consensus both within the appraisal community as well as a lack of consensus between the appraisal industry and Real Estate Agents. Adjustments ideally reflect the contributory value of additional SqFt, however (much like site value analysis) when adjusting for differences in GLA, both the "price of entry" and the law of diminishing returns must be considered as "price per square foot" figures often utilized by real estate agents generally are not consistent when comparing/adjusting for GLA differences vs. calculating an overall GLA "price per square foot" of a home. Some market participants (buyers, sellers, agents, brokers, etc.) rely heavily on "price per square foot" calculation as a foundation for value opinions. This approach is not typically a credible method to develop relevant price-per-SqFt adjustment factors. Overall price per SqFt methods encompass all property characteristics and amenities, often with little to no regard for specific, identifiable differences. This method generally works only in conforming areas where most significant property characteristics are very similar (e.g., comparing condominium projects, different models within conforming tracts, etc.).

• Price-per-SqFt: The diversity of housing stock in many Southern California markets and the limited availability of sufficiently similar comparables can precipitate the use of comparables that span a wide variety of per-SqFt prices ("Sale Price/Gross Liv Area"). Wide price-per-SqFt ranges of figures in the Sales Comparison Approach "grid" have become a largely ubiquitous and inevitable element of credible valuations in many diverse Southern California market areas.

• Price-per-gross living area figures are not typically consistent with the actual contributory value of GLA (or actual construction costs) in market areas with diverse housing stock as they often do not adequately incorporate sufficient recognition of the potential impact of myriad other factors/characteristics (e.g., lot size, view, proximity to positive or negative external factors, etc.). Furthermore, in neighborhoods with diverse property stock, the specific property characteristics that have the greatest impact on value/marketability can vary significantly and, in many market areas there is no market consensus regarding which attributes have the greatest impact.

• Line-item adjustments for GLA based on the "Sale Price/Gross Liv. Area" figures of the comparables would not adequately reflect market reaction, and would likely exceed industry standards and adjustment thresholds typically deemed "acceptable" by the intended users/other readers of the appraisal report. Additionally, it is not unusual for market reaction to differences in GLA to deviate from overall/total GLA price per SqFt figures (e.g., price-of-entry and/or diminishing returns).

• Broad-brush pricing/value analysis based on Price-per-GLA may have relevance/credibility when comparing properties that share many of the same characteristics (e.g., model match condominium units on different floors, or tract homes of similar size but with different floor plans). Unfortunately, these price-per-SqFt figures are commonly, yet erroneously, utilized as the primary foundation of property valuations by some real estate professionals, however this rudimentary and myopic approach to value is inherently and deeply flawed.

## Public Records/Assessor data

Compounding the noted challenges of procuring accurate SqFt data for properties in Los Angeles County is the somewhat convoluted methodology utilized by the Los Angeles Department of Building and Safety and which is typically the basis for SqFt figures reported in Assessor data.

An actual example of how Los Angeles Department of Building and Safety RFA calculations outlined in the building permit application comments states, in part,

"Baseline Hillside Ordinance RFA Calculation: Maximum allowable RFA: 13868.35 s.f. (per slope band analysis) +20% (Tier I Green Bonus) = 16642 s.f. Proposed RFA: 705 s.f. (proposed basement) - 705 s.f. (basement exemption) +5534 s.f. (proposed first floor) +4988 s.f. (proposed second floor) + 1215 s.f. (proposed covered patio) - 693 s.f. (5% covered patio exemption) + 938 s.f. (proposed garage) - 400 s.f. (garage exemption) + 949 s.f. (proposed ceiling >14') - 100 s.f. (ceiling > 14' exemption) = 12431 s.f. proposed RFA".

The above calculations serve to demonstrate how SqFt figures reported in Assessor data may differ significantly from SqFt totals via physical property measurements.

In some cases, the reported Assessor SqFt ("Building SqFt") and/or other public records data sources for new/newer construction and/or recently expanded homes may be based on the final RFA figure with no apparent regard for how the final RFA figure relates to the actual, physical SqFt of a residence.

For many years, it was common practice for some developers and agents/brokers to overstate the SqFt of new construction homes in MLS listings by adding covered porches, etc. to calculations. However, in recent years it is not atypical for some newer construction homes to actually be reported with larger square footage figures in Assessor/Pubic Records data than reported by Agents, Brokers, or Developers because of the methodology now utilized by the Los Angeles Department of Building and the Assessor's tendency to defer to Building Department figures.

• Client is advised that there is a pervasive misconception throughout much of the Real Estate Industry (including among appraisers and lenders), and the general public, that "Public Records" data is "official" data. This misconception is most commonly encountered in matters related to the SqFt of Single-Family residences. Square Footage data discrepancies have become a large enough problem that some appraisal education providers have developed entire continuing education classes dedicated to the topic/issue. Certified course provider Appraiser eLearning has a class titled Public Records, Square Footage & the Real Estate Information Crisis which includes excerpts such as:

"Tax departments provide this information without warranty of any kind and are not responsible for any errors or omissions. It is created solely for their use in estimating property values for the assessment process."

"The square footage data reported by county assessors was never designed or intended to be used outside of the tax department."

"This information was never meant to be used as a detailed source of square footage details; not by the real estate industry, the appraisal industry, or the insurance industry. All these industries are simply taking the assessor's information and trying to force it to work in the real estate comparison and valuation processes. And, far too often, simply because it is the most readily available source."

| Main File No. PP25-A0403 | | Page # 55 of 67 |
|---|---|---|

## Supplemental Addendum 2

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

"In the calculation of residential square footage, public records can vary in methods, terminology, and even within the same state there can be large variations in how square footage information is collected and reported."

"In most states, agents, appraisers, or assessors are not required to follow any specific measurement standard. Measurement methods are generally required to be 'locally acceptable."

• ANSI measurement standard requirements were adopted by Fannie Mae on April 1, 2022 and were subsequently adopted by most lenders, even for non-GSE (Government-Sponsored Enterprise) related valuations. Adherence to ANSI standards typically has minimal impact on measurement results when compared to equally precise pre-ANSI appraisal measurements (1/10-foot or 1" measurement increments) however some, mostly minor, new potential discrepancies have been noted for some properties.

*Fannie Mae Standardized Property Measuring Guidelines FAQ's (July 2022) state, in part, "GLA for properties in local MLS systems and assessor records may not have been derived using the ANSI standard for measuring and calculating square footage. The appraiser may not know what method was used to calculate the GLA shown in an MLS listing or in tax assessor data. Through research and their knowledge of the local market, appraisers determine if the GLA provided through alternate sources should be adjusted. The adjustment process does not change the requirement to report subject GLA using the ANSI standard."*

Home sizes reported in Assessor data most certainly do not reflect ANSI standards in most cases, and the previously described procedural/methodological changes all but ensure that SqFt figures will rarely, if ever, be consistent with ANSI derived measurements as well as typical pre-ANSI appraisal and lending industry standards.

Ideally the differences would be within an acceptable variance, however some of the changes have been noted to result in relatively substantial differences, many of which cannot be fully reconciled due to the complexity and variability of the Assessor methods of determining SqFt.

## GLA adjustments

Adjustment factors utilized in the Sales Comparison Approach "grid" reflect the estimated market reaction to differences in GLA within the context of the properties being compared to each other. Thus, market reaction may differ depending on the specific category or segment of the market and depending on the level of conformity between the properties being compared. While it is prudent to give some consideration to the estimated construction costs for similar homes, both construction bids and actual costs can range significantly (in some cases from under $300 per SqFt to well over $2,000 per SqFt) and costs do not always correlate directly with Quality, return on investment and/or marketability. Furthermore, contractor bids themselves can vary significantly for the same project scope and/or end result.

The estimated, incremental value typically paid by buyers in the marketplace may or may not equal actual construction costs (depending on specific sub-markets/categories/market segments). As stated previously, there are some areas, submarkets, categories and/or market segments in which the contributory value of GLA can actually exceed construction costs.

Typically, the contributory value of additional living area diminishes when the size of the house exceeds what is typical for the neighborhood (diminishing returns) thus, market reaction (and adjustment factors) may not necessarily be consistent with price-per-square-foot figures indicated for the overall GLA price-per-square-foot of an entire home/property.

## BASEMENT & FINISHED ROOMS BELOW GRADE

*Fannie Mae guidelines include explicit instructions that state, in part, "Only finished above grade areas can be used in calculating and reporting of above-grade room count and square footage for the gross living area. Fannie Mae considers a level to be below-grade if any portion of it is below-grade, regardless of the quality of its finish or the window area of any room. Therefore, a walk-out basement with finished rooms would not be included in the above-grade room count. Rooms that are not included in the above-grade room count may add substantially to the value of a property, particularly when the quality of the finish is high. For that reason, the appraiser should report the basement or other partially below- grade areas separately and make appropriate adjustments for them on the Basement & Finished Rooms Below- Grade line in the Sales Comparison Approach adjustment grid."*

Appraiser acknowledges that some appraisers may include below-grade levels in the "Above Grade Room Count/Gross Living Area" if a property is marketed as a 3-story home with 2 above-grade levels even if permits themselves show the level as "basement" and even if the lot topography is relatively flat. It is this appraiser's opinion, however, that including below-grade areas as "above-grade" in the "grid" is an approach that is more appropriately utilized when appraising hillside homes built with the slope of the terrain rather than for homes built on relatively flat lots. Segregating the above-grade areas from the below-grade areas results in a more transparent analysis of property characteristics (and potentially market appeal), even if determined to warrant the same price-per-SqFt adjustment factor.

While there may be occasions when deviating from the FNMA instructions may be warranted, those occasions are not common. For appraisal assignments which include properties (subject, comparables or both) with below-grade or partially below-grade areas, an effort was made to identify and segregate these areas and to analyze the potential impact on the overall functionality and marketability to determine appropriate adjustment factors.

• Different adjustment factors may be utilized within the same Sales comparison approach "grid", in cases when comparables may have superior or inferior finish, features, and/or utility/functionality to each other (e.g., basements with an interior staircase vs. a "walk-out" basement and/or finished basements permitted as "GLA" by the municipality vs. "finished" basements originally permitted as storage and/or mechanical).

• Below-grade/finished basement level SqFt for the comparables may be estimated, in some cases, if specific/verifiable information is limited or unavailable.

• Below-grade/finished basement level Bedroom and Bathroom counts reported in the "grid" may also reflect estimates if specific/verifiable information is limited or unavailable but they appear to be included in the above-grade room counts in other data sources (typically MLS listings and sometimes public records).

## FUNCTIONAL UTILITY

The "Functional Utility" data field and corresponding line-item adjustments are sometimes utilized for a variety of factors not adequately represented in the pre-printed appraisal form. The line-item may be utilized to address superior or inferior functional utility of a home, superior or inferior functional utility of a site, differences in beneficial easements, and in some cases, other factors that may impact marketability not specifically related to functional utility such as special assessments, entitlements, or sales with the potential for subdivision.

## ENERGY EFFICIENT ITEMS

Solar Electric Systems: Due to the limited availability of reliable/credible data to establish irrefutable contributory value of solar, line-item adjustments for Solar (when applicable) are typically applied at a factor commensurate with estimated market costs unless otherwise stated.

## GARAGE/CARPORT

Garage/Carport figures indicated in the Sales Comparison Approach "grid" may include tandem parking spaces which may be reported as the same parking space count but may warrant line-item adjustment to reflect the inferior marketability and market value of tandem vs. non-tandem spaces (e.g., 2-car side-by side garage reported as 4ga vs. 2-car garage with 2 additional tandem spaces also reported as 4ga). Garage and/or Carport adjustments in the sales comparison grid may, in some cases, be greater than actual construction costs as set-back regulations, lot coverage limitations, the location and/or configuration of existing

Main File No. PP25-A0403 | Page # 56 of 67

## Supplemental Addendum 2

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State CA | Zip Code 90077 |
| Lender/Client | N/A | | | | |

improvements, etc. may not always allow for the construction of a new and/or additional garage or carport space. In these cases, the contributory value of parking spaces may exceed actual construction costs and/or contractor bids.

• Comparables utilized in the Sales comparison approach "grid" with the same Parking description may warrant line-item adjustments if any of the parking spaces are noted to be tandem spaces which are widely regarded to typically have inferior utility to standard parking spaces.

• Driveway Car Storage adjustments in the Sales comparison approach "grid" are typically applied only if the subject and/or comparable/s have dedicated/improved, off-street driveway parking spaces, intended for use as primary parking (e.g., properties with no garage or carport) or if the number of driveway parking spaces represents an obvious market advantage (or disadvantage). Driveway Car Storage count is acknowledged to be highly subjective due largely to the lack of an official FNMA definition or guidance (e.g., Some may base driveway car storage count only on spaces that would still allow for unimpeded access to other spaces, while others may base counts on estimates of valet-style, stacked parking, etc.).

• Some garages converted to "habitable" areas may be recognized in some specific market areas as having contributory value, regardless of permit status. However, some lender guidelines dictate that un-permitted garage conversions should not be given value in an appraisal. There are some cases when a converted garage space is recognized to have likely contributory value, in which case it is generally appropriate to value the converted garage spaces in a manner commensurate with the value of an otherwise fully functioning garage space.

### NON-STANDARDIZED/CUSTOM LINE-ITEMS IN THE SALES COMPARISON APPROACH "GRID"

#### Auxiliary/Accessory/ADU

*Fannie Mae "Uniform Appraisal Dataset (UAD) Frequently Asked Questions" (updated May 15, 2017) Q28 states, "Outbuildings are to be treated separately and should not be considered in the rating of the primary residence. Quality and Condition of any outbuilding(s) should take into account the condition, quality, and utility of the structure(s) and be reported elsewhere on the form". Thus, Quality and Condition of outdoor/exterior site improvements (pool, spa, landscaping, hardscaping, etc.) were considered in (and are reflected in) the overall Quality and Condition ratings of both the subject and comparables [unless otherwise indicated in "SUPPLEMENTAL ADDENDUM PT 1"].*

*\*NOTE: Improvement Section (B4-1.3-05), of the Appraisal Report the Fannie Mae Selling Guide Instructions (published August 03, 2022) state, in part, "When reporting the living area of an ADU, it should not be included with the Gross Living Area calculation of the primary dwelling. It should be reported and adjusted for on a separate line in the grid, unless the ADU is contained within or part of the primary dwelling with interior access and above grade. If a standalone structure does not meet the ADU minimum requirements, it should be treated as any other ancillary structure and included as a separate line item in the sales comparison approach then adjusted based on its contributory value to the subject property."*

• The terms "Guest Unit" or "Guest House" are commonly utilized by market participants as a blanket term to describe any additional "habitable" structure/area. However, "Guest Unit" or "Guest House" may not always represent an accurate description of the structure/amenity being described. Thus, in most cases the broader term Auxiliary ("Aux" in the Sales Comparison Approach "grid") is utilized as a "catch-all" due to the lack of universally accepted definitions. UAD guidelines specify that the Quality and Condition of Accessory Structures should be considered separate from the Quality and Condition of the primary residence. This may result in different price per SqFt adjustments for different comparables that otherwise have seemingly similar "Auxiliary/Accessory" Structures line-item descriptions. Further obfuscating the matter is the recent rise in popularity of the terms ADU (accessory dwelling unit) and ALQ (accessory living quarters) in many Southern California municipalities/communities.

• Line-item adjustments for Auxiliary/Accessory/ADU applied in the Sales Comparison Approach "grid" may not always be applied at the same price-per-SqFt rate for all comparables based on multiple factors including; differences in Quality, Condition, and/or the level of finish and/or utility (e.g., Bonus Room with no plumbing vs. Guest House with bathroom, etc.). In some cases, it may be necessary to utilize lump sum adjustments (e.g., $25,000, $50,000, etc.) if the availability of specific, verifiable information is limited.

• In some cases, it may be appropriate to value Auxiliary Structures/ADU's at the same price-per-SqFt as the GLA adjustments. For instance, an 9,000 SqFt home with a permitted 2,000 SqFt guest house may, in some cases, have a marketing advantage over an otherwise similar 11,000 SqFt home with no guest house. In this case, a price-per-SqFt adjustments for the Auxiliary Structures equal to the GLA adjustments may be warranted.

• Sizes of value Auxiliary Structures may be estimated in some cases when specific/exact/reliable/verifiable information is not available.

• In cases when "Guest Units", "Guest Houses", "ADU's", etc. described in MLS listing are found to be below-grade/ finished basement areas they are accounted for accordingly in the Sales Comparison Approach "grid".

#### Other/Submarket

It is common for the availability of credible and/or relevant market data to determine appropriate submarket adjustments to be limited. Lack of adequate data is often a result of limited overall sales volume of specific property-types in diverse neighborhoods along with site-specific locational factors that also impact the marketability and/or market value of a property. In some cases, a property may be located within both a widely recognized, and easily defined, neighborhood (e.g., Pacific Palisades) as well as within a more narrowly defined/specific submarket within that larger neighborhood (e.g., Palisades Riviera). In some circumstances, different submarkets within the same larger neighborhood may warrant line-item adjustments to adequately reflect superior/inferior marketability. If applicable, submarkets are thus identified in the Sales Comparison Approach "grid" and adjusted-for accordingly when warranted.

An effort was made to evaluate relevant factors that are typically known to market participants. However, some potentially relevant factors may not be widely known by market participants or even by real estate appraisers. Factors that can impact the marketability of a property despite lack of widespread awareness may include (but are not limited to): anti-mansionization ordinances; hillside ordinances; flight paths; methane gas districts; scenic parkways; subterranean subway tunnels; earthquake faults; California Coastal Commission; Santa Monica Mountains Coastal Zone; Deed Restrictions in specific tracts; parcel specific deed restrictions; abandoned oil and gas wells; subsurface oil and gas rights; historic designations; tree protection preservation ordinances; sewer/drainage projects; eminent domain; community specific plans; etc.

### Amenities not typically adjusted for within the Sales Comparison Approach "grid" (unless otherwise stated)

• Tennis Courts: Adjustments for Tennis Courts typically only applied in Estate areas with large "usable" site areas where Tennis Courts do not impinge on other amenities, gardens, etc. In most non-Estate areas of Southern California, a significant portion of market participants may regard the value of a Tennis Court to be largely in the actual "usable" site area. There is a lack of consensus among market participants if a Tennis Court has contributory value as some may prefer lawn, garden, or other uses on the same site area.

• Driveway/Off-street parking: Due to the typically limited data regarding Driveway/Off-street parking for the comparables and the somewhat subjective nature of parking spot estimates, line-item adjustments for driveway parking are not typically applied unless otherwise stated in the addendum as the value is typically adequately reflected in "usable" site estimates.

• Basements (Mechanical/Storage/"California"): No adjustments were made for mechanical/storage basements, unless otherwise stated in the addendum, due to the lack of reliable data for most comparables.

| Main File No. PP25-A0403 | Page # 57 of 67 |

### Supplemental Addendum 2

File No PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State CA | Zip Code 90077 |
| Lender/Client | N/A | | | | |

## ADDITIONAL COMMENTS ON THE SALES COMPARISON APPROACH "GRID"

• Valuations in market areas with diverse housing stock often include wide ranges of both comparable sale prices as well as wide ranges of adjusted sale prices. In many cases this range may be significantly wider than would otherwise be considered "typical" in other markets where the housing stock is more homogenous however often unavoidable if adequately accounting for differences between properties. Further contributing to the wide range of prices are the significant premiums which are often commanded by renovated and/or new construction properties. It is not unusual for some properties, in certain submarkets and/or categories, to command premiums that far exceed actual renovation or replacement costs. The impact and extent of these premiums are evidenced by the ongoing presence of "flippers" and developers in the marketplace. Factors which can influence these noted premiums include (but may not be limited to): the traditionally low inventory of appropriately priced, renovated properties in the neighborhood; the potentially lengthy and arduous permit approval process; the continually evolving engineering and/or construction minimum standards/requirements (and corresponding enforcement) by local jurisdictions; entitlement restrictions/limitations; citizen opposition; and the impact of specifically motivated buyers who may have extraordinary purchasing power and who may be willing to pay significant premiums for specific property types, specific locations and/or during specific time periods.

• The generally limited overall inventory of certain housing stock and the correlative constraints of a generally limited supply of available properties (scarcity) can cause the buyer/seller dynamic in these submarkets to be perpetually fluid in nature. Substantive changes in the balance of supply and demand can sometimes be precipitated by seemingly nominal changes in inventory (e.g., 1 or 2 new listings, 1 or 2 recent sales). Furthermore, some properties which may have specific and/or significant market appeal to a specific (or limited) subset of buyers may not have universal appeal to otherwise similarly equipped buyers in the marketplace (e.g., a property that is located next door to a property already owned by a potential buyer). A lack of unanimity among market participants about specific property characteristics that impact market appeal is not atypical.

### High-End market dynamics

The high-end real estate market in the greater Los Angeles/Beverly Hills/Malibu area can, during certain economic climates, function in a manner that appears to be independent from much of the remainder of the real estate market. It is not unusual for a portion of the buyers participating in real estate transactions in these high-end market areas to be somewhat "insulated" from economic conditions that might otherwise impact most participants in more "typical" or conforming market areas.

It is not unusual in some high-end market areas and/or categories for the market participants (both buyers and sellers) to have motivations that may appear to have minimal correlation with prevalent economic indicators, economic influences and/or market conditions. In some cases, the specific motivations of these market participants may even appear to be somewhat incongruent, contrary to, or disconnected from, these indicators, influences and/or conditions.

In some cases, the buyer/seller dynamic may also involve sellers who recognize their potential advantage over a significantly motivated buyer and who may compel buyers to pay significant premiums that may not necessarily reflect any substantive consideration of prior sales in the area and/or the market value of the property as it relates to so-called "comparable" sales. This dynamic between buyer and seller in the high-end market is not always consistent with the buyer/seller dynamic as it relates to the widely accepted definition/understanding of "Market Value" in the real estate industry (defined by the Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. as "The most probable price that the specified property interest should sell for in a competitive market after a reasonable exposure time, as of a specified date, in cash, or in terms equivalent to cash, under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, for self-interest, and assuming that neither is under duress").

Transactions in some high-end markets may also involve buyer-agent relationships that are somewhat inconsistent with typically understood boundaries of fiduciary duty. In some cases, the market value of a property targeted for purchase may be less germane than getting the property they want, regardless of the market value that could be reasonably supported by market data and a "winning" bid may be the sole metric by which a buyer's agent is judged. It is not unusual for some buyers to be completely unaware of prior sales in the area and evaluate the value of a property exclusively by how it compares to other listings available/on the market at that time.

In some high-end market areas that include participants with extraordinary purchasing power, participants with specific motivation, and/or a substantial number of transactions that take place with no widespread market exposure in Multiple Listing Services, it could reasonably be argued that the market dynamics are sufficiently atypical to reasonably conclude that few, if any, of the transactions should be considered "market value" when examined within the context of the widely accepted definitions of "market value" (the foundation of most residential appraisals).

From an appraisal standpoint, the task of reconciling the sale prices of these transactions can be quite daunting. It is not unusual for typical "industry standards" and/or lender guidelines to offer insufficient latitude within the context of typical appraisal practice to adequately reflect market reaction to differences between properties.

• It is not unusual for a portion of the transactions in some high-end market areas to take place with no widespread market exposure in Multiple Listing Services. These listings/transactions are known to market participants by various terms that include (but may not be limited to): pocket, private, off-market, quiet, whisper, etc.

In some cases, a property may be initially exposed to the market via an MLS listing only to be later Withdrawn, Canceled, or allowed to Expire by the listing agent once a buyer has been secured. This tactic is not uncommon in the market area and is often implemented by agents to shelter buyer and/or seller from widespread, public awareness of the transaction. The status of Canceled or Withdrawn listings will sometimes be changed in the MLS to "Expired" after a specific amount of time which can further obscure details of the transaction. The noted lack of transparency associated with some transactions in the market can have a detrimental impact any efforts on credibly analyze market data/trends.

Due to the significant number of transactions in high-end markets in which confidentiality is a priority, it may be necessary, in some cases, to rely heavily on confidential information provided by local real estate agents/brokers, colleagues, real estate professionals and/or other market participants.

Further exacerbating difficulties in accurately evaluating market conditions/trends in some high-end submarkets are the significant number of listings with extraordinarily optimistic list prices, some of which can remain on the market for extended periods of time with unmotivated sellers and/or with few (or no) price adjustments. While these listings may have a significant impact on the superficial/raw months of supply statistics, they may have minimal appreciable impact on perception of supply-and-demand among informed market participants (effective supply and demand).

Analysis of potential listing comparables, estimated months-of-supply, and estimates of projected market negotiations must all be navigated with cognizance of the preponderance of listings with optimistic list prices. These list prices may not reflect actual market value and thus these listings may contort DOM data (both macro and micro) as well as Average/Median List Price figures. It is not unprecedented (or even atypical) for a portion of the optimistically priced listings in certain submarkets to ultimately sell for prices that are more "in-line" with actual market conditions despite the lack of any substantive price adjustments.

Client is cautioned that in some high-end markets in which relevant market data is limited, conclusions drawn from a limited matched pair analysis (with only 2 sales) involving market participants who may have specific motivations and extraordinary purchasing power, and for whom risk mitigation may not be among the primary objectives, may not be the most definitive indicator of market reaction to differences.

In cases when multiple potential buyers with "deep pockets" are in competition with each other to submit the "winning" bid for a property, it is not unusual for at least a portion of the potential buyers to develop specific motivations, not unlike what some behavioral economists may refer to as "auction fever". This can be especially true if one (or multiple) potential buyers have recently "lost out" during previous attempted property purchases and can sometimes result in contract

### Supplemental Addendum 2

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | |

prices that are well above prices that could otherwise be supported by market data. In some cases, these premiums may also exceed what can be reasonably explained and/or reconciled within the Sales Comparison Approach "grid".

• NOTE: Comparable photos included in the appraisal report may not always be the most recent appraiser photo if older photos are deemed to better represent the property at the time of the transfer.

• NOTE: Several gated communities in Los Angeles County have strict no-photography policies for appraisers. Thus, some photos included in an appraisal report may be older photos that were taken during prior assignments and some photos may be MLS photos. New attempts to photograph potential comparables in those areas are typically limited to MLS listings that did not include front photos. Any photo attempts within these communities will be made discreetly and judiciously.

Fannie Mae Selling Guide (Published October 05 2022) excerpts include,

• Section B4-1.3-07, Sales Comparison Section of the Appraisal Report (04/15/2014). Overview, Data and Verification Sources of Comparable Sales, and Prior Sales History of the Subject and Comparable Sales: https://singlefamily.fanniemae.com/media/31146/display#page=617
• Section B4-1.3-08, Comparable Sales (03/02/2022). Selection of Comparable Sales: https://singlefamily.fanniemae.com/media/31146/display#page=618
• Section B4-1.3-09, Adjustments to Comparable Sales (01/31/2017). Analysis of Adjustments:
https://singlefamily.fanniemae.com/media/31146/display#page=622
• Section B4-1.1-06, Uniform Appraisal Dataset (UAD) and the Uniform Collateral Data Portal (UCDP) (02/02/2022):
https://singlefamily.fanniemae.com/media/31146/display#page=571

## COST APPROACH

When the availability of relevant vacant residential parcel sales data is limited, extraction is typically the next best methodology available for land/site valuation. However, extraction of land value from "Tear Downs" or "Fixers", can sometimes result in data that is unreliable and inconsistent due, in large part, to the discrepant opinions of individual market participants (real estate agents, real estate brokers, buyers, sellers, etc.) regarding what qualifies as a "tear-down" or "fixer". Thus, a home that might be viewed as a "Tear Down" by one buyer may be viewed as a restoration, renovation and/or expansion opportunity by another buyer. Conversely, in some market areas a home that is only 10-years old may be considered a "tear-down" if the site has significant investment value as a redevelopment opportunity with an even larger home. Additionally, some redevelopment buyers may even be willing to pay significant premiums based on their own projections of investment value and the potential profit after redevelopment. Thus, each potential "tear-down" and/or "fixer" sale must be analyzed individually. In addition to potentially specific buyer motivations considered is also given to other factors that may impact the marketability such as any possible negative external influences (traffic, etc.) which can have a significant impact on the marketability of a property and its corresponding site value. Site values extracted from properties that sold with existing improvements should be considered a "starting point" for an opinion of land value as existing improvements of "tear-down" and/or "land value" sales comparables may, in some cases, have some contributory value (even in cases when they are eventually demolished). This also may result in "as improved" values that may be higher than the value of parcels that are completely unimproved. Additionally, when adjusting for differences in site size, the law of diminishing returns must be considered as price-per-square-foot figures for an entire site are not typically consistent with the value of differences in site area between two properties.

### Cost data sources

Client is cautioned that the widely available and appraisal "industry standard" cost analysis sources which include (but are not limited to): Marshall & Swift, DwellingCost.com, Building-Cost.net, Craftsman-Book.com, etc. often do not reflect cost estimates that are consistent with cost estimates based on prior construction appraisal files and/or builder cost surveys. This is particularly true for high quality residences in many of the high-end areas of Southern California. A 2022 online chat/discussion with a customer support representative of one of the major online cost estimators regarding the methodologies and capabilities of the software for cost estimates of high-end properties culminated in an admission from the cost estimator customer service representative that "...this probably isn't the right tool for your purposes...that would not be a fit for our software." Appraiser acknowledges that some clients may specifically request cost approach data that can be replicated/verified, however any implicit assertion of absolute accuracy may prove to be misleading if relied upon as fact. Additionally, foundation costs, in particular, can vary tremendously from neighborhood-to-neighborhood and, in some cases, even from lot-to-lot (particularly in hillside and/or beachfront areas). In the absence of property/site specific contractor's bids, the appraiser must often rely, at least in part, on prior experience and past building cost surveys conducted with local builders. NOTE: Even with construction appraisal assignments, appraisers are rarely privy to the actual, final construction costs which can sometimes exceed projections by a significant margin.

Further contributing to the generally dubious nature of Cost Approach conclusions are myriad additional factors that can hinder an appraiser's ability to reliably establish a credible estimate of accrued depreciation. These factors include (but are not limited to): the diversity of buyer requisites; the prevalence of specifically motivated and/or "deep pocketed" market participants (in some areas); and the capricious nature of building costs in the Southern California market area impacted by numerous, divergent variables (price-per-SqFt bids/estimates, eventual final costs, material costs, and the diversity of opinions regarding the return on investment (contributory value) for various, specific property attributes, etc.). Furthermore, it is not uncommon, in many portions of the region with high land-to-value ratios, for the market to recapture more than the actual cost of land and improvements (entrepreneurial profit) in periods of increasing or stable markets.

Under some circumstances (e.g., new tract development, special use, etc.) the Cost Approach can be a relevant approach to value, but within well-established, and/or older tracts, it has considerable, and well documented limitations, not the least of which is the uncertainty of measuring the accrued depreciation evident in the property being appraised due to all causes (physical, functional, and external). According to USPAP the "Cost Approach" is only necessary if its development is "for credible assignment results" (SR 1-4).

• NOTE: One publicly available cost source is published by the California State Board of Equalization (CALIFORNIA STATE BOARD OF EQUALIZATION RESIDENTIAL BUILDING COSTS handbook (EFFECTIVE JANUARY 1, 2023). The highest indicated price-per-SqFt estimate for properties of over 5,000 SqFt listed in the handbook is $643.40. The guide suggests adding a 10% premium for properties located in Los Angeles County which would equate to roughly $707.74/SqFt. The top tier estimate does not adequately reflect costs in higher-priced areas of Southern California. The cost guide also under-estimates the cost of both garages and finished basements in the subject's area as the top end estimated costs range from $69.41 to $99.13 per SqFt for detached garages and from $59.54 to $89.08 per Sqft for attached garages. Finished basement costs are estimated to be between $64.49 and $123.67 per Sqft.

• Unless otherwise stated, Cost approach figures utilized in the report reflect a combination of widely available cost estimate data in conjunction with past appraiser experience/construction files and contractor interviews.

### Entrepreneurial Incentive/Profit

In some cases, the Cost Approach, as developed in the Appraisal may render a Value Opinion that does not appear to fully support the "Indicated Value by Sales Comparison Approach" without an additional line-item for "Entrepreneurial Incentive/Profit" (described in the Appraisal Institute's "The Appraisal of Real Estate; Eleventh Edition" as "...net residual value after the property has been sold and all tangible costs have been paid... [and] includes the return on equity capital"). The difference between the two approaches to value is indicative of the enduring viability of home renovations as an investment for property owners, developers and/or "flippers" who specifically build and/or renovate homes for a profit based on the margin that can be achieved between actual construction/renovation costs and market value. It appears that market conditions still support potential opportunities for residual "Entrepreneurial Profit" even for resales and/or older homes. It would not be prudent for developers and/or "flippers" to participate in the market if their cost analysis were to indicate a total cost estimate equal to market value. Thus, entrepreneurial profit/incentive remains a relevant consideration for both market participants and appraisal professionals alike.

Main File No. PP25-A0403 | Page 59 of 67

**Supplemental Addendum 2**

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State CA | Zip Code 90077 |
| Lender/Client | N/A | | | | |

The Appraisal Institute website includes a document titled "Understanding the Appraisal" which includes the statement, "The cost approach is based on the understanding that market participants relate value to cost. In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation in the structures from all causes. Entrepreneurial profit and/or incentive may be included in the value indication."

The Appraisal Institute website also includes a continuing education class titled "The Cost Approach: Unnecessary or Vital to a Healthy Practice?" which includes a description of the "8 important steps in the cost approach" stated as, "Estimate site value. Estimate cost of improvements. Estimate entrepreneurial incentive. Estimate total cost of improvements. Estimate depreciation in the structure. Estimate depreciated cost. Estimate contribution of site improvements. Derive indicated value of the property."

Opinion of Site Value utilized in the Cost Approach (Additional Comments)

Establishing a credible/reliable opinion of site value for use in the Cost Approach may be possible, in some instances, if an adequate number of directly relevant and verifiable vacant-land and/or land-value sales are available. However, even in cases with reliable site value data, the estimated improvement costs developed within the cost approach are rarely considered to be reliable indicators.

Myriad factors can contribute to difficulties in isolating a quantifiable contributory value of site when utilizing the abstraction method, including (but not limited to): existing neighborhood infrastructure; existing site improvements (curbs, driveway aprons, utilities at the street); existing permits/entitlements; existing architectural plans and/or specifications; existing reports (geological, etc.); characteristics and/or presence of adjacent properties; deed restrictions; CC&R's; the "price of entry" in the area; diminishing returns for larger sites.

In areas where the supply of vacant/undeveloped parcels is limited, it is not uncommon for "tear-down" sales purchased by developers may command prices that far exceed the prices commanded by the most recent (yet often dated) land sales. When no vacant parcels are available for purchase, buyers may be forced to pay market value for improved properties that may subsequently be demolished for redevelopment. The analysis of investment value can result in the site value and entrepreneurial profit/incentive to become intertwined with appropriate allocation of each difficult to determine.

NOTE: Fannie Mae Selling Guide (Published October 05 2022), Section B4-1.3-10, Cost and Income Approach to Value (04/15/2014)
https://singlefamily.fanniemae.com/media/31146/display#page=625

## RECONCILIATION OF VALUE

Definition of Market Value (Fannie Mae Selling Guide (Published October 05 2022), Section B4-1.1-01 dated 04/15/2014 is available at:
https://singlefamily.fanniemae.com/media/31146/display#page=560

## ADDITIONAL/GENERAL DISCLAIMERS, ETC.

USPAP Advisory Opinion 13 states, in part, "An appraiser must not allow assignment conditions to limit the scope of work to such a degree that the assignment results are not credible in the context of the intended use."

Appraisers are given the task of deriving adjustments that are intended to reflect the contributory value of various property characteristics based on the actions/reactions of buyers in the marketplace. The most common (and theoretically ideal) method for accomplishing this task is known as a paired sales analysis. This method can work quite well in areas of mostly conforming homes properties with minor differences. However, many market areas in the greater Los Angeles area are very diverse in property characteristics and amenities. In its purest form, paired sales analysis works by comparing two (or more) properties and attributing the difference in sale prices to specific, easily identifiable characteristics or amenities. Take, for example, two sold properties that are almost identical in every way, apart from one having a pool. If the contract and transfer dates are proximate (with same or similar market conditions), both represented "typical" arms-length, and both represented fair market value transfers, it can generally be safely concluded that the difference between the sale prices is most likely attributed primarily to the pool. The difference between sale prices could then be utilized as a reliable adjustment factor. In areas like the subject's neighborhood however, it becomes less practical to apply this method (sometimes, nearly impossible). In market areas where no two homes are alike, the task of determining which specific differences or attributes contribute to value (and to what extent they contribute to value) can become hazy. In fact, in many cases, the emotions and/or specific motivation of the individual buyer/s can play a greater role than more tangible, salient characteristics. This makes the challenge of adjusting for the contributory value of any singular attribute very complicated, unscientific, and nuanced.

Appraisers must rely on a combination of several approaches and/or perspectives, including (but not limited to): a form of modified matched paired sales analysis (with controls); the attributable market difference ascertained by depreciated replacement cost/contributory value; discussions with local realtors who specialize in the area; and the appraiser's experience in (and knowledge of) the subject's specific market area. In some cases, is may be prudent to speak directly to market participants (buyers, sellers, agents, brokers, etc. involved in recent transactions), to gain a better understanding of the motivations of the market participants and how much the "typical" buyers are willing to pay for various property characteristics or amenities. We, as appraisers, also analyze what the current cost would be to build a similar house or to add a certain/specific amenity. Unfortunately, the exact contributory value of any one feature/item is often unclear and there is generally a range of prices/costs that could be considered "reasonable" projections.

While most market participants would acknowledge that actual market reaction to differences between properties exists on a fluid continuum, generally accepted appraisal methodology and industry standards dictate that adjustments within the sale comparison approach "grid" are applied with broad/rounded, incremental figures (e.g., $50,000, $100,000, $150,000, etc.) and/or percentages (e.g., 2.5%, 5%, 7.5%, 10%, etc.). Additionally, significant consideration must be given to the reaction of market participants to "Static" factors (e.g., Location, View) vs. "Dynamic" factors (e.g., Quality, Condition). Location, View, Design (Style), Quality, Condition and Submarket are generally applied in increments of 2.5% of the Sales prices of the comparables (when applicable and unless otherwise indicated). Adjustments in the Sales Comparison "grid" (for most factors) are rounded to the nearest $500 unless otherwise indicated in the addendum. Adjustments for all individual amenities / characteristics are intended to reflect the estimated market reaction to differences and they may not always represent figures that are commensurate with actual construction costs/contractor bids. While some amenities historically a have a higher "return on investment" than others, the items that recapture their cost in the market often differ from area to area and/or between different property price ranges and categories. This is especially true when analyzing the contributory value of additional structures and/or secondary "living" areas such as guest units, bonus rooms, or finished basements for which the contributory value of (and corresponding adjustments in the sales comparison Sales Comparison Approach "grid") may, in some cases, be greater than actual construction or replacement costs due to myriad factors that may include (but may not be limited to): set-back regulations; lot coverage limitations; location and/or configuration of existing improvements; and other factors described above.

The diversity of opinions among market participants extends well beyond the variables widely acknowledged to be subjective (Style, etc.). Multiple variables such as Room Counts and SqFt are widely assumed to be clearly, and objectively quantifiable and unambiguous. However, in Real Estate, many of these variables are paradoxically open to interpretation. For instance, rooms indicated as "Bedrooms" in Real Estate marketing may-or-may-not have closets, reasonable access to bathrooms, sufficient ingress/egress, sufficient ceiling height, etc. and both buyers and sellers may have different criteria for what they consider to be a "Bedroom". Industry standards for measuring/calculation SqFt/GLA have also changed somewhat in recent years and some approaches to property measurement remain somewhat ambiguous and/or incompatible with widely held understanding/assumptions (e.g., credit given to thicker-than-typical foundation walls, or walls with additional ornamentation). Adding to potential uncertainty related to seemingly objective variables are inconsistencies that have been noted on a relatively regular basis not just between but also within data sources (e.g., MLS listings with differing room counts in the property overview, the listing remarks, online marketing, and/or shown on floor plans). The client is advised that due to the aforementioned irregularities in reporting, the representations of salient

## Supplemental Addendum 2

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | | |
| City | Los Angeles | County | Los Angeles | State | CA | Zip Code | 90077 |
| Lender/Client | N/A | | | | | |

characteristics of properties (GLA, room count, site area, etc.) utilized in the appraisal report may differ somewhat from figures reported in other data sources and discrepancies are sometimes irreconcilable. In some cases, the source deemed most reliable/credible may ultimately reflect a "judgment call" based on the appraiser's prior experience, knowledge of market areas, knowledge of the fallibility/reliability of the data sources, etc. and data utilized in the report is by no means intended to imply absolute certainty.

Some market participants may mistakenly equate "Value" with "Cost" or "Price". Cost refers to actual expenditures (materials, labor, etc.). Price, however, refers to the amount that someone pays for something. While cost and price can each affect value, they do not determine value. This dynamic can also impact the return-on-investment for the market value of a property as some expenditures may generate significant profits while others may have an adverse impact on the market value of a property. Admittedly, some line-item adjustments within an appraisal report are much "qualitative" (reflecting generally positive or negative market influences) as they are "quantitative" (verifiably derived from hard data/information). Even in a high-supply and supported appraisal report, it remains possible that every single line-item adjustment could be questioned if scrutiny is focused on a singular variable, outside the larger context of numerous other and myriad other factors which can also impact marketability/value, and which do not have the same impact for every buyer. Further impeding an appraiser's ability to develop irrefutable adjustments is the fundamental foundation of appraisal practice which involves the appraiser's "opinion" of value which itself is based largely on the "opinions" and/or specific motivations of market participants (buyers, sellers, etc.) due to the largely subjective nature of real estate in general.

In some cases, verbiage from MLS listings may be included in the appraisal report as part of a property description for a comparable utilized in the Sales Comparison Approach "grid". Any MLS listing verbiage included in an appraisal report should not be construed as the opinion of the appraiser unless otherwise stated. California licensed Real Estate brokers and salespeople, though subject to Federal Fair Housing laws, are not subject to the same GSE criteria as Appraisers regarding subjective descriptions. California Real Estate Law permits realtors to describe properties with subjective language that is legally allowed and referred to as "puffing" ["superlative statements about a property that shouldn't be considered assertions of fact": California Real Law; 6th Edition - 2007; Page 558 [cf. pages. 214-215]]. Thus, while personally refraining from similar subjective terminology within the appraisal report, it is still Appraisers' USPAP responsibility to attempt to distinguish between comments that may reflect "puffing" and those that represent actual assertions of fact. Appraisers are obligated to analyze all relevant marketing factors that may have an impact on "market reaction" and to 'objectively' adjust for differences. In some cases, understanding the way a property was marketed may be integral to adequately understanding market reaction and extract quotes from marketing materials may be the most concise and direct manner to encapsulate any potentially relevant marketing strategies to an end user. The appraiser acknowledges that Federal Fair Housing regulations and Government Sponsored Enterprises (GSE's) have guidelines regarding unacceptable, 'subjective' terminology and has endeavored to remain in compliance with industry standards for Appraiser verbiage.

Reported DOM of Pending sales utilized in the Sales Comparison Approach "grid" may differ somewhat depending on how the DOM is calculated. DOM may reflect listing date to contract date, or it may reflect listing date to the effective date of appraisal (particularly in cases when utilizing Pending Sales which do not all ultimately close escrow).

Overly optimistic list prices that require line-item adjustments of 10% or greater to adequately reflect estimated market negotiations, are not atypical in many high-end market areas.

The prevalence of investment buyers (syndicates, etc.) indicates that the Principle of Anticipation is now a significant market factor in some high-end markets of Southern California. While this may have a tangible impact on the outcome of "bidding wars" it is not entirely consistent with the definition of "Market Value"

## Definitions and references of potential relevance

### USPAP

• **CLIENT:** Uniform Standards of Professional Appraisal Practice (USPAP) 2018-2019 Edition definition of "CLIENT" states, "The party or parties who engage, by employment or contract, an appraiser in a specific assignment."
• **EXTRAORDINARY ASSUMPTION:** Uniform Standards of Professional Appraisal Practice 2018-2019 Edition definition of "EXTRAORDINARY ASSUMPTION" states, "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions."
• **REPORT:** Uniform Standards of Professional Appraisal Practice (USPAP) 2018-2019 Edition definition of "REPORT" states, "any communication, written or oral, of an appraisal or appraisal review that is transmitted to the client, or a party authorized by the client upon completion of an assignment."
• **INVESTMENT VALUE:** Uniform Standards of Professional Appraisal Practice (USPAP) 2018-2019 Edition definition of "INVESTMENT VALUE" states, "The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market."

### ANSI

• **ATTACHED SINGLE-FAMILY HOUSE:** "A house that has its own roof and foundation, is separated from other houses by dividing walls that extend from roof to foundation and does not share utility services with adjoining houses; may be known as a townhouse, rowhouse, or duplex, for example."
• **DETACHED SINGLE-FAMILY HOUSE:** "A house that has open space on all its sides."
• **FINISHED AREA:** "An enclosed area in a house that is suitable for year-round use based upon its geographic region, embodying walls, floors, and ceilings that are similar to the rest of the house."
• **GRADE:** "The ground level at the perimeter of the exterior finished surface of a house."
• **LEVEL:** "Areas of the house that are vertically within 2 ft. of the same horizontal plane."
• **SQUARE FOOTAGE:** "An area of a house that is measured and calculated in accordance with the standard. When employing Metric or Standard International (SI) measurement units, the term floor area is used in place of square footage."
• **UNFINISHED AREA:** "Sections of a house that do not meet the criteria of finished area."

### California Department of Real Estate Reference Book – A Real Estate Guide Chapter 15 – Appraisal and Valuation

• **PRINCIPLE OF SUPPLY AND DEMAND:** "Principle of supply and demand. Holds that price varies directly, but not necessarily proportionately, with demand, and inversely, but not necessarily proportionately, with supply. Increasing supply or decreasing demand tends to reduce price in the market. The opposite is also true."
• **PRINCIPLE OF ANTICIPATION:** "Principle of anticipation. Value is created by anticipated future benefits to be derived from the property. In the Market Value Analysis, appraisers estimate the present worth of future benefits. This is the basis for the income approach to value. Simply stated, the income approach is the analysis of the present worth of projected future net income and anticipated future resale value. Historical data are relevant because they aid in the interpretation of future benefits."

### Additional Notes

• NOTE: Abbreviations may vary depending on field character limits.
• NOTE: "Caesarstone" is sometimes utilized in property descriptions as a generic term for Quartz based/engineered composite.
• NOTE: "E" or "Elv" typically utilized in property sketches to indicate "Elevator".
• NOTE: "Wainscot" is a term noted to be utilized interchangeably by many in the appraisal profession with shower and/or tub surround. The Merriam-Webster dictionary definition of "Wainscot" states, "a (1): a usually paneled wooden lining of an interior wall, (2): a lining of an interior wall irrespective of material, b: the lower three or four feet (about one meter) of an interior wall when finished differently from the remainder of the wall."

### COMMON APPRAISAL REPORT ABBREVIATIONS

Main File No. PP25-A0403    Page # 61 of 62

### Supplemental Addendum 2

File No. PP25-A0403

| Borrower | N/A - Private Party | | | | |
|---|---|---|---|---|---|
| Property Address | 1811 Bel Air Rd | | | | |
| City | Los Angeles | County | Los Angeles | State CA | Zip Code 90077 |
| Lender/Client | N/A | | | | |

- Adj = Adjacent
- ADU = Accessory Dwelling Unit
- ALQ = Accessory Living Quarters
- Aux = Auxiliary Structure
- Balc = Balcony
- Bch = Beach
- BchAdj = Beach Adjacent
- BchClb = Beach Club
- Bchfrnt = Beachfront
- Bcks = Backs
- Blc = Balcony
- BnsRm = Bonus Room
- CDOM = Cumulative Days on Market
- CDS = Cul-de-sac
- Cmrcl = Commercial property
- Cnsrv = Santa Monica Mtns Conservancy
- Crftsmn = Craftsman
- Cty = City
- Cyn = Canyon
- Dwl = Drywall
- Est = Estate
- ExtEntArea = Exterior Entertainment Area
- ExOb = External Obsolescence
- EXP = Initial Market Exposure Price
- Fdr = Feeder Street
- FF&E = Furniture, fixtures, and electronics
- GH = Guest House
- Gtd = Gated
- HrsFac = Horse Facilities
- Hwd = Hardwood
- InfPl = Infinity Edge Pool
- ItalRenais = Italian Renaissance
- Lgn = Lagoon Style
- LP = Last known/most recent or current List Price
- Ltd = Limited
- LtdOcn = Limited Ocean
- MdCntMod = Mid-Century Modern
- MdrnFrmhs = Modern Farmhouse
- Medit = Mediterranean
- Mid-Cent = Mid-Century
- Mkt = Market
- MnrFdr = Minor Feeder Street
- ModTrnsSp = Modern Transitional Spanish
- Mrb = Marble
- NeoMed = Neo Mediterranean
- NeoMedMd = Neo Mediterranean Modern
- Ocn = Ocean
- OLP = Original List Price
- PkB = peek-a-boo
- PlHse = Pool House
- Plstr = Plaster
- Pnt = Paint
- Prom, Prmntory = Promontory
- Pvln = Pavilion
- Pvt = Private Street
- Rdg = Ridge
- Rky = Rocky Beach
- Schl = School Influence
- Sds = Sides
- SFVSky = San Fernando Valley Skyline/City
- SGV = San Gabriel Valley
- ShrdPvt = Shared Private
- Sndy = Sandy
- SpclAsmnt = Special Assessment
- SprtCt, SprtsCt, SprtsCrt, SptCt = Sports Court
- Thru = Through Street
- TIntrsctn = "T" Intersection
- TnsCt = Tennis Court
- TradMod = Traditional/Modern
- Trc = Terrace
- TrchDwn = Torch Down Roof
- Trf = Traffic Influence
- Trnstnl = Transitional
- Trtp = Treetops
- Trv = Travertine
- Vest = Vestibule
- WdLm = Wood Laminate
- Z.E. = Zero Edge

End of Supplemental Addendum Pt 2

**CoreLogic Public Records – Page 1**

**1811 Bel Air Rd, Los Angeles, CA 90077-2728, Los Angeles County**   Auction ♡ Active Listing
APN: 4370-014-025   CLIP: 3078338837

| | | | | | |
|---|---|---|---|---|---|
| | MLS Beds **2** | MLS Full Baths **2** | Half Baths **N/A** | MLS List Price **$18,000** | MLS List Date **03/21/2025** |
| | MLS Sq Ft **1,664** | Lot Sq Ft **8,205** | MLS Yr Built **1953** | Type **SFR** | |

### OWNER INFORMATION

| | | | |
|---|---|---|---|
| Owner Name | Mazur Jamie | Tax Billing Zip | 90021 |
| Tax Billing Address | 1935 E 7th St | Tax Billing Zip+4 | 1205 |
| Tax Billing City & State | Los Angeles, CA | Owner Occupied | No |

### COMMUNITY INSIGHTS

| | | | |
|---|---|---|---|
| Median Home Value | $5,209,468 | School District | LOS ANGELES UNIFIED |
| Median Home Value Rating | 10 / 10 | Family Friendly Score | 89 / 100 |
| Total Crime Risk Score (for the neighborhood, relative to the nation) | 67 / 100 | Walkable Score | 53 / 100 |
| Total Incidents (1 yr) | 31 | Q1 Home Price Forecast | $5,359,366 |
| Standardized Test Rank | 69 / 100 | Last 2 Yr Home Appreciation | 14% |

### LOCATION INFORMATION

| | | | |
|---|---|---|---|
| Zoning | LARE40 | Most Hazardous Flood Zone | X |
| Tract Number | 10798 | Flood Zone Panel | 06037C1580F |
| School District | Los Angeles | Flood Zone Date | 09/26/2008 |
| Census Tract | 2621.00 | Within 250 Feet of Multiple Flood Zone | No |
| Subdivision | 10798 | | |

### TAX INFORMATION

| | | | |
|---|---|---|---|
| APN | 4370-014-025 | Tax Area | 67 |
| % Improved | 10% | Lot # | 6 |
| Legal Description | TRACT NO 10798 LOT COM AT MO ST W COR OF LOT 6 TH N 89 55'46 * E 1.05 FT TH S 18 21'48" E 29.3.24 FT TH N 61 40' E TO E LINE OF SD LOT TH S ON A CURVE CONCAVE 10 E RADIUS EQUALS 69 FT 68.82 FT TH S LOT 6 | | |

### ASSESSMENT & TAX

| | 2024 | 2023 | 2022 |
|---|---|---|---|
| Assessment Year | 2024 | 2023 | 2022 |
| Assessed Value - Total | $3,109,384 | $3,048,416 | $2,988,644 |
| Assessed Value - Land | $2,787,724 | $2,733,063 | $2,679,474 |
| Assessed Value - Improved | $321,660 | $315,353 | $309,170 |
| YOY Assessed Change (%) | 2% | 2% | |
| YOY Assessed Change ($) | $60,968 | $59,772 | |

| Tax Year | Total Tax | Change ($) | Change (%) |
|---|---|---|---|
| 2022 | $35,239 | | |
| 2023 | $36,946 | $1,706 | 4.84% |
| 2024 | $37,682 | $737 | 1.99% |

| Special Assessment | Tax Amount |
|---|---|
| Safe Clean Water83 | $62.40 |
| Flood Control 62 | $19.10 |
| Lacity Park Dist21 | $16.05 |
| La Stormwater 21 | $15.23 |
| Rposd Measure A 83 | $30.11 |
| Mrcaopnspace#180 | $40.00 |
| Mrcatire-Os#180 | $103.00 |
| Trauma/Emerg Srv86 | $83.20 |
| Lawestmosqab31 | $13.95 |
| Total Of Special Assessments | $383.04 |

### CHARACTERISTICS

**Property Details** Courtesy of PETER B BURNERS, COMBINED LA - WESTSIDE MLS - CLAW

The data within this report is compiled by CoreLogic from public and private sources. The data is deemed reliable, but is not guaranteed. The accuracy of the data contained herein can be independently verified by the recipient of this report with the applicable county or municipality.

## CoreLogic Public Records – Page 2

| | | | |
|---|---|---|---|
| County Land Use | Single Family Resid | Fireplace | Y |
| Universal Land Use | SFR | Fireplaces | 1 |
| Lot Frontage | 40 | Heat Type | Central |
| Lot Depth | 110 | Parking Type | On Site |
| Lot Acres | 0.1884 | Roof Material | Gravel & Rock |
| Lot Area | 8,205 | Roof Shape | Flat |
| Lot Shape | Irregular | Interior Wall | Plaster |
| Style | Modern | Exterior | Stucco |
| Building Sq Ft | 1,664 | Foundation | Slab |
| Stories | 1 | Year Built | 1953 |
| Total Units | 1 | Effective Year Built | 1953 |
| Total Rooms | 5 | Other Impvs | Fence |
| Bedrooms | 2 | Other Rooms | Dining Room |
| Total Baths | 2 | Equipment | Range Oven |
| Full Baths | 2 | # of Buildings | 1 |

### SELL SCORE

| | | | |
|---|---|---|---|
| Rating | N/A | Value As Of | N/A |
| Sell Score | N/A | | |

### ESTIMATED VALUE

| | | | |
|---|---|---|---|
| RealAVM™ | $2,563,400 | Confidence Score | 73 |
| RealAVM™ Range | $2,251,300 - $2,875,500 | Forecast Standard Deviation | 12 |
| Value As Of | 04/07/2025 | | |

(1) RealAVM™ is a CoreLogic® derived value and should not be used in lieu of an appraisal.

(2) The Confidence Score is a measure of the extent to which sales data, property information, and comparable sales support the property valuation analysis process. The confidence score range is 50 - 100. Clear and consistent quality and quantity of data drive higher confidence scores while lower confidence scores indicate diversity in data, lower quality and quantity of data, and/or limited similarity of the subject property to comparable sales.

(3) The FSD denotes confidence in an AVM estimate and uses a consistent scale and meaning to generate a standardized confidence metric. The FSD is a statistic that measures the likely range or dispersion an AVM estimate will fall within, based on the consistency of the information available to the AVM at the time of estimation. The FSD can be used to create confidence that the true value has a statistical degree of certainty.

### RENTAL TRENDS

| | | | |
|---|---|---|---|
| Estimated Value | 6079 | Cap Rate | 0.5% |
| Estimated Value High | 7308 | Forecast Standard Deviation (FSD) | 0.2 |
| Estimated Value Low | 4850 | | |

(1) Rental Trends is a CoreLogic® derived value and should be used for information purposes only.

(2) The FSD denotes confidence in an Rental Trends estimate and uses a consistent scale and meaning to generate a standardized confidence metric. The FSD is a statistic that measures the likely range or dispersion a Rental Amount estimate will fall within, based on the consistency of the information available to the Rental Amount at the time of estimation. The FSD can be used to create confidence that the true value has a statistical degree of certainty.

### LISTING INFORMATION

| | | | |
|---|---|---|---|
| MLS Listing Number | 25514837 | MLS Current List Price | $18,000 |
| MLS Status | Active | MLS Orig. List Price | $18,000 |
| MLS Status Change Date | 03/21/2025 | MLS Listing Agent | C132428-Weronika Sznajder |
| MLS Listing Date | 03/21/2025 | MLS Listing Broker | CROSBY DOE ASSOCIATES, INC. |

| | | | |
|---|---|---|---|
| MLS Listing # | 25-483889 | | 19-531106 |
| MLS Status | Sold | | Sold |
| MLS Listing Date | 01/16/2025 | | 11/22/2019 |
| MLS Listing Price | $18,700 | | $2,995,000 |
| MLS Orig Listing Price | $18,700 | | $2,995,000 |
| MLS Close Date | 02/19/2025 | | 12/24/2019 |
| MLS Listing Close Price | $18,000 | | $2,950,000 |
| MLS Listing Expiration Date | | | 09/28/2020 |

### LAST MARKET SALE & SALES HISTORY

| | | | |
|---|---|---|---|
| Recording Date | 12/24/2019 | Sale Type | Full |
| Sale Date | 11/19/2019 | Deed Type | Grant Deed |
| Sale Price | $2,950,000 | Owner Name | Mazur Jamie |
| Price Per Square Feet | $1,772.84 | Seller | Norton Muriel A Trust |
| Document Number | 1440187 | | |

| | | | |
|---|---|---|---|
| Recording Date | 12/24/2019 | 12/24/2019 | 01/23/2002 |
| Sale Date | 11/19/2019 | 11/21/2019 | 01/03/2002 |
| Sale Price | $2,950,000 | | |
| Nominal | | Y | Y |
| Buyer Name | Mazur Jamie | Norton Muriel A Trust | Norton Muriel A 2002 Trust |
| Seller Name | Norton Muriel A Trust | Norton Muriel A | Norton Muriel A |

Property Details  Courtesy of PETER B BURNESS, COMBINED L.A. - WESTSIDE MLS - CLAW

This data within this report is compiled by CoreLogic from public and private sources. The data is deemed reliable, but is not guaranteed. The accuracy of the data contained herein can be independently verified by the recipient of this report with the applicable county or municipality.

Generated on: 04/21/25
Page 2/4

## CoreLogic Public Records – Page 3

| | | | | | |
|---|---|---|---|---|---|
| Document Number | 1440187 | | 1440186 | | 172238 |
| Document Type | Grant Deed | | Affidavit | | Trustee's Deed(Transfer) |

**MORTGAGE HISTORY**

| | | | | |
|---|---|---|---|---|
| Mortgage Date | 10/30/2023 | 06/21/2021 | 12/24/2019 |
| Mortgage Amt | $575,000 | $350,000 | $2,212,500 |
| Mortgage Lender | Finance Ca | Finance Ca | Impac Mtg |
| Mortgage Code | Conventional | | Conventional |

**FORECLOSURE HISTORY**

| Document Type | Notice Of Sale | Notice Of Sale | Notice Of Sale | Notice Of Default | Notice Of Sale |
|---|---|---|---|---|---|
| Default Date | | | | 12/27/2024 | |
| Foreclosure Filing Date | | | | 12/27/2024 | |
| Recording Date | 03/25/2025 | 02/19/2025 | 01/14/2025 | 12/31/2024 | 12/14/2024 |
| Document Number | | | | 932726 | |
| Default Amount | | | | $654,023 | |
| Final Judgment Amount | | | | | |
| Original Doc Date | | | | 10/30/2023 | |
| Original Document Number | | | | 741554 | |

| Document Type | Notice Of Trustee's Sale | Notice Of Default | Release Of Lis Pendens/Notice | Notice Of Sale | Notice Of Trustee's Sale |
|---|---|---|---|---|---|
| Default Date | | 09/06/2024 | | | |
| Foreclosure Filing Date | 12/11/2024 | 09/06/2024 | | | 05/18/2021 |
| Recording Date | 12/12/2024 | 09/09/2024 | 06/24/2021 | 06/19/2021 | 05/20/2021 |
| Document Number | 879022 | 607022 | 990887 | | 808521 |
| Default Amount | | $186,414 | | | |
| Final Judgment Amount | $2,470,634 | | | | $2,399,805 |
| Original Doc Date | 12/24/2019 | 12/24/2019 | 01/07/2021 | | 12/24/2019 |
| Original Document Number | 1440188 | 1440188 | 28654 | | 1440188 |

| Document Type | | | Notice Of Default | | |
|---|---|---|---|---|---|
| Default Date | | | 01/05/2021 | | |
| Foreclosure Filing Date | | | 01/05/2021 | | |
| Recording Date | | | 01/07/2021 | | |
| Document Number | | | 28654 | | |
| Default Amount | | | $140,840 | | |
| Final Judgment Amount | | | | | |
| Original Doc Date | | | 12/24/2019 | | |
| Original Document Number | | | 1440188 | | |

**Property Details** Courtesy of PETER B BURNESS, COMBINED LA - WESTSIDE MLS - CLAW

The data within this report is compiled by CoreLogic from public and private sources. The data is deemed reliable, but is not guaranteed. The accuracy of the data contained herein can be independently verified by the recipient of this report with the applicable county or municipality.

Generated on: 04/21/25
Page 3/4



### CoreLogic Public Records – Page 4



PROPERTY MAP

*Lot Dimensions are Estimated

Property Details  Courtesy of PETER B INJAYEDS, COMBINED L.A. - WESTSIDE MLS - CLAW

The data within this report is compiled by CoreLogic from public and private sources. The data is deemed reliable, but is not guaranteed. The accuracy of the data contained herein can be independently verified by the recipient of this report with the applicable county or municipality.

Generated on: 04/21/25

Page 4/4



Business, Consumer Services & Housing Agency
## BUREAU OF REAL ESTATE APPRAISERS
## REAL ESTATE APPRAISER LICENSE

### Peter B. Burness

has successfully met the requirements for a license as a residential real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified Residential Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:    AR 028342

Effective Date:    September 26, 2023
Date Expires:    September 25, 2025

Angela Jemmott, Bureau Chief, BREA

3072766

**Errors & Omissions Insurance Policy Declarations Page**



GREAT**AMERICAN**
INSURANCE GROUP

301 E. Fourth Street, Cincinnati, OH 45202

**DECLARATIONS**
for
**REAL ESTATE APPRAISERS**
**ERRORS & OMISSIONS INSURANCE POLICY**

**THIS IS BOTH A CLAIMS MADE AND REPORTED INSURANCE POLICY.**

**THIS POLICY APPLIES TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD.**

Insurance is afforded by the company indicated below. (A capital stock corporation)

☒  Great American Assurance Company

Note: The Insurance Company selected above shall hereafter be referred to as the **Company**.

| Policy Number | RAP3669123-25 | Renewal of | RAP3669123-24 |

Program Administrator:      **Herbert H. Landy Insurance Agency Inc.**
**100 River Ridge Drive, Suite 301  Norwood, MA 02062**

---

Item 1. **Named Insured**      Peter B Burness

Item 2. **Address**      31701 Bainbrook Ct

City, State, Zip Code:      Westlake Village, CA 91361

Item 3. **Policy Period**  From:    **03/12/2025**    To    **03/12/2026**
(Month, Day, Year)    (Month, Day, Year)
Both days at 12:01 a.m. Standard Time at the address of the **Named Insured** as stated in Item 2.

Item 4. **Limits of Liability**

A  $   **1,000,000**    Damages Limit of Liability – Each Claim

B  $   **1,000,000**    Claim Expenses Limit of Liability – Each Claim

C  $   **2,000,000**    Damages Limit of Liability – Policy Aggregate

D  $   **2,000,000**    Claim Expenses Limit of Liability – Policy Aggregate

Item 5. **Deductible** (Inclusive of Claim Expenses):

A  $   **500**    Each Claim

B  $   **1,000**    Aggregate

Item 6. **Premium** $    **967.00**

Item 7. **Retroactive Date** (if applicable):    03/12/2003

Item 8. **Forms, Notices and Endorsements attached**
D42100 (03/15)  D42300 CA (10/13)  IL7324 (07/21)
D42402 (05/13)  D42412 (03/17)  D42413 (06/17)  D42414 (08/19)

Authorized Representative

Printed 04/25

Page 1 of 1

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**9454 Wilshire Boulevard, 6th floor**
**Beverly Hills, CA 90212**

A true and correct copy of the foregoing document entitled (*specify*): __**RESPONSE TO MOTION REGARDING THE AUTOMATIC STAY**
**AND DECLARATION(S) IN SUPPORT**__ will be served or was served **(a)** on the judge in chambers in the form and manner required by
LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR,
the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) __**7/1/2025**__, I checked the
CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail
Notice List to receive NEF transmission at the email addresses stated below:

Debtor's Counsel: Michael Jay Berger    michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com,michael.berger@ecf.inforuptcy.com

U.S. Trustee: Dare Law    dare.law@usdoj.gov

Capital One Auto: Amitkumar Sharma    amit.sharma@aisinfo.com

United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

Counsel for Finance California: Bruce G Landau    bruce@landauandlandau.com

Counsel for U.S. Bank National Trust, Shannon A Doyle    sdoyle@ghidottiberger.com, bknotifications@ghidottiberger.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On (*date*) _____, I served the following persons and/or entities at the last known addresses
in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be
completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person**
**or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by
personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or
email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be
completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| _7/1/2025_ | Yathida Nipha | /s/Yathida Nipha |
| Date | Printed Name | Signature |

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 4                        **F 4001-1.RFS.RESPONSE**